UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

FILED

NOV 21 2006

Deputy Clerk, U.S. District Court
Middle District of Louisiana
Baton Rouge, La.

OCCIDENTAL CHEMICAL CORP., §
§
Plaintiff, §
§
v. §
§
LOUISIANA PUBLIC SERVICE §
COMMISSION, JACK A. ("JAY") §
BLOSSMAN, JR., JAMES M. FIELD, §
LAMBERT C. BOISSIERE, III, C. §    CIVIL ACTION NO. 06-894-JJB-DLD
DALE SITTIG, FOSTER L. §
CAMPBELL, in their official capacities §
as Commissioners of the Louisiana §
Public Service Commission, AND §
ENTERGY LOUISIANA LLC, §
FORMERLY KNOWN AS ENTERGY §
LOUISIANA, INC., §
§
Defendants. §

## ORIGINAL COMPLAINT

Occidental Chemical Corp. ("Occidental") files its Original Complaint as follows:

## SUMMARY OF COMPLAINT

1. On August 15, 2006, the Louisiana Public Service Commission ("LPSC")
issued an order (the "LPSC Order" or "Order")[1] approving an avoided cost methodology that
violates the Public Utility Regulatory Policies Act of 1978 ("PURPA") and the Federal Energy
Regulatory Commission's ("FERC" or "Commission") regulations thereunder. The LPSC Order
guarantees qualifying facilities ("QFs") making sales to Entergy Louisiana LLC, formerly known
as Entergy Louisiana, Inc. ("Entergy Louisiana"), of "as-available energy" will never receive a
rate of payment equal to Entergy Louisiana's "incremental costs . . . of electric energy . . . which,

---

[1] See Exhibit 1, The August 15, 2006 LPSC Order.

ORIGINAL COMPLAINT

JSL (e) Summons issued 11/21/06          AU1 46608v6

but for the purchase from the [QFs], [Entergy Louisiana] would generate itself or purchase from another source."[2]  Such a result violates PURPA.  Moreover, the LPSC's failure to implement PURPA is demonstrated by the broad scope of entities to whom the LPSC's Order applies; i.e., it is not limited to Occidental, but instead applies to all QFs "putting" energy to Entergy Louisiana, is binding on present and future QF suppliers (even those not now in existence) who "put" energy to Entergy Louisiana, and provides a clear statement of policy by the LPSC that avoided cost may be calculated by other utilities within Louisiana using a methodology that violates PURPA.  In short, and as demonstrated throughout this Complaint, the LPSC's Order effectively rewrites the LPSC's rules implementing PURPA's requirements.  Because these changes violate PURPA, the LPSC Order conflicts with and undermines federal law (i.e., PURPA) and the nationwide energy policy developed by Congress and regulated by FERC.  As a result, the LPSC Order constitutes a failure to implement Section 210 of PURPA and FERC's implementing regulations as required by Section 210(f) of PURPA.

     2.     The LPSC Order violates PURPA and the Commissions' regulations because it:

- Fails to implement 18 C.F.R. § 292.101(b)(6), which sets forth the meaning of "avoided cost";

- Fails to implement 18 C.F.R. § 292.304(a)(1), requiring that rates for purchases of electricity from QFs be just and reasonable;

- Fails to implement 18 C.F.R. § 292.304(b), requiring that the rate for purchases be equal to the purchasing utility's avoided costs;

---

[2] 18 C.F.R. § 292.101(b)(6) (2006).

- Fails to implement 18 C.F.R. § 292.304(d), giving QFs the right to provide energy on an "as-available" basis and to receive a rate for such energy based on the purchasing utility's avoided costs calculated at the time of delivery;

- Fails to implement 18 C.F.R. § 292.304(e), which sets forth the factors affecting rates for purchases from QFs;

- Fails to implement 18 C.F.R. § 292.304(f), concerning suspension of purchases from QFs during periods in which, due to operational circumstances, purchases from QFs would result in costs greater than those which the purchasing utility would incur if it did not make such purchases, but instead generated an equivalent amount of energy itself;

- Fails to implement 18 C.F.R. § 292.307, concerning discontinuance of purchases from QFs during system emergencies; and

- Fails to implement 18 C.F.R. § 292.302, regarding the availability of electric utility system cost data from which avoided costs may be derived.

3. Specifically, among other things, the following elements of the LPSC Order's avoided cost methodology violate PURPA:

- The LPSC Order's Use of "Rejected Purchases"[3] Violates PURPA;

- The LPSC Order's Use of "Double-Counting" Violates PURPA;

- The LPSC Order's Use of a 75% "Rejected Purchases" Cap Violates PURPA;

- The LPSC Order's Use of "Emergency Sales" Violates PURPA;

---

[3] "Rejected Purchases" are offers Entergy purports to receive to sell economy energy and "rejects" based upon its forecasted purchases of QF energy in a given hour. Ex. 1, LPSC Order at 3. However, as explained below, the "rejected purchases" used by Entergy to determine the avoided cost amount are illusory and violate PURPA because these purported purchase proxies are made without reference to a transmission screen, or double counting, and contain other flaws discussed below.

<u>Original Complaint</u>

3

- The LPSC Order's Failure to Require Entergy Louisiana to Provide QFs With Avoided Cost Data Violates PURPA; and

- The LPSC Order's Failure to Include Off-System Sales in the Avoided Cost Calculation Violates PURPA.

4.     On July 12, 2002, Occidental and Entergy Louisiana executed a contract under which Entergy Louisiana purchases electricity from Occidental. *See* Exhibit 2, Agreement for Purchased Power from Qualified Cogeneration Facility between Occidental Chemical Corporation and Entergy Louisiana, Inc (the "QF Contract"). The QF Contract requires Entergy Louisiana to pay Occidental at a rate equal to Entergy Louisiana's full "Avoided Cost," "as set forth in the LPSC General Order of February 27, 1998, and the Regulations adopted thereby or attached thereto." Ex. 2, Article 1 Definitions. Because the LPSC Order's avoided cost methodology understates Entergy Louisiana's avoided cost, Entergy Louisiana is in breach of its contract with Occidental.

5.     Through this lawsuit, Occidental seeks an order: (1) requiring the LPSC to properly implement PURPA and FERC's regulations thereunder; (2) prohibiting the LPSC and its Commissioners from enforcing the Order; (3) requiring Entergy Louisiana to pay Occidental the avoided cost amount it agreed to pay under the QF Contract per the LPSC's 1998 General Order[4] (i.e., the amount Entergy Louisiana would have paid Occidental under the avoided cost methodology approved by the LPSC in its 1998 General Order for all energy sold to Entergy Louisiana under the QF Contract from October 2003 to present); and (4) awarding Occidental its attorneys' fees and other costs incurred to prosecute this lawsuit.

---

[4] In re: Generic Rulemaking Proceeding Concerning Avoided Costs Estimates, Docket No. U-22739, "General Order" (LPSC Feb 27, 1998) (amends and supersedes Order No. U-14964), attached hereto as Exhibit 3.

**PARTIES**

6.      Occidental is a corporation organized and existing under the laws of the State of New York with its principal place of business in Dallas, Texas. Occidental's address is 5005 LBJ Freeway, Dallas, Texas 75244-6119. Occidental is a subsidiary of Occidental Petroleum Corporation, a publicly traded company listed on the New York Stock Exchange. Occidental is engaged in the manufacture of basic chemicals, vinyls and specialty chemicals throughout the United States, including Louisiana.

7.      In Entergy Louisiana's service territory within Louisiana, Occidental owns and operates two chlor-alkali facilities, the Taft and Convent Facilities.[5] At the Taft Facility, Occidental has developed a cogeneration facility that is a QF under PURPA.[6] The Taft QF is capable of producing 778 MW of power and is interconnected with Entergy Louisiana under a FERC-jurisdictional interconnection agreement and generator imbalance agreement. After supplying the electric and steam requirements of the Taft chlor-alkali plant, the Taft QF has approximately 500 MW of generating capacity available for sale.[7] The Taft QF began commercial operations on December 17, 2002.

8.      The LPSC is an agency of the State of Louisiana required to implement FERC's regulations under PURPA. The LPSC's address is Galvez Building, 12th Floor, 602 North Fifth Street, P.O. Box 91154, Baton Rouge, LA 70821-9154.

---

[5] As a result of Occidental's purchase of Vulcan Chemical in June 2005, Occidental owns (through a wholly owned subsidiary, Basic Chemical LLC) a cogeneration plant at its Geismar, Louisiana, chemical plant; however, this generation plant is inoperable and therefore has no electrical output available for sale into the wholesale markets.

[6] *Occidental Chem. Corp.*, Docket No. QF00-64-000, "Notice of Self-Certification as a Qualifying Cogeneration Facility" (filed June 1, 2000).

[7] Occidental currently sells portions of its generating capacity to Entergy Louisiana under three-year contracts.

9.      Jack A. ("Jay") Blossman, Jr. is the Commissioner for District 1 of the LPSC. He may be served at either of his two offices as Commissioner: 215 St. Ann Drive Suite 3, Mandeville, Louisiana 70471, or 1221 Elmwood Boulevard, Yenni Building, Harahan, Louisiana 70123. Commissioner Blossman is named herein solely in his capacity as a Commissioner.

10.      James M. Field is the Commissioner for District 2 of the LPSC. He may be served at either of his two offices as Commissioner: 617 North Boulevard, Suite B, Baton Rouge, Louisiana 70821, or 1314 Walker Road, Lafayette, Louisiana 70506. Commissioner Field is named herein solely in his capacity as a Commissioner.

11.      Lambert C. Boissiere, III is the Commissioner for District 3 of the LPSC. He may be served at either of his two offices as Commissioner: 1100 Poydras Street, Suite 1020, New Orleans, Louisiana 70163, or Galvez Building, 11th Floor, 602 North Fifth Street, Baton Rouge, Louisiana 70802. Commissioner Boissiere is named herein solely in his capacity as a Commissioner.

12.      C. Dale Sittig is the Commissioner for District 4 of the LPSC. He may be served at any of his three offices as Commissioner: 300 Bobcat Drive, Eunice, Louisiana 70535 or c/o Pineville City Hall, 910 Main Street, Pineville, Louisiana 71360, or 1011 Lakeshore Drive, Suite 201, Lake Charles, Louisiana 70601. Commissioner Sittig is named herein solely in his capacity as a Commissioner.

13.      Foster L. Campbell is the Commissioner for District 5 of the LPSC. He may be served at any of his three offices as Commissioner: One Texas Centre, 415 Texas Street, Suite 100, 71101, Post Office Drawer E, Shreveport, Louisiana 71161 or 124 South Grand

Street, Monroe, Louisiana 71201, or 1001 E.E. Wallace Blvd., Ferriday, Louisiana 71334. Commissioner Campbell is named herein solely in his capacity as a Commissioner.

14.     Entergy Louisiana is a Texas limited liability company authorized to do business in Louisiana with its principal place of business located at 4809 Jefferson Highway, Jefferson, Louisiana 70121. Entergy Louisiana is an electric public utility company operating in Louisiana.

## JURISDICTION

15.     The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337. Occidental's claims arise under the Constitution and laws of the United States, including the Supremacy Clause of the United States Constitution (Art. VI, cl. 2), the Public Utility Regulatory Policies Act of 1978, 16 U.S.C. §§ 824a-3, the Federal Power Act, 16 U.S.C. 796 and 42 U.S.C. § 1983. Declaratory relief is proper pursuant to 28 U.S.C. §§ 2201-2.

16.     This Court has specific jurisdiction over the LPSC and its Commissioners pursuant to § 210(h) of PURPA. More specifically, a party may petition FERC to bring an enforcement action against a state commission, such as the LPSC, requiring proper implementation of PURPA. If, after 60 days, FERC has not initiated an enforcement action, the party may then bring suit in a federal district court, to require a State regulatory authority or nonregulated electric utility to comply with the requirements of § 210(f) of PURPA. 16 U.S.C. § 824a-3(h). Occidental filed an enforcement proceeding with the FERC on September 18, 2006. On November 17, 2006, pursuant to its long standing policy of declining to initiate

enforcement proceedings in these types of matters, the FERC issued an order declining such an action.[8] As a result, the Court has jurisdiction over this matter under § 210(h) of PURPA.

17.     This Court has personal jurisdiction over Entergy Louisiana because it has engaged in substantial and continuous business in the state of Louisiana.  This Court has supplemental jurisdiction over Occidental's state law claims against Entergy Louisiana under 28 U.S.C. §1367 because the claims are so related to the claims against the LPSC that they are part of the same "case or controversy."

## VENUE

18.     Venue in this Court is proper under 28 U.S.C. § 1391(a)(1) and (2) because the LPSC resides in the Middle District of Louisiana and because a substantial part of the events giving rise to this lawsuit occurred in this district.

## FACTUAL BACKGROUND

19.     PURPA Section 210 was enacted to encourage the development of cogeneration facilities and small power production facilities or QFs, and to reduce the demand for fossil fuels.  FERC promulgated rules with respect to utilities' purchases of electricity from these facilities.  PURPA requires each state agency with regulatory authority over electric public utilities to fully and properly implement PURPA's provisions and the associated FERC regulations at the state level.  16 U.S.C. § 824a-3(f).  On February 27, 1998, the LPSC issued an order titled "General Order" to implement PURPA.[9]  The General Order, *inter alia*, requires utilities subject to the jurisdiction of the LPSC to purchase all energy and capacity made

---

[8] The FERC Notice of Intent Not to Act is attached hereto as Exhibit 4.

[9] The LPSC's February 27, 1998 General Order amended and superseded its 1982 General Order (LPSC docket No. U-14964), which initially implemented PURPA.

available by QFs at prices equal to the purchasing utility's "avoided cost." The General Order defines "avoided cost" as "the incremental costs to an electric utility of electric energy or capacity or both which, but for the purchase from the qualifying facility or qualifying facilities, such utility would generate itself or purchase from another source."[10] This definition is exactly the same as FERC's definition.

20.     The General Order requires a purchasing utility to determine its avoided cost for as-available QF energy on an hourly basis using an economic dispatch model that calculates the difference between the cost of energy actually furnished by the utility system (assuming zero cost for QF power) and the cost the utility system would have been required to incur absent the presence of QF power.[11]

21.     On July 25, 2003, Entergy Louisiana sent a letter to the LPSC proposing to modify Entergy Louisiana's then-existing avoided cost methodology. On August 13, 2003, the LPSC, through its Commissioners, Jack A. ("Jay") Blossman, Jr., James M. Field, Irma Dixon,[12] C. Dale Sittig, and Foster L. Campbell (collectively, along with Lambert C. Boissiere, III, the "Commissioners"), initiated a docket to investigate the reasonableness of Entergy Louisiana's proposed changes to its avoided cost methodology. On September 30, 2003, the LPSC Staff issued a recommendation that Entergy Louisiana be allowed to implement, on an interim basis, certain of its proposed changes.

---

[10] Ex. 3, General Order § 101(b)(6).

[11] Ex. 3, General Order § 204(g).

[12] Ms. Dixon has since been replaced as Commissioner by Lambert C. Boissiere, III.

**ORIGINAL COMPLAINT**

AU1 46608v6

22. In an Interim Order issued on October 16, 2003,[13] without a hearing or antecedent reasonableness review, the LPSC authorized Entergy Louisiana to modify its avoided cost methodology on an interim basis. However, the LPSC further ordered that "a full investigation be undertaken to analyze whether it is in the public interest, and consistent with our 1998 General Order and PURPA, to permit Entergy Louisiana to implement its proposed changes on a permanent basis."[14]

23. Despite the fact that Entergy Louisiana's proposed methodology failed to comply with the definition of "avoided costs" in PURPA and the General Order, on June 27, 2006, an LPSC Administrative Law Judge ("ALJ") issued a Recommendation on Contested Proposed Stipulated Settlement ("ALJ Recommendation") finding that the Contested Settlement[15] was in compliance with PURPA and the General Order and recommending that the Contested Settlement be adopted.[16] The ALJ Recommendation was adopted in full by the LPSC in its August 15, 2006, order (*i.e.*, the LPSC Order).[17] The LPSC Order is a final order.

24. On September 18, 2006, Occidental filed a Petition for Enforcement Pursuant to Section 210(h) of PURPA before FERC. Under 16 U.S.C. § 824a-3(h)(2)(B), if FERC does not take action with sixty (60) days of the date on which the Petition was filed, a party may bring a lawsuit in a federal district court. Since more than sixty (60) days have passed

---

[13] *Entergy Avoided Cost Proceeding*, Order No. U-27469-A (L.P.S.C. Oct. 16, 2003) ("Interim Order"), attached hereto as Exhibit 5.

[14] Ex. 5, LPSC Order No. U-27469-A, at 3; Ex. 1, LPSC Order at 3.

[15] A contested settlement was reached regarding Entergy Louisiana's new avoided cost methodology as set forth in its July 25, 2003 letter to the LPSC, with slight modifications. Occidental opposed the settlement and a hearing on the settlement was held before an ALJ.

[16] *Entergy Avoided Cost Proceeding*, "Recommendation on Contested Proposed Stipulated Settlement" (L.P.S.C. June 27, 2006), attached to Exhibit 1, LPSC Order at Exhibit 2.

[17] Ex. 1, LPSC Order at 1, 5.

**ORIGINAL COMPLAINT**

AU1 46608v6

since September 18, 2006 and FERC has notified the parties of its intention not to act, Occidental has the power to bring this lawsuit at this time.

## I.  THE LPSC ORDER'S AVOIDED COST METHODOLOGY VIOLATES PURPA

25.     In enacting PURPA, and specifically Section 210 of PURPA, Congress intended to encourage the development of non-utility generation utilizing cogeneration and small power production, thereby conserving use of fossil fuels.[18]  "'Congress believed that increased use of cogeneration and small power production would reduce the demand for traditional fossil fuels, and it recognized that electric utilities had traditionally been 'reluctant to purchase power from, and to sell power to, the nontraditional facilities.'"[19]  Accordingly, Congress directed FERC to prescribe rules requiring electric utilities to purchase power from QFs at the electric utility's avoided cost rate.[20]  The LPSC's approval of Entergy Louisiana's methodology provides an example of the LPSC's failure to properly implement PURPA because the LPSC's Order impermissibly rewrites the rules regarding calculation of "avoided costs" by failing to implement the definition of "avoided costs" as contained in PURPA.

26.     FERC's PURPA regulations define "avoided cost" by reference to energy either purchased or generated by a utility if not for the QF purchase:

"Avoided costs" means the incremental costs to an electric utility of electric energy or capacity or both which, but for the purchase

---

[18] *American Paper Institute, Inc. v. American Electric Power Service Corp.,*, 461 U.S. 402, 405, 103 S.Ct. 1921, 76 L.Ed.2d 22 (1983).  *See also Middle S. Servs., Inc.*, 15 FERC ¶ 61,302 at 61,662 (1981) ("Section 210 of PURPA was intended by Congress to encourage cogeneration"); *FERC v. Miss.*, 456 U.S. 742, 750 (1982).

[19] *American Paper*, 461 U.S. at 405 (citing *FERC v. Miss.*, 456 U.S. 742, 750 (1982)); *Sithe Energies, Inc.,* 105 FERC ¶ 61,240 at P 2 (2003) ("In passing PURPA, Congress identified two major obstacles that had served in the past to stifle non-utility powerplant development:  (1) the reluctance of traditional electric utilities to purchase power from and sell power to non-traditional utilities; and (2) the substantial burdens of pervasive federal and state regulation.  Congress in PURPA sought to remove these obstacles.").

[20] *See American Paper*, 461 U.S. at 406 (under PURPA QFs are entitled to a rate equal to the purchasing utility's "full avoided cost").

from the qualifying facility or qualifying facilities, such utility
would generate itself or purchase from another source.

18 C.F.R. § 292.101(b)(6). As FERC has explained, "in order to maximize the incentives for

QFs, [FERC] sets the price for purchases from QFs, absent negotiations, at the statutory ceiling.

Thus, the avoided cost rate is neither more nor less than the price the utility would have paid for

comparable power from other sources, including wholesale sources."[21]

27.     As FERC has previously noted, the "avoided cost" definition satisfies the

ratepayer protection provisions of Section 210 of PURPA as well:

> Under section 210 of PURPA, an electric utility's ratepayers are
> intended to be at least indifferent, in terms of the rates they pay, as
> to the source of power. In other words, the ratepayer is not to pay
> any more for power because the utility has purchased power from a
> QF rather than generating the power itself or purchasing power
> from another wholesale source. This is the purpose underlying the
> incremental cost ceiling on the rates utilities have to offer to
> purchase QF power.[22]

28.     The LPSC Order's avoided cost methodology, however, violates PURPA

and FERC's regulations and directives in a number of critical respects, each of which will be

discussed in turn below. Moreover, the LPSC's failure to implement PURPA is demonstrated by

the broad scope of entities to whom the LPSC's Order applies; i.e., it is not limited to Occidental,

but instead applies to all QFs "putting" energy to Entergy Louisiana, is binding on present and

future QF suppliers (even those not now in existence) who "put" energy to Entergy Louisiana,

---

[21] *See Administrative Determination of Full Avoided Costs, Sales of Power to Qualifying Facilities, and Interconnection Facilities,* 53 Fed. Reg. 9331 (Mar. 22, 1988), 55 Fed. Reg. 31,882 (Aug. 22, 1988), FERC Stats. & Regs. ¶ 32,457 at 32,158 (1988) ("ADFAC NOPR"), *terminated,* 84 FERC ¶ 61,265 (1998). *See also American Paper,* 461 U.S. at 406 (under PURPA QFs are entitled to a rate equal to the purchasing utility's "full avoided cost").

[22] ADFAC NOPR, FERC Stats. & Regs. at 32,158; *see also American Paper,* 461 U.S. at 406 (approving PURPA's definition of avoided cost).

and provides a clear statement of policy by the LPSC that avoided cost may be calculated by other utilities within Louisiana using a methodology that violates PURPA.

### 1. The LPSC Order's Use of Rejected Purchases Violates PURPA.

29.     The LPSC Order allows up to 75% of Entergy Louisiana's avoided cost to be calculated by using Entergy Louisiana's "Rejected Purchases."   As previously stated, "Rejected Purchases" are offers Entergy Louisiana receives to sell economy energy and "rejects" based upon its forecasted purchases of QF energy in a given hour.[23]  The methodology considers "next day" and "current day" Rejected Purchases.   The criteria Entergy Louisiana uses to identify Rejected Purchases for inclusion in the avoided cost calculation are the price of the offer and whether the offer is "valid," meaning whether it includes the "identity of the seller, price, quantity, start time, and duration, and whether the counterparty is on the list of approved counterparties for the Entergy Louisiana System."[24]

30.     Entergy Louisiana's motive in proposing to change the avoided cost methodology to include "Rejected Purchases" was not to improve the accuracy of the avoided cost methodology, but to discourage QFs from delivering energy to Entergy Louisiana by paying QFs less than avoided cost.  For example, an internal Entergy Louisiana e-mail from Mr. Alan B. Ralston dated December 18, 2001, states that new QFs had interconnected with Entergy Louisiana's system and, that the increased QF put

> is a very substantial amount of power and the processes that accommodated the excess QF power when the total was less than 500 MW are not designed to accommodate today's level and will not accommodate the level expected in the next year or so.

---

[23] Ex. 1, LPSC Order at 3.

[24] *Entergy Avoided Cost Proceeding*, "Contested Proposed Stipulated Settlement Term Sheet" at p. 5, attached to Ex. 1, LPSC Order at Exhibit 1.

[T]he only incentive the QF has to reduce the amount of power put to the System is the price it receives for that energy — the lower the price the less energy the QFs may supply. I believe it is time to revise the avoided cost calculation to include as an appropriate avoided cost determinant purchased power offers received, but not executed.[25]

31.     Entergy Louisiana's discriminatory intent to discourage the delivery of energy from QFs is antithetical to PURPA and FERC's PURPA regulations because they are designed to encourage the development of QFs. Entergy Louisiana's proposed reduction of the avoided cost payments to QFs is also directly contrary to controlling United States Supreme Court jurisprudence.[26] Notwithstanding, the LPSC approved Entergy Louisiana's proposal.

32.     It is undisputed that there are transmission constraints within and external to the Entergy Louisiana control area that can and do preclude Entergy Louisiana from procuring a given offer of economy energy that may otherwise be, for the period offered, the lowest-cost offer. Under the LPSC Order, however, the limitations and constraints on the Entergy Louisiana transmission system, and thus on the ability of Entergy Louisiana to accept economy energy purchase alternatives to QF power, are presumed not to exist. The methodology states: "*[n]o transmission limitation will be assumed* for external or internal Avoided Cost Rejected Purchases."[27] Available Transmission Capability ("ATC") screens that ostensibly determine the deliverability of economy energy purchase offers to Entergy Louisiana's system are simply removed. The methodology states: "[f]or purposes of Processing Next Day and Current Day

---

[25] E-mail from Alan B. Ralston, Entergy, to William L. Franklin, *et al.*, Entergy (Dec. 18, 2001, 10:29 AM) ("Ralston E-mail"), attached hereto as Exhibit 6.

[26] *See American Paper, supra.*

[27] *Entergy Avoided Cost Proceeding*, "Contested Proposed Stipulated Settlement Term Sheet" at p. 7, attached to Ex. 1, LPSC Order at Exhibit 1.

Rejected Purchases, any cumulative ATC screens have been removed."[28] Whether Entergy Louisiana would actually have been able to accept any or all of the "valid offers" that are included in the avoided cost calculation as Rejected Purchases is expressly and intentionally not considered.

33.     As a consequence of removing any screens that would eliminate energy offers that are not deliverable due to transmission constraints, and assuming away all transmission limitations, the Rejected Purchases component of the LPSC Order violates PURPA. The "incremental cost of alternative electric energy" is defined in Section 210(d) of PURPA as "the cost to the electric utility of the electric energy which, but for the purchase from such cogenerator or small power producer, such utility would generate or purchase from another source."[29] In *Southern California Edison Co.* ("*SoCalEd*"),[30] the Commission determined the avoided cost calculation must reflect sources of purchased power that are "available" to the utility and that are "able to sell" to the utility: "regardless of whether the State regulatory authority determines avoided cost administratively, through competitive solicitation (bidding), or some combination thereof, it must in its process reflect prices available from *all sources able to sell to the utility whose avoided cost is being determined.*"[31] Sources of energy that cannot be delivered to the purchasing utility are not "sources *able to sell to the utility whose avoided cost is being determined.*" The methodology approved by the LPSC Order allows Entergy Louisiana to include in the avoided cost calculation offers to sell Entergy Louisiana energy without

---

[28] *Id.* at p. 5.

[29] 16 U.S.C. § 824a-3(d).

[30] *Southern California Edison Co.*, 70 FERC ¶ 61,675 (1995).

[31] *SoCalEd*, 70 FERC at 61,677 (emphasis added).

consideration of a fundamental criterion — whether transmission is available to support the offer to sell such that the source of energy was "able to sell" the energy offered.

34. Moreover, FERC requires that the avoided cost rate be "reasonably verifiable" and an "objective standard" be used for determining payments to a QF because it reflects payments that would have been made to the sources of power that were displaced *by the QF*, that is, the costs avoided by purchasing QF power. Without determining whether transmission capacity was available to consummate a Rejected Purchase, the requirement that the avoided cost rate be "reasonably verifiable and objective" cannot be met. A methodology for determining avoided cost that ignores transmission constraints violates PURPA.

**2. The LPSC Order's Use of "Double-Counting" Violates PURPA**

35. It is common practice for market participants to offer the same energy out of the same generating resource to the same buyer, albeit at different prices and at different times, in an effort to increase the "flexibility" of their products. Under the Rejected Purchases component of LPSC Order, multiple offers of the same energy are included in the calculation of Entergy Louisiana's avoided cost without regard for "double-counting."

36. Double-counting offers can have a significant impact on the avoided cost calculation. For example, assume that Entergy Louisiana projects that it will receive "PURPA Put" of 1,334 MWh of QF energy during a given hour of the following day. Seventy-five percent of the projected "PURPA Put" is approximately 1,000 MWh for that one hour. Further assume (regardless of the inability to determine deliverability) that Company A offers the same 500 MW of economy energy from the *same capacity source* to Entergy Louisiana through two day-ahead block purchase offers, the first priced at $21.00/MWh and the second at $20.00/MWh. In other words, after Company A's offer to sell 500 MW of economy energy for $21.00/MWh

was rejected by Entergy Louisiana, it subsequently offered to sell Entergy Louisiana the same capacity at $20.00/MWh. Also, assume Company B makes the next day-ahead block offer to Entergy Louisiana of 500 MW at $27.00/MWh. If reality were the determinant of what is included in "Rejected Purchases," only the first offer from Company A would be counted. The remaining 500 MW of "Rejected Purchases" for this hour's avoided cost would be priced at the offer from Company B, resulting in an avoided cost of $24.00/MWh.[32] But, in this example, under the LPSC Order all 1,000 MWh (*i.e.*, 75% of the PURPA Put amount) will be priced on the two offers from Company A, one of which could not have been delivered to Entergy Louisiana, resulting in a substantially lower avoided cost of $20.50/MWh.[33] In this example, the double counting resulted in an avoided cost that was understated by $3.50/MWh. If a QF put 300 MWh to Entergy Louisiana in the hour in the example, the QF would receive $1,050.00[34] less than it should have received for the energy it delivered in that hour.

37.     The LPSC Order permits this "double-counting."[35] Any methodology that sets the avoided cost rate based on costs that are not avoidable is, by definition, contrary to PURPA. Under PURPA, QFs may not be paid at a rate below Entergy Louisiana's full avoided cost simply because the LPSC has chosen to approve a methodology that sets the avoided cost rate based on offers that Entergy Louisiana could not have consummated due to double counting.

---

[32] ($21.00/MWh X 500 MW = $10,500.00; $27.00/MWh X 500 MW = $13,500.00; $10,500.00 + $13,500.00 = $24,000.00; $24,000.00 ÷ 1,000 MWh = $24.00/MWh).

[33] ($21.00/MWh X 500 MW = $10,500.00; $20.00/MWh X 500 MW = $10,000.00; $10,500.00 + $10,000.00 = $20,500.00; $20,500.00 ÷ 1,000 MWh = $20.50/MWh).

[34] (300 MWh X $3.50/WMh = $1,050.00).

[35] Ex. 1, LPSC Order at 4-5.

ORIGINAL COMPLAINT

AU1 46608v6

### 3.    The LPSC Order's Use of a 75% "Rejected Purchases" Cap Violates PURPA

38.    PURPA requires that the avoided cost rate must be based on the cost to the utility of the electric energy which, but for the purchase from the QF, such utility would have generated itself or purchased from another source.[36]  The methodology approved by the LPSC Order does not conform to PURPA because it imposes an arbitrary, artificial cap (75%) that has no relationship to whether Entergy Louisiana would have generated energy itself or purchased it from another source.

39.    Further, Entergy Louisiana rejects purchases for reasons other than QF put, including errors in its estimation of weather conditions and load decreases.  Under PURPA, only energy that would have been purchased in the absence of QF put to the utility may be considered in calculating avoided cost.  However, the methodology approved by the LPSC Order allows Entergy Louisiana to include purchases that were rejected for reasons that have nothing to do with QFs and are entirely out of the QF's control, such as Entergy Louisiana's misprediction of weather.

### 4.    The LPSC Order's Use of "Emergency Sales" Violates PURPA

40.    The LPSC Order approves a methodology that provides, in the event Entergy Louisiana is forced to sell power in the wholesale power market (typically at a loss) as a result of low demand conditions combined with the presence of QF energy on its system, the avoided cost rate will be based in part, on the sales price of these so-called "Emergency Sales."[37]  This aspect of the methodology violates the avoided cost requirements of PURPA and FERC's

---

[36] 16 U.S.C. § 824a-3(d); 18 C.F.R. § 292.101(b)(6).

[37] *See* Ex. 1, LPSC Order, at 1.

<u>ORIGINAL COMPLAINT</u>

AU1 46608v6

regulations. In addition, it violates the requirements of FERC's regulations addressing circumstances in which purchases from QFs are not required.

41. Entergy Louisiana's Emergency Sales have nothing to do with its avoided *costs*. First, if Entergy Louisiana is generating the energy that it is forced to sell into the wholesale power market, it is obviously not avoiding the cost of such generation. Second, the *price* at which Entergy Louisiana chooses to sell this energy has nothing to do with the *cost* of producing the energy. "Price" and "cost" are distinct concepts. Nothing in PURPA or the FERC regulations permits a utility to pay a QF for its energy based on a sales price the utility obtains for its power. Entergy Louisiana decides the price at which it chooses to sell energy for Emergency Sales. As a consequence, it can manipulate the avoided cost rate by setting the price arbitrarily low and (as has, in fact, been the case) selling the energy at a loss.[38] A methodology which permits this type of manipulation of the avoided cost rate is unlawful under PURPA.

42. PURPA and the FERC regulations provide utilities with a mechanism for dealing with low demand events during which QFs are delivering energy to the utility. By ignoring the mechanism set forth in federal law and calculating the avoided cost rate using the price of "Emergency Sales," the LPSC Order violates both 18 C.F.R. §§ 292.304(f)(1) and 292.307(b). Section 292.304(f) provides:

> (1) Any electric utility which gives notice pursuant to paragraph (f)(2) of this section will not be required to purchase electric energy or capacity during any period during which, due to operational circumstances, purchases from qualifying facilities will result in costs greater than those which the utility would incur if it did not make such purchases, but instead generated an equivalent amount of energy itself.

---

[38] *See id.*; Ex. 6, Ralston E-mail.

(2) Any electric utility seeking to invoke paragraph (f)(1) of this section must notify, in accordance with applicable State law or regulation, each affected qualifying facility in time for the qualifying facility to cease the delivery of energy or capacity to the electric utility.

(3) Any electric utility which fails to comply with the provisions of paragraph (f)(2) of this section will be required to pay the same rate for such purchase of energy or capacity as would be required had the period described in paragraph (f)(1) of this section not occurred.

18 C.F.R. § 292.304(f). This section, sometimes referred to as the "negative avoided cost" provision, spells out in the clearest possible terms the "remedy" when a utility, due to operational circumstances, would incur greater costs by purchasing from QFs than if it did not make such purchases. The regulation does *not* permit the utility simply to continue to make purchases from QFs and then turn around and reduce the avoided cost rate by making "Emergency Sales." The LPSC Order, however, permits this precise result, which on its face is contrary to the requirements of Section 292.304(f)(1) of FERC's regulations.

43.     Furthermore, Section 292.307(b) permits a utility to discontinue QF purchases during a "system emergency:"

During any system emergency, an electric utility may discontinue . . . [p]urchases from a qualifying facility if such purchases would contribute to such emergency . . . ."

18 C.F.R. § 292.307(b). There is nothing in this regulation that permits a utility to change the avoided cost rate to all QFs putting energy to the utility on an "as-available" basis if the utility continues to make purchases from QFs during an "emergency."

44.     The LPSC's position evidences a disregard of the specific criteria in FERC's regulations that during a "system emergency," the utility's authority to discontinue

purchases is specific to purchases from those QFs that "would contribute to such emergency."[39] The LPSC would have all QFs relieve the utility of the regulatory obligation to establish that any individual QF's put was contributing to a system emergency. This is not what FERC's regulations provide. The LPSC Order permits a result wholly at odds with FERC's regulations.

5. **The LPSC Order's Failure to Require Entergy Louisiana to Provide QFs With Avoided Cost Data Violates PURPA.**

45. Section 292.302 of FERC's regulations requires electric utilities to make available data from which avoided costs may be derived. 18 C.F.R. § 292.302. In contrast, the LPSC Order's methodology is a "black box" that does not reveal how the avoided cost calculation is performed. Upon information and belief, the methodology uses a sub-routine of the Entergy Louisiana System's Intra-System Billing ("ISB") computer model. The sub-routine cannot be segregated from the ISB model, therefore, it cannot be, nor is it required to be, provided by Entergy Louisiana to QFs for their understanding of the derivation of avoided costs. Similarly, QFs are not provided with input assumptions or the algorithms required to run the pertinent models from which the avoided cost calculations are derived.[40] Indeed, on information and belief, no one outside of Entergy Louisiana has ever run the model to test Entergy Louisiana's calculation of avoided cost using the data and assumptions which Entergy Louisiana uses.

---

[39] 18 C.F.R. § 292.307(b).

[40] Ex. 1, LPSC Order at 3.

**ORIGINAL COMPLAINT**

21

46.     Section 292.302 of the Commission's PURPA regulations, subsection (b), expressly requires utilities "[t]o make available data from which avoided costs may be derived."[41]  In the preamble to these regulations, the Commission stated:

> As the Commission observed in the Notice of Proposed Rulemaking, in order to be able to evaluate the financial feasibility of a cogeneration or small power production facility, an investor needs to be able to estimate, with reasonable certainty, the expected return on a potential investment before construction of a facility.  This return will be determined in part by the price at which the qualifying facility can sell its electric output.  Under §292.304 of these rules, the rate at which a utility must purchase that output is based on the utility's avoided costs, taking into account the factors set forth in paragraph (e) of that section. *Section 292.302 of these rules is intended by the Commission to assist those needing data from which avoided costs can be derived. It requires electric utilities to make available to cogenerators and small power producers data concerning the present and anticipated future costs of energy and capacity on the utility's system.*[42]

47.     The LPSC Order approved an audit process.  The audit process, however, does not provide for the data inputs, assumptions and algorithms that Entergy Louisiana uses in running the model and calculating avoided costs to be available to QFs.  Pursuant to the LPSC Order, the audit process it approved is an integral component of the process of calculating an avoided cost rate.[43]  As such, the audit process must "accord[] with the [PURPA] and [FERC] regulations."[44]  An avoided cost based on the application of an undisclosed methodology using

---

[41] 18 C.F.R. § 292.302.

[42] *See Small Power Production and Cogeneration Facilities; Regulations Implementing Section 210 of the Public Utility Regulatory Policies Act of 1978*, Order No. 69, 45 Fed. Reg. 12,214 (Feb. 25, 1980), FERC Stats. & Regs. [Regs. Preambles 1977-1981] ¶ 30,128 at 30,868 (1980), ("Order no. 69"), *on reh'g*, 45 Fed. Reg. 33,958 (May 21, 1980), FERC Stats. & Regs. [Regs. Preambles 1977-1981] § 30,160 (1980), *aff'd in part and vacated in part, Am. Elec. Power Serv. Corp. v. FERC*, 675 F.2d 1226 (D.C. Cir. 1982), *rev'd in part, American Paper*, 461 U.S. at 404-05 (1983)(emphasis added).

[43] Ex. 1, LPSC Order at 3-4.

[44] *SoCalEd*, 70 FERC at 61,677.

data and assumptions that the purchasing utility does not provide to QFs — thereby preventing the QFs from being able to verify the integrity of the avoided cost calculation — fails to ensure that QFs are being compensated for their energy at a "full avoided cost" rate.

### 6. The LPSC Order's Failure to Include Off-System Sales in the Avoided Cost Calculation Violates PURPA.

48.     The LPSC Order's avoided cost methodology permits Entergy Louisiana to remove costs associated with off-system sales from the calculation of its avoided cost. This violates PURPA, which requires the avoided cost methodology consider *all* costs which a purchasing utility avoids by making purchases from QFs.

49.     Entergy Louisiana deems the highest production costs on its system (purchases and generation) to be the source of power for its off-system power sales. However, the LPSC Order arbitrarily removes these off-system power sales costs before calculating the avoided cost. The result of this methodology is that the resources that supplied Entergy Louisiana's off-system sales are not included in the group of resources deemed to be displaced by more efficient and lower-cost QFs. Hence, the costs of the sources of power that supply the off-system sales are not included when Entergy Louisiana sets the avoided costs rate. This serves to artificially and substantially reduce the avoided cost rate, contrary to the requirement that QFs are to receive a rate for energy that is equal to the purchasing utility's "full avoided cost."

50.     Under controlling law, a purchasing utility's "avoided incremental cost" must be used in the avoided cost calculation.[45] An avoided cost methodology that arbitrarily deems an entire category of costs as "not avoided" is fundamentally inconsistent with both this

---

[45] Order No. 69, FERC Stats. & Regs. at 30,866.

principle and the definition of avoided cost. PURPA demands that avoided cost be determined by considering the cost of *all* sources of supply that the purchasing utility can avoid, regardless of whether or not such sources of supply would be serving retail load. A cost attributable to an off-system sale is avoided by a QF purchase just as much as a cost attributable to an on-system load and, thus, cannot lawfully be excluded from the avoided cost calculation.[46]

## CAUSES OF ACTION

### COUNT 1

**(Commissioners - Declaratory Judgment and Injunctive Relief)**

51.     Occidental incorporates by reference the allegations set forth above.

52.     An actual controversy has arisen and now exists between Occidental and LPSC and its Commissioners. Occidental contends that its rights under the United States Constitution and federal law have been violated, as more fully set forth above, and further contends that the LPSC Order is unlawful and unenforceable insofar as it violates the rights held by Occidental as an operator of a QF under PURPA. Occidental therefore requests a declaration of its rights as to such matters, as well as further necessary or proper relief, including injunctive relief, pursuant to 28 U.S.C. § 2202.

53.     Specifically, Occidental seeks a declaration that the avoided cost methodology approved in the LPSC Order fails to properly implement PURPA because it results in QFs receiving less than avoided cost for the reasons set forth above. Occidental also seeks an injunction against the LPSC and its Commissioners that prohibits them from enforcing the Order.

---

[46] Moreover, an avoided cost methodology that arbitrarily allocates the highest cost resources to off-system sales and excludes those costs from the avoided cost calculation is flawed because it fails to reflect the fact that the utility, as a supplier of non-firm off-system sales, can *withdraw* the power for *any reason*. In other words, if a QF is delivering energy and ceases to do so, or if anticipated QF deliveries do not materialize, Entergy can "cut" an off-system sale and use the energy that would otherwise supply that sale to serve its retail load in lieu of the QF energy.

16 U.S.C. 824a-3(h)(2)(B)(the district court may issue "injunctive relief or other relief as may be appropriate.")

## COUNT II

### (Federal Preemption/Supremacy Clause)

54.     Occidental incorporates by reference the allegations set forth above.

55.     Occidental operates the Taft cogeneration facility, a qualifying facility under PURPA and thus, is entitled to all the protections of federal law and state law implementing PURPA and the federal regulations thereunder. The failure of the LPSC and its Commissioners to ensure that all utilities in Louisiana pay QFs for energy at a rate equal to their full avoided costs constitutes a past and continuing violation of the Supremacy Clause of the United States Constitution in that, through PURPA, federal law requires that QF facilities be paid at avoided cost for all electricity "put" to a utility by a QF. The LPSC's action constitutes unlawful state regulation of the wholesale sale of electric power in interstate commerce, an area pre-empted by the Federal Power Act, 16 U.S.C. 796.

56.     Because the LPSC Commissioners have ignored PURPA in approving Entergy Louisiana's avoided cost methodology, they have created an unauthorized and extra-statutory avoided cost methodology. The LPSC Order is preempted by federal law because: (1) Congress has occupied the field of the sale of energy and capacity from QFs and the right of the State of Louisiana to regulate QFs is entirely contingent upon compliance with PURPA and FERC's rules and regulations promulgated thereunder; (2) the LPSC Order stands as an obstacle to the accomplishment of the federal objectives underlying PURPA; and (3) the LPSC Order conflicts with federal law.

57.     The doctrine of federal preemption, as dictated by the Supremacy Clause of the United States Constitution, requires Louisiana law and the LPSC to require Entergy Louisiana to purchase power from QFs at a rate equal to Entergy Louisiana's avoided cost as defined under PURPA and FERC's regulations. The LPSC Order deprives Occidental of its rights under PURPA because it allows Entergy Louisiana to pay Occidental an amount less than Entergy Louisiana's avoided cost.

58.     Occidental is entitled to injunctive relief to restrain Defendants from taking an action that directly interferes with Occidental's rights under federal law. Occidental may obtain such relief pursuant to 28 U.S.C. §§ 1331 and 1343, in that its preemption claim arises under federal law regulating commerce. As a result, Occidental is entitled to a declaration that the LPSC Order is null and void in that it is preempted as violative of federal law and an injunction permanently enjoining enforcement of the Order as a contradiction of federal law.

## COUNT III

### (Entergy Louisiana - Suit on Open Account)

59.     Pursuant to the terms of the QF Contract, Entergy Louisiana is obligated to pay Occidental for energy at a rate equal to its avoided cost. Since implementing the LPSC Interim Order in October 2003, Entergy Louisiana has underpaid Occidental and in violation of the terms of the QF Contract. Entergy Louisiana is more than thirty days past due on its obligation to pay Occidental at a rate equal to Entergy Louisiana's avoided cost since the issuance of the LPSC's Interim Order. Demand is hereby made that Entergy Louisiana pay Occidental the amount due and outstanding on this open account. The amount due equal to the difference between Entergy Louisiana's avoided cost and the amount Entergy Louisiana paid to Occidental pursuant to Entergy Louisiana's new methodology since the LPSC issued its Interim

Order in October 2003. At this time, Occidental cannot calculate the exact dollar amount owed due to a lack of access to the data necessary to calculate avoided cost under the LPSC Order and LPSC's General Order; however, the total due is certainly denominated in millions of dollars.

## COUNT IV

### (Entergy Louisiana - Breach of Contract)

60. Occidental incorporates by reference the allegations set forth above.

61. On July 12, 2002, Occidental and Entergy Louisiana entered into the QF Contract. Ex. 2. According to the terms of the QF Contract, Entergy Louisiana agreed to purchase electric energy from Occidental at a rate equal to "the calculated hourly Avoided Costs at the time of delivery to [Entergy Louisiana]." *See* Exhibit 2, Article III.B. "Avoided Costs" are defined "as set forth in the LPSC General Order of Februrary 27, 1998."

62. As described above, the LPSC Order approved a revised avoided cost methodology requested and advocated by Entergy Louisiana that violates PURPA and the definition of Avoided Cost in the LPSC General Order. Since Entergy Louisiana is not currently paying Occidental for energy at a rate equal to its avoided cost, Entergy Louisiana is in breach of its contract with Occidental. Occidental seeks damages in the amount of Entergy Louisiana's underpayment for energy since implementation of the new and improper methodology for calculating avoided cost under the LPSC's Interim Order and continuing in the LPSC Order, along with interest as provided by law.

63. All conditions precedent to recovery by Occidental on a breach of contract claim have been met or waived.

## COUNT V

### (Entergy Louisiana - Breach of the Implied Covenant of Good Faith and Fair Dealing)

64.     Occidental incorporates by reference the allegations set forth above.

65.     "As a general rule, Louisiana recognizes an implied covenant of good faith and fair dealing in every contract." *Clark v. America's Favorite Chicken Co.*, 110 F.3d 295, 296 (5th Cir. 1995); *Brill v. Catfish Shaks of America,* 727 F. Supp. 1035, 1039 (E.D.La.1989); *Bonanza Int'l, Inc. v. Restaurant Management Consultants, Inc.,* 625 F. Supp. 1431, 1445 (E.D.La.1986); *See also*, La. C.C. arts. 1983 and 1759. In this case, Entergy Louisiana breached its duty of good faith and fair dealing to Occidental by intentionally and maliciously formulating a method of calculating avoided cost that systematically understates Entergy Louisiana's avoided cost. Entergy Louisiana also breached its duty of good faith and fair dealing by submitting its incorrect method of calculating avoided cost to the LPSC and requesting approval to implement that method, despite knowledge that the method it advocated be adopted by the LPSC understated Entergy Louisiana's avoided cost. As a result, Entergy Louisiana is liable to Occidental for all damages arising out of Entergy Louisiana's breach of the implied covenant of good faith and fair dealing, incorporated into the QF Contract including, but not limited to, damages equal to the difference between the avoided cost methodology under the LPSC's General Order and the amount Entergy Louisiana has paid Occidental since October 2003 under the LPSC's Interim Order and continuing under the LPSC Order, along with interest as provided by law.

### ATTORNEYS' FEES

66.     Occidental requests an award of attorney's fees in prosecuting its claims pursuant to La. R.S. 9:2781 and La. C.C. art. 1997.

ORIGINAL COMPLAINT

AU1 46608v6

## RELIEF REQUESTED

Occidental requests that the Court:

a. declare that the avoided cost methodology approved in the LPSC Order fails to properly implement PURPA because the Order fails to calculate avoided cost consistent with PURPA;

b. prohibit the LPSC and its Commissioners from enforcing its Order;

c. order Entergy Louisiana to pay Occidental damages in an amount equal to the difference between the avoided cost methodology under the LPSC's 1998 General Order and the amount Entergy Louisiana has paid Occidental since October 2003 under the LPSC's Interim Order and continuing under the LPSC Order, along with interest, based on Occidental's open account claim or, in the alternative, as a result of Entergy Louisiana's breach of contract;

d. award Occidental its attorneys' fees and costs; and

e. award such other and further relief to which Occidental is justly entitled.

Respectfully submitted,

By: _____
　　　Luke F. Piontek
　　　Louisiana State Bar No. 19979
　　　TRIAL ATTORNEY
　　　J. Kenton Parsons
　　　Louisiana State Bar No. 10377
　　　Gayle T. Kellner
　　　Louisiana State Bar No. 20585
　　　Cori M. Blache
　　　Louisiana State Bar No. 27964
Roedel, Parsons, Koch, Blache,
Balhoff & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, LA 70809
Telephone: (225) 929-7033
Facsimile: (225) 928-4925

Mike Stenglein
Texas State Bar No. 00791729
Ryan H. Downton
Texas State Bar No. 24036500
DEWEY BALLANTINE LLP
401 Congress Ave., Suite 3200
Austin, Texas 78701
Telephone: (512) 226-0300
Facsimile: (512) 226-0333

Earle O'Donnell
Washington DC Bar No. 919489
Zori Ferkin
Washington DC Bar No. 358226
Daniel Hagan
Washington DC Bar No. 482196
DEWEY BALLANTINE LLP
1775 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone: (202) 862-1000
Facsimile: (202) 862-1093

**ATTORNEYS FOR OCCIDENTAL
CHEMICAL CORP.**

OCCIDENTAL CHEMICAL CORP.,　　§
　　　　　　　　　　　　　　　　§
　　　　　Plaintiff,　　　　　　§
　　　　　　　　　　　　　　　　§
v.　　　　　　　　　　　　　　　§
　　　　　　　　　　　　　　　　§
LOUISIANA  PUBLIC  SERVICE　§
COMMISSION, JACK A. ("JAY")　§
BLOSSMAN,  JR.,  JAMES  M.　§
FIELD, LAMBERT C. BOISSIERE,　§
III, C. DALE SITTIG, FOSTER L.　§
CAMPBELL,  in  their  official　§　　　　CIVIL ACTION NO. _____
capacities as Commissioners of the　§
Louisiana　　Public　　Service　§
Commission,  AND  ENTERGY　§
LOUISIANA  LLC,  FORMERLY　§
KNOWN　　AS　　ENTERGY　§
LOUISIANA, INC.,　　　　　　　§
　　　　　　　　　　　　　　　　§
　　　　　Defendants.

## <u>CERTIFICATE OF SERVICE</u>

I, Luke F. Piontek, hereby certify, declare and state under penalty of law

as follows:

1.　　　I am a partner in the law firm of Roedel, Parsons, Koch, Blache,

Balhoff & McCollister, A Law Corporation, counsel to the plaintiff in this action,

Occidental Chemical Corp.  I make this declaration of my own personal knowledge.

2.　　　A copy of all pleadings, and other papers filed in this action, have

been provided to the Louisiana Public Service Commission, via U.S. Mail properly

addressed and postage prepaid, simultaneously with the filing of such pleadings and other

papers with this Court.

3.    A copy of all pleadings, and other papers filed in this action, have been provided to the Commissioners of the Louisiana Public Service Commission, Jack A. "Jay" Blossman, James M. Field, Lambert C. Boissiere, III, C. Dale Sittig, and Foster L. Campbell, via U.S. Mail properly addressed and postage prepaid, simultaneously with the filing of such pleadings and other papers with this Court.

4.    A copy of all pleadings, and other papers filed in this action, have been provided to Entergy Louisiana, LLC, via U.S. Mail properly addressed and postage prepaid, simultaneously with the filing of such pleadings and other papers with this Court.

5.    The above and foregoing is true and correct.


Baton Rouge, Louisiana, this 21st day of November, 2006.


_____
Luke F. Piontek
Louisiana State Bar No. 19979

**Roedel, Parsons, Koch, Blache,**
**Balhoff & McCollister**
8440 Jefferson Highway, Suite 301
Baton Rouge, LA  70809
Telephone:  (225) 929-7033
Facsimile:  (225) 928-4925

# LOUISIANA PUBLIC SERVICE COMMISSION

### ORDER NO. U-27469-B
### (CORRECTED)[1]

## LOUISIANA PUBLIC SERVICE COMMISSION
## EX PARTE

**Docket No. U-27469 In re: Examination into whether Entergy Gulf States, Inc. and Entergy Louisiana, Inc.'s proposed new "avoided cost" calculation methodology is proper and allowable under Commission General Order dated February 27, 1998.**

(Decided at Open Session held July 12, 2006)

## I.    INTRODUCTION

This matter is before the Commission in connection with a Contested Proposed Stipulated Settlement ("Contested Settlement") being sponsored by the Louisiana Public Service Commission Staff ("Commission Staff") and Entergy Louisiana, LLC ("ELL") and Entergy Gulf States, Inc. ("EGSI") (collectively, "Entergy"). It is supported, or not opposed, by all Intervenors in this docket except Calpine Central, LP ("Calpine") and Occidental Chemical Corp., ("Occidental") (collectively known as "Calpine/OCC").

Entergy sent a letter to the Commission on July 25, 2003, proposing to use a new methodology to calculate avoided costs and requesting that it be allowed to implement that methodology on September 1, 2003. Entergy asserted that its avoided cost methodology no longer accurately reflected its avoided cost during off-peak periods, and stated that certain modifications were necessary to reflect market conditions during off-peak hours. Entergy proposed changing its existing avoided cost methodology to include energy prices reflected in offers that are "rejected" as a result of Entergy's purchases of Qualified Facility ("QF") power and costs associated with "emergency sales" of energy that Entergy makes as a result of excess QF supplies.

The Commission issued Order No. U-27469-A on October 8, 2003.    In this Interim Order, the Commission authorized Entergy to modify its avoided cost calculation on an interim basis to reflect the "cost of purchases from other sources." It was also ordered:

> That a full investigation be undertaken to analyze whether it is in the public interest, and consistent with our 1998 General Order and PURPA to permit Entergy to implement its proposed changes on a permanent basis.[2]

The Order also provides for refunds, plus interest, if the final approved methodology would have resulted in higher QF avoided cost payments[3] than was paid under the interim method. A true-up procedure was attached to and made a part of the Commission's Order.

On October 31, 2005, a Contested Stipulated Settlement ("the Settlement") was filed along with supporting pleadings and testimony. A hearing was held and briefs were submitted. A copy of the Contested Stipulated Settlement is attached hereto as Exhibit #1.

The Administrative Law Judge ("ALJ") issued a Recommendation on the Contested Proposed Stipulated Settlement on June 27, 2006. The ALJ found that the settlement methodology results in a just and reasonable avoided cost that is in the interest of the ratepayers. The Recommendation was considered at the Commission's Business and Executive Session on July 12, 2006. On motion of Commissioner Blossman, seconded by Commissioner Sittig, and unanimously adopted, the Commission voted to accept the Recommendation On Contested Proposed Stipulated Settlement of the presiding Administrative Law Judge. The Commission's action approved a settlement of the issues in the Entergy avoided cost docket and establishes a new methodology for calculating avoided cost for the Entergy operating companies subject to the Commission's jurisdiction resulting in millions of dollars to Entergy ratepayers annually.

---

[1] This Order is being corrected to reflect that it should have been titled U-27469-B, as it is the third Order issued in this Docket.
[2] LPSC Order No. U-27469-A at 3.
[3] *Id.*, Exhibit "A".



As part of the Settlement, there will be payments owed to Qualifying Facilities. After these payments, there will be net benefits to the ratepayers exceeding $150 million. In September 2006, Staff will bring a recommendation to the Commission on how to flow back these payments through Entergy's Fuel Clause.

## II. BACKGROUND AND PROCEDURAL HISTORY

The matter was docketed and published in the Commission's Official Bulletin dated August 13, 2003. On August 26, 2003, the Commission Secretary informed Entergy that its request was not a routine filing that could be implemented without further investigation. This docket was initiated and Air Liquide America, Chevron USA, Inc., PPG Industries, Inc., Formosa Plastics Corp., Louisiana, Exxon Mobil Corp., Dow Chemical Co., ConocoPhillips, CII Carbon LLC, Lemle & Kelleher, Louisiana Mid-Continent Oil and Gas Association, LEUG, Agrilectric Power Partners, Mike Thibodeaux, LEAN, Marathon Oil Company, Alliance for Affordable Energy, Calpine Corp., and Occidental Chemical Corp. intervened.

The Commission issued Order No. U-27469-A on October 8, 2003. In this Interim Order, the Commission authorized Entergy to modify its avoided cost calculation on an interim basis to reflect the "cost of purchases from other sources." It was also ordered:

> That a full investigation be undertaken to analyze whether it is in the public interest, and consistent with our 1998 General Order and PURPA to permit Entergy to implement its proposed changes on a permanent basis.[4]

The Order also provides for refunds, plus interest, if the final approved methodology would have resulted in higher QF avoided cost payments[5] than was paid under the interim method. A true-up procedure was attached to and made a part of the Commission's Order.

Ultimately, on October 31, 2005, a Contested Stipulated Settlement ("the Settlement") was filed along with supporting pleadings and testimony. The Settlement was entered into between Entergy and Commission Staff and is supported, or not opposed, by all Intervenors in this docket except Calpine Central, LP ("Calpine") and Occidental Chemical Corp., ("Occidental") (collectively known as "Calpine/OCC"). Calpine/OCC filed oppositions to the settlement. The Contested Stipulated Settlement resolved several issues that were raised during the proceeding. It also reiterated those issues that remained opposed by Calpine/OCC and that required a recommendation from the Administrative Law Judge and, ultimately, a ruling from the Commission. A hearing was held on the Contested Stipulated Settlement from January 30 through February 2, 2006. Mr. Matthew I. Kahal testified on behalf of Staff in support of the Settlement. Entergy presented John Hurstell, Bruce Louiselle and Sallie T. Rainer as its witnesses in support of the Settlement. Calpine/OCC presented the testimony of Robert Nordhaus and Scott Norwood in opposition to the Settlement. The litigants submitted final post hearing briefs in this matter on March 20, 2006.

## III. DISCUSSION

Section 210 of the Public Utility Regulatory Policies Act of 1978 ("PURPA") was designed to encourage the development of cogeneration facilities and small power production facilities or QFs, and to reduce the demand for fossil fuels. The Federal Energy Regulatory Commission ("FERC") promulgated rules with respect to utilities' purchases of electricity from these facilities. The Commission issued a General Order on February 27, 1998 implementing PURPA ("General Order").

Both FERC and the General Order require utilities to purchase electric energy from a QF at a rate equal to the utility's "full avoided cost," *i.e.*, the cost to the utility which, but for the purchase from the qualifying facility, would be incurred by the utility in generating the electricity itself or purchasing the electricity from another source.

Rule 6(D) of the Commission Rules of Practice and Procedure provides that when two or more non-aligned parties reach agreement with regard to all issues in the form of a Proposed Stipulated Settlement signed by the agreeing parties, they may file a Contested Stipulated Settlement and request a hearing ("Request"). Commission Staff and Entergy reached such an agreement in this proceeding. Their Request included a Joint Motion requesting a Contested Stipulation Hearing; the Stipulated Settlement, signed by all Agreeing Parties, the documents, testimony and exhibits in support of the Contested Stipulated Settlement; and a statement of how the proposed settlement is in the public interest. A Settlement Term Sheet was also filed into the

---

[4] LPSC Order No. U-27469-A at 3.
[5] *Id.*, Exhibit "A".

record in this proceeding. Those parts of the Stipulated Settlement that are not contested by any of the parties were also forwarded to the Commissioners, without a recommendation on the merits by the Administrative Law Judge, as provided for in Rule (6)(B)(2).

Pursuant to Rule 6(H) of the Commission Rules of Practice and Procedure, the parties proposing a stipulated settlement shall have the burden of proving that the Stipulated Settlement is reasonable in light of the record, consistent with the law, and not contrary to the public interest.

## PROPOSED SETTLEMENT TERM SHEET

In the proposed Settlement Term Sheet submitted by Commission Staff and Entergy, Commission Staff and Entergy agreed on a method of resolving the following issues:

1. Hourly QF Puts,

2. Avoided Cost Audit,

3. Emergency Sales,

4. Review of the Hourly Avoided Cost Methodology, and

5. Miscellaneous Issues, including that Entergy shall be subject to the true up provided in the LPSC's October 16, 2003 Interim Order, a limited audit from January 1, 2003 through October 18, 2003, information that Entergy will preserve during the first year of the settlement and the fact that Entergy shall terminate its practice of providing each QF with the best estimate of avoided cost prices to that QF for the first fifteen days of the current month.

## SUMMARY OF THE SETTLEMENT TERMS

For over 20 years, Entergy has been calculating avoided cost on an after-the-fact basis. Commission Staff and Entergy aver that the settlement reached is designed to make that calculation more accurate by implementing a methodology that will allow Entergy to take into account economy purchases that it cannot make because of the presence of QF put on the Entergy System and to reflect emergency sales. The Settlement is attached as Joint Staff/Companies Exhibit 1.

The main features of the settlement are:

1. Entergy will continue to calculate after-the-fact avoided costs using the Intra System Billing ("ISB") model;

2. Entergy must notify Staff and QFs in advance of any future changes in calculation methodology;

3. Rejected purchases will be included in the avoided cost calculation as approved under the interim method, except in any given hour the percentage of avoided costs that would be set by rejected purchases is capped at 75 percent of the total QF put supply; *i.e.*, at least 25 percent would be based on the running costs of Entergy's owned or controlled dispatchable resources;

4. A true-up mechanism will be applied to the payments for the period October 11, 2003 until Commission approval of the Settlement and will be paid to all QFs;

5. Mid-month reporting of avoided costs by Entergy will cease;

6. An audit of the interim period and annual audits of QF prices and payments are required. The audit costs are to be split 50/50 between putting QFs and Entergy;

7. A review of the rejected purchase methodology would be allowed beginning one year after the Settlement; and

8. Emergency sales can be included in the avoided cost prices, if Entergy provides QFs with specified advance notification.

## SUMMARY OF OPPOSITION OF CALPINE AND OCC

Calpine/OCC oppose the Settlement on several grounds. They allege that the following elements of the avoided cost methodology endorsed by LPSC Staff and Entergy are inconsistent with PURPA and the federal and state implementing rules:

1. The inclusion of a rejected purchases methodology that allows offers which could not have been consummated to participate in the avoided cost calculation;

2. The inclusion of emergency sales in the avoided cost calculation;

3. The processing of off-system sales prior to the calculation of avoided cost;

4. The after-the-fact determination of avoided cost; and

5. The inability to verify the accuracy and reliability of the avoided cost calculation.

## SUMMARY OF THE RECOMMENDATION OF THE ADMINISTRATIVE LAW JUDGE ON THE CONTESTED STIPULATED SETTLEMENT

Calculating a utility's avoided cost under PURPA is a complex and tricky matter. The fact that FERC regulations do not prescribe a particular method of calculation but rather leave it to individual jurisdictions is indicative of that fact. The interim avoided cost methodology currently in use has saved ratepayers millions of dollars, particularly where the cost of non-peak energy is concerned. Calpine/OCC argues that Entergy's motive in adjusting the avoided cost methodology is not purely altruistic. It declares that Entergy is trying to stifle competition from QFs. Entergy argues that Calpine/OCC is only interested in getting paid far greater amounts of money for its energy that it puts to Entergy than it could get for the same energy on the open market. As is often the case, the truth probably lies somewhere between these allegations. The main concerns of the Commission are to ensure that regulated utilities have a reasonable opportunity to make an adequate return on their investments, that the requirements of PURPA are met concerning promoting energy production from qualified QFs and that the ratepayers of Louisiana do not pay more for energy due to QF puts than they would if the puts were not made.

The fact that there has been a large increase in the amount of energy that QFs put onto Entergy's system over the last several years is not disputed. The fact that there does not appear to be a decline in the amount of energy put to the system by QFs since imposition of the interim method seems to indicate that they are still receiving adequate compensation for their energy. It is also necessary to realize that the goals of PURPA, which resulted in the requirement that regulated utilities be required to buy all of the energy QFs put on their systems, may have been or may soon be met. There is currently a Proposed Rulemaking before the FERC addressing the possibility that regulated utilities may no longer be required to accept QF puts if certain criteria are met.

Although Calpine/OCC argued strenuously that the proposed avoided cost methodology does not conform to PURPA or the Commission's General Order, there does not appear to be any convincing evidence that this is the case. It also states that FERC has explained that the avoided cost rate must provide a reasonably verifiable and objective standard. It argues that this is not possible under this settlement. This tribunal disagrees with this statement. There is no one correct way to calculate avoided costs.

The calculations are complex and of necessity, require many "best guesses" and "judgment calls." This is a situation where there are many ways of getting from Point A to Point B, none of which involve a straight line. The calculation proposed in this Settlement Term Sheet appears to be the best method currently available to reach Point B, or determine Entergy's avoided cost. It provides the opportunity to audit the matter in one year and provides many safeguards to QFs. Some aspects, including the use of a 75% cap on rejected purchases, seem to be rather generous to QFs. No testimony was provided that indicated that transmission constraints or possible double counting of rejected purchases would make more than a small percentage of rejected costs unreliable.[6]

## CONCLUSION

Pursuant to Rule 6(D) of the Rules of Practice and Procedure of the Louisiana Public Service Commission, those parts of the Stipulated Settlement that are not contested by any of the parties were forwarded to the Commissioners, without a recommendation on the merits by the ALJ, as provided for in Rule (6)(B)(2).

Rule (6)(E)(2)(b) of the Rules of Practice and Procedure of the Louisiana Public Service Commission states that the Administrative Law Judge shall issue a recommendation to the

---

[6] A more complete recitation of the contested parts of the settlement of this Docket is contained in the Recommendation on Contested Proposed Stipulated Settlement issued by presiding ALJ Finnegan on June 27, 2006 and is attached hereto as Exhibit #2.

Commissioners with regard to the Contested Stipulated Settlement. In this proceeding, comments were received that contested certain portions of the settlement. The opportunity to file rebuttal comments concerning the contested portions of the settlement was provided along with a hearing on the contested issues.

Having reviewed the challenges to the Contested Stipulated Settlement filed by Calpine/OCC, it is the recommendation of the Administrative Law Judge that the Settlement is in compliance with PURPA and the General Order and that it be adopted. She stated the settlement methodology results in an avoided cost that is just and reasonable and nondiscriminatory against QFs, while also being in the best interests of Louisiana ratepayers. Staff recommended that the Commission approve the ALJ's findings. We concur.

Both Staff, Entergy and 19 out of 21 Intervenors support, or do not oppose, the Stipulated Settlement. Having reviewed the record, it is our determination that the contested parts of the Stipulated Settlement are in the public interest and consistent with our 1998 General Order and PURPA. Pursuant to Rule (6)(H) of the Rules of Practice and Procedure, the parties proposing a stipulated settlement shall have the burden of proving that the Stipulated Settlement is reasonable in light of the record, consistent with the law, and not contrary to the public interest. We feel the parties have met their burden of proof regarding the Stipulated Settlement. We therefore agree to permit Entergy to implement these changes, as outlined in the Stipulated Settlement.

**IT IS THEREFORE ORDERED THAT:**

The Contested Stipulated Settlement submitted in this docket on October 30, 2005 is hereby adopted.

It is further ordered that Staff bring a recommendation to the Commission in September 2006 outlining how Entergy plans to flow back payments owed by Entergy to the QFs through the Fuel Adjustment Clause.

**BY ORDER OF THE COMMISSION**
**BATON ROUGE, LOUISIANA**

August 15, 2006

/S/ JAMES M. FIELD
DISTRICT II
CHAIRMAN JAMES M. FIELD

/S/ JACK "JAY" A. BLOSSMAN
DISTRICT I
VICE CHAIRMAN JACK "JAY" A. BLOSSMAN

/S/ C. DALE SITTIG
DISTRICT IV
COMMISSIONER C. DALE SITTIG

/S/ FOSTER L. CAMPBELL
DISTRICT V
COMMISSIONER FOSTER L. CAMPBELL

LAWRENCE C. ST. BLANC
SECRETARY

/S/ LAMBERT C. BOISSIERE, III
DISTRICT III
COMMISSIONER LAMBERT C. BOISSIERE, III

ENTERGY LOUISIANA, INC.
ENTERGY GULF STATES, INC.
DOCKET NO. U-27469
CONTESTED STIPULATED SETTLEMENT
SETTLEMENT TERM SHEET

**I.** **HOURLY QF PUTS**

**A.** All Qualifying Facilities ("QFs")[1] retain their rights under PURPA and the LPSC's February 27, 1998 General Order to deliver as-available ("Put") energy to Entergy Louisiana Inc. ("ELI") and Entergy Gulf States, Inc. ("EGS") (individually, the "Company" and, collectively, the "Companies") and to participate in other procurement processes conducted by Entergy Services, Inc. ("ESI") on behalf of the Entergy Operating Companies. ELI and EGS retain the right to accept or reject QF Puts in accordance with the provisions of PURPA and the LPSC February 27, 1998 General Order.

**B.** QF Puts shall be priced at avoided cost using the Entergy Intra System Bill ("ISB") program. The avoided cost calculation methodology, including the ISB model, may be modified by ESI from time-to-time. The Companies shall provide notice to the LPSC, all QFs and any party to Docket No. U-27469 of any material change or modification to the avoided cost calculation methodology as set forth herein. Such notice, which may be in the form of a letter, fax, or other written

---

[1] QFs refer to those Qualifying Facilities located within the Entergy Louisiana, Inc. LPSC-jurisdictional service area and Entergy Gulf States, Inc. Louisiana service territory.

- 1 -


EXHIBIT
PRINDLSKOFF (LH)
U-27469
7/11/06

communication, must be provided no later than 30 days prior to the change or modification being implemented.  In this context, a "material change or modification to the avoided cost calculation methodology" is intended to refer to changes in the calculation procedure or ISB model structure used to calculate the hourly avoided cost, not changes in model data inputs, such as, for example, changes to the heat rate, fuel costs or other variable Operation and Maintenance ("O&M") costs associated with the Entergy System's generation (provided the Companies use the same data for both intra-system billing under the Entergy System Agreement and the avoided cost calculation); changes to generating unit capacity ratings or other engineering parameters of the unit; changes resulting from the acquisition of new purchase power resources, contract modifications or termination of purchase power contracts; and, changes to loads.  However, the Companies will provide to the auditor all of the inputs that were used in the avoided cost calculation during the audit period, as set forth in Paragraph No. 3 of the Audit Process described in Appendix A to this Term Sheet, including but not limited to the information set forth in the preceding sentence.

C.    The dispatchable resources used to calculate the hourly avoided cost price shall include generators and purchase power agreements on economic dispatch, non-firm purchases, energy that would have been available to serve native load but for emergency sales, and rejected purchases.  These resources shall be processed in the following order:

-2-

1.  Subject to the notice provisions set forth in this step, emergency sales during low load conditions are backed down from their actual level to zero starting with the lowest priced emergency sale and working up to the highest priced emergency sale. The total amount of emergency sales backed down is limited to the amount of actual QF energy. If the amount of actual QF energy is greater than the total amount of emergency sales, the process proceeds to the next step. If notice of an emergency sale is given at least 30 minutes in advance of the sale, then the price of the emergency sale shall be included in the avoided cost calculation. If notice is not given at least 30 minutes in advance of the emergency sale, then the price of the sale will not be included in the avoided cost calculation. Notice shall be communicated to QFs by broadcast fax and e-mail and shall be considered to have been received at the time that it is sent.

2.  Subject to the provisions of this paragraph, rejected next day purchases are included up to the total amount of purchases that are identified as "rejected next day purchases" for purposes of this process by application of the criteria set forth below. The rejections are processed in date-time order. The total amount of rejected next day purchases included is limited to the lesser of a) the forecasted QF energy for the hour, or b) 75% of the actual QF energy in any hour. Once either of these limits is met or all rejected next day purchases are included, the process proceeds to next step. The

- 3 -

process for identifying avoided cost rejected purchases is described in II.F below.

3.     The remaining dispatchable resources (generation, dispatchable contract resources, rejected current day purchases, and single hour purchases that were made but backed down as a source of an off-system sale) are dispatched up their incremental cost curves by the remaining amount of actual QF energy. The portion of rejected current day purchases permitted to be utilized as an input in this step shall be those rejected current day purchases first received in date-time order, but not in excess of 75% of the amount of actual QF energy in any hour less the amount replaced in the previous step by rejected next day purchases.

D.     At each hour, the ISB avoided cost calculation will incorporate Avoided Cost Rejected Purchases (defined in Section E, below) at a ceiling level of 75% of the actual hourly Put. The remaining 25% of supply will be based on the actual owned or contracted for generation resources of the Entergy System. If rejected purchases account for less than 75% of the actual QF put to Entergy, then that amount of rejected purchases applies. In the event of an Emerging Sale serving as the basis for a portion of the avoided cost price, the 75% ceiling on rejected purchases shall apply to the remainder of the QF Put amount in that hour. The following protocol will apply for the application of the 75% cap on the rejected purchases:

- 4 -

*For purposes of Processing Next Day and Current Day Rejected Purchases, any cumulative ATC screens have been removed.*

*The Next Day Rejected Purchases will be sorted in date time order. Then the Next Day Rejected Purchases will be accumulated for the avoided cost calculation starting with the first one in date time order observing the following constraints:*

- *SUM(Next Day Rejected Purchase MWH) <= Min of (Projected QF Put MWH or 75% of the Actual QF Put MWH)*

- *All Next Day Rejected Purchases are exhausted.*

*The current day rejected purchases will be sorted in date time order. The current day rejected purchases will be accumulated for the avoided cost calculation starting with the first one in date time order observing the following constraints:*

- *SUM(Current Day Rejected Purchase MWH) <= 75% of Actual QF Put less SUM(Next Day Rejected Purchase MWH) from Next Day Process (above)*

- *All Current Day Rejected Purchases are exhausted.*

E.   If the Entergy System is unable to accept an offer for economy energy due to the QF energy that is expected to be put to the System, Entergy records the rejected purchase as an "Avoided Cost Rejected Purchase." An Avoided Cost Rejected Purchase may be either a rejected next day purchase or a rejected current day purchase. The criteria used by the traders for identifying rejected purchases as Avoided Cost Rejected Purchases for purposes of the avoided cost calculation are the price of the offer and the amount of QF energy forecasted for the relevant period. Only "valid" offers are considered. An offer is a "valid" offer when it includes the identity of the seller, price, quantity, start time, and duration, and the counterparty is on the list of approved counterparties for the Entergy System. For

this process, the price of a valid offer must be lower than the Alternate Price[2] during on-peak periods and lower than Off Peak Price Cap during off-peak periods. The Off Peak Price Cap for any given hour will be the lower of (1) the Alternate Price or (2) the greater of the highest cost actual daily block purchase, or 125% of an appropriate *Market Index* price (such as, but not exclusively, "Into-Energy") for off-peak deliveries that was published on the prior day for that hour. For an offer to be "valid" it must have also been made by a potential seller from which Entergy would have otherwise accepted the offer.

The Entergy System provides an estimate of the amount of QF energy for the following day. The next day traders record rejected next day purchases as Avoided Cost Rejected Purchases up to the estimated amount of the QF energy that will be put to the System. These next day rejections are recorded in date time order. Any next day rejections that are recorded after rejected purchases have been recorded in the amount of the estimated QF energy for the pertinent time period are not used in the avoided cost calculation.

The current day traders record rejections based on the difference between the projected hourly QF energy and the rejections already recorded by the next day traders.

---

[2]    The Alternate Price is the estimate of the System's incremental cost based upon the assumption that the QF Put is zero MWh

DM6441.1

F.   No transmission limitation will be assumed for external or internal Avoided Cost Rejected Purchases.

All avoided cost calculations for hourly QF Puts will be based on after-the-fact hourly calculations. They will not be based on a projection of the avoided cost.

G.   Within 120 days of the approval of this Term Sheet by the LPSC, ELI and EGS shall adjust payments previously made to any QFs delivering QF Put during the period of time beginning with the effective date of the Commission's October 16, 2003 Interim Order such that the payments to qualifying facilities since October 19, 2003 shall be consistent with the methodology provided for in this Term Sheet. The repayment processing shall be completed for the period October 19, 2003 to June 30, 2005 within 120 days from the date of a final order of the LPSC approving this Term Sheet; however, the Companies shall be permitted an additional two weeks of processing time for each additional quarter (3 months) for which repayments to QFs must be made beyond June 30, 2005. [We may need to discuss the refund process and will let you know.] However, consistent with the Commission's October 16, 2003 Interim Order, if cumulative payments to any QF during the period of time identified immediately above would be lower than those actually made to the QF, the QF shall not be required to return any portion of the previous payments. This protection for the QFs applies only to excess payments resulting from the change in avoided cost methodology, not those due to other factors such as clerical errors.

-7-

3866443

H.  The parties agree that any adjustments in payments made pursuant to subsection (I) are: i) for energy delivered from QFs for the period from October 19, 2003 through the date on which the revised avoided cost calculation is implemented by a final Commission order approving this Term Sheet; ii) just and reasonable and do not exceed ELI's and EGS's avoided cost; and iii) permissible to recover in the applicable jurisdictional Fuel Adjustment Clauses of ELI and EGS. The Commission shall determine the manner and timing in which any additional payments to the QFs are recovered from ratepayers through the Fuel Adjustment Clause.

II. **AVOIDED COST AUDIT**

A.  ELI and EGS shall submit the avoided cost calculation and payments to QFs to an audit as allowed by the General Order. Such audits will not be conducted more frequently than annually. All costs billed to the Companies by the auditor will be shared 50/50 between the Companies and those QFs that put QF energy to the Companies under the applicable ELI and EGS tariffs governing Puts by QFs during the period covered by the audit. The allocation among the QFs of the 50% of such costs assigned to QFs will be based on each QF's PURPA put kWhs to ELI or EGS during the audit period. When the auditor submits his report he shall identify the percentage responsibility for audit costs for each QF. ELI and EGS, as applicable, shall be entitled to reflect that amount as an offset to the next (and subsequent) payment(s) that they make to each QF until the negative credit is

- 8 -

extinguished. The allocation among the QFs of the 50% of such costs assigned to QFs will be based on the ratio that each QF's PURPA put kWh provided to ELI or EGSI during the audit period compares to the total QF put provided to ELI and EGSI during the audit period as identified by the auditor. If a QF disputes its allocated percentage responsibility for the audit costs, the QF nevertheless remains responsible for its allocated percentage amount while the dispute is pending, and the Companies shall reflect the allocated amount as an offset to the payments that they otherwise would make to the QFs. The QFs are solely and entirely responsible for their 50% share of the audit costs, and the Companies are solely and entirely responsible for their 50% share of the audit costs. Under no circumstances shall the QFs be responsible for the Companies' share of the audit costs. Under no circumstances shall the Companies be responsible for the QFs' share of the audit costs. ELI and EGSI may recover the 50% of audit costs allocated to them through their respective Fuel Adjustment Clauses.

B.   The auditor shall be selected and retained by the Commission pursuant to its standard professional procurement regulations.

C.   The auditor shall report to the Commission and shall be supervised by the Commission Staff.

D.   These audits will be conducted annually for QF Puts delivered during the prior calendar year. The audit will be designed to ensure that ELI and EGS are

calculating avoided costs properly pursuant to Commission-prescribed methodologies and making accurate payments to the QFs. The auditor shall not evaluate the appropriateness of the approved methodology. The Commission Staff shall undertake all reasonable efforts to begin its audit of the previous calendar year period no later than 60 days after the close of the calendar year under review. It is understood that ELI and EGS shall not be required to produce data to the auditor sooner than 90 days after the date of the calendar year under review.

E. Any remedies arising from the auditor's findings must be symmetrical with respect to ELI/EGS and the QFs. Thus, the audit will report both over- and under-payments to the QFs made by ELI and EGS, to the extent that any such over- or underpayments occurred.

F. The scope of the audit, including the identification of the data to be provided to the auditor and applicable confidentiality provisions, are set forth in the accompanying Appendix A to this Term Sheet.

## III. EMERGENCY SALES

A.  At times, the Entergy System dispatchers may be required to make sales at less than the Entergy System incremental costs. These sales are made in order to maintain minimum stable operating levels without curtailing QF production or in order to minimize the level of such curtailment. These sales are referred to as emergency sales. The cost for emergency sales used in the avoided cost calculation is the price received for the sale, as the energy sold would have been available to serve the Entergy System's customers but for the emergency sale.

B.  If ELI or EGS reasonably believes that it will be required to make emergency sales, the Company will attempt to provide QF's with two hours notice of those sales. If notice of an emergency sale is given at least 30 minutes in advance of the sale, then the price of the emergency sale shall be included in the avoided cost calculation. Notice shall be given by broadcast fax and e-mail, with such notice to be considered to have been received when it was transmitted. If notice is not given at least 30 minutes in advance of the emergency sale, then the price of the sale will not be included in the avoided cost calculation but will be recovered through the Fuel Adjustment Clause of ELI or EGS, as applicable. The Company's failure to provide timely notice of an emergency sale does not, by itself, constitute evidence or proof of imprudent action on the part of the Company. Entergy shall keep a log of the emergency sales and provide such log to the auditor. Each QF is required to supply a fax number and an email address

- 11 -

to ELI, EGSI, and the Commission Staff. Any change in that information must be made in writing to all three parties.

C.    ELI and EGS will provide to QFs delivering energy to its respective system a monthly report identifying all Emergency Sales made in the previous month, including the corresponding times and magnitudes of such sales. In the event that the Entergy System makes an Emergency Sale that is in excess of 500 MWh in any single hour, ELI and EGS, shall make an appropriate representative available if so requested by a QF within 30 days of such request. ELI and EGS agree further to work at this meeting, in good faith, with the QFs to determine if it is possible to provide notice in the future before Emergency Sales in excess of 500 MWs will be made. The requesting QF is responsible for notifying all other QFs of the scheduled date, time, and place of the meeting. ELI and EGS shall only be obligated to attend one meeting with QFs for each month during which the Company had an emergency sale of 500 MWh or more in a single hour.

IV.   REVIEW OF HOURLY AVOIDED COST METHODOLOGY

A.    The Commission Staff (including any assigned Consultant and Special Counsel) shall conduct a review of certain aspects of the avoided cost methodology, which are described in Sections B, C, and D, below, beginning one year after the Commission approves this Term Sheet (the "One Year Review"). All parties participating in the instant Docket shall be permitted to participate in the One Year without the necessity of filing a formal intervention. Notice of the review

- 12 -

will be published in the Commission's Official Bulletin so that other parties may

request intervention as well.

B.  The review shall be directed at potential refinements to the rejected purchase

quantification.

    1.  It may include technical modifications to determining the appropriate
    quantity of Rejected Purchases that should be used to determine the
    Avoided Cost price (for example, whether 75% is the correct level of
    Rejected Purchases to use in the avoided cost calculation).

    2.  It may include the potential modification of the methodology or the
    substitution of an improved methodology related to the determination of
    the level of rejected purchases to be included in the avoided cost
    calculation (for example, a specific transmission screen to be used in lieu
    of a percentage cap).

C.  The review may not address the elimination of Rejected Purchases from the

avoided cost calculation or propose an avoided cost calculation methodology

based on the projection of avoided costs.

D.  The review may address proposed changes to the utilization of rejected purchases

based on new regulatory guidelines concerning transmission service (e.g., the

Available Flowgate Capacity process used by the Entergy Transmission Business

Unit to schedule transmission service).

E.  The review may address the suggestion by Staff to employ a "Day-Ahead

Mechanism" that would allow the QFs to schedule blocks of energy on a day

ahead basis to be priced at a measure of avoided cost.

- 13 -

F.    The review may address a request by the QFs for ELI and EGS to reinstitute their prior practices of providing the QFs with their best estimates of avoided cost prices for the first fifteen (15) days of the current month with fifteen (15) days after ELI and EGSI provided the QFs with avoided cost prices for the prior month.

G.    No sooner than one year after implementation of this Term Sheet, assuming it is approved by the LPSC, any party is free to file a complaint seeking any relief to which it would otherwise be entitled. No complaint may be filed until one year after the date of approval of the settlement. Any complaint filed on or after one year after the date of approval of the Term Sheet may not seek relief for activities occurring during the year of the settlement, unless there is a claim that a party violated the provisions of this Term Sheet, or the complaint relates to those matters that are to be considered by the auditor in the audit process provided for in Appendix A to this Term Sheet.

H.    Pursuant to the Commission's Rules, any party participating in this review may seek protection of data deemed confidential or proprietary.

I.    The LPSC's agreement to this settlement does not in any way waive the LPSC's right, ability, and obligation at any time to re-examine Entergy's avoided cost methodology and any other related issues addressed herein in a separate proceeding should the LPSC determine that such a re-examination is warranted

- 14 -

and initiates a docket to conduct that review. The other parties' agreement to this settlement does not preclude them from taking any position on an appropriate avoided cost methodology in other state jurisdictions or at the FERC.

V.   MISCELLANEOUS ISSUES

A.   For the period of October 19, 2003 through the date the final avoided cost calculation methodology goes into effect, the Companies shall be subject to the true up provided in the LPSC's October 16, 2003 Interim Order. In addition, there shall be a limited audit for the period January 1, 2003 through October 18, 2003. The scope of this limited audit will be confined to clerical errors in the payments to QFs but shall not include the avoided cost pricing calculations. The limited audit will be symmetrical with respect to ELI/EGS and the QFs. That is, the audit will report on both under- and over-payments to the QFs, and the remedy for such over-and under-payments shall be structured symmetrically. The adjustment of any such under- or over-payments to QFs that must be remedied as a result of the limited audit will take place through the fuel adjustment clauses of ELI and EGS, as applicable. The limited audit shall be conducted by the Commission Staff as part of this Docket. The data to be provided to the Staff shall be as specified in Sections 3 (b) and (l) of Appendix A to this Term Sheet, and the confidentiality provisions set forth in Appendix A also shall apply to the data provided to the Staff as part of this limited audit.

- 15 -

B.  During the first year this settlement is in effect, the Companies will preserve and shall provide the following information in order to help resolve possible double counting and transmission issues at the end of the one-year settlement period as referenced in Section IV B, C and D, above:

- For each flowgate, the last value of Available Flowgate Capability (AFC) calculated and posted on OASIS for each delivery hour.

- For each flowgate, the last Response Factor matrix calculated for each delivery hour.

- The seller scheduled hourly MW and the location of the generating unit (if known by Entergy) for each next-day and current-day accepted purchase for each hour of delivery.

- All of the information specified under Section 3 of Appendix A of this Term Sheet.

C.  The Companies shall terminate their practice of providing each QF with the Company's best estimate of avoided cost prices to that QF for the first fifteen (15) days of the current month within fifteen (15) days after the Companies have provided the QFs with avoided cost prices for the prior month.  The Companies shall continue to provide each of their respective QFs with the avoided cost prices for the prior month for each hour that the QF put energy to the Company.

By: _Paul L. Zim_
(Signature)

REPRESENTING
LOUISIANA PUBLIC SERVICE COMMISSION STAFF

By: _Karen H. Freese_
(Signature)

REPRESENTING
ENTERGY LOUISIANA, INC. AND
ENTERGY GULF STATES, INC.

By: _____
(Jennifer J. Vosburg)

REPRESENTING

_____

_____

_____

_____

_____

_____

By: _____
        (Signature)

REPRESENTING
LOUISIANA PUBLIC SERVICE COMMISSION STAFF


By: _____
        (Signature)

REPRESENTING
ENTERGY LOUISIANA, INC. AND
ENTERGY GULF STATES, INC.

By: *[signature]*
        (Jennifer J. Vosburg)

REPRESENTING

Air Liquide Large Industries, U.S. LP
_____

Chevron U.S.A., Inc.
_____

CII Carbon LLC
_____

ConocoPhillips Company
_____

Dow Chemical Company
_____

Exxon Mobil Corporation
_____


- 17 -

By: _____
    (Randy Young)

REPRESENTING
THE LOUISIANA ENERGY USERS GROUP


By: _John H. Chavanne_____
    (John H. Chavanne, Esq.)

REPRESENTING
MARATHON OIL COMPANY


By: _____
    (Luke Piontek)

REPRESENTING
CALPINE CENTRAL


By: _____
    (Jeff Copesky)

REPRESENTING
LOUISIANA MID-CONTINENTAL OIL AND GAS ASSOCIATION


By: _____
    (Micah Walker)

REPRESENTING
THE ALLIANCE FOR AFFORDABLE ENERGY


By: _____
    (Signature)

REPRESENTING
OCCIDENTAL CHEMICAL CORPORATION

- 18 -

## APPENDIX A
### AUDIT PROCESS

1.  The calculation of avoided cost by Entergy Gulf States, Inc. ("EGSI") and
    Entergy Louisiana, Inc. ("ELI") (collectively, the "Companies") and payments to
    QFs will be audited on an annual basis. Such audits will be conducted beginning
    April 1 of each year. The audit will cover the 12 months ending December 31 of
    the prior year, except that the first audit will cover the period beginning October
    19, 2003 through December 31, 2004. Pursuant to Section V.A. of the Term
    Sheet, a limited audit will also be performed for the period of January 1, 2003
    through October 18, 2003.

2.  An independent auditor shall be selected by the Louisiana Public Service
    Commission through its regular procurement process. The role of the auditor
    will be to review all necessary data to ensure that the Companies' calculation of
    their avoided costs for the applicable audit period was correct, in compliance with
    all applicable regulations, and consistent with the avoided cost methodology
    approved for ELI and for EGS's Louisiana jurisdictional operations. The auditor
    shall also verify that the payments to the QFs accurately reflect the audited
    avoided cost price that was to have been paid to the QFs. The auditor will not be
    permitted to review or report on any issues, data, or calculations relating to the
    prudence of the dispatch of the Entergy generation or transmission resources.

- 1 -

3. The Companies shall make the following information available to the auditor by April 1 of each audit year. Items a. through e., h., i, and k. through l. shall be furnished for each hour of the audit period and shall be provided in an electronic format that can be easily manipulated (such as Excel).

    a.    Total PURPA puts in MWh.

    b.    Avoided cost price in $ per MWh for PURPA Put energy.

    c.    Rejection log of Next Day Avoided Cost Rejections and Current Day Avoided Cost Rejections.

    d.    Forecasted QF Put (MWh).

    e.    Alternate Price for Next and Current Day.

    f.    MW Daily Off Peak Index.

    g.    Highest Cost Actual Daily Block Purchase.

    h.    Sources Table – includes all emergency sales, dispatchable resources, Hourly purchases, available Next Day Rejections, and Current Day Rejections, MWh and price, utilized in the avoided cost calculation.

    i.    The approved counterparty list, with updates, maintained by ESI.

    j.    Environmental adders by hour, including SO2 adders.

    k.    O&M adder by hour.

    l.    Monthly payment records for QFs.

In addition to the foregoing information, the Companies will retain all hourly output results of the avoided cost calculation. The Companies will respond to follow-up requests for additional information related to the Companies' calculation of avoided cost for the applicable audit period upon request by the

LPSC Staff and auditor and will make a good faith effort to provide all information requested by the LPSC Staff and the auditor in a prompt manner. Such information will be provided to the LPSC Staff and auditor subject to the terms of a confidentiality agreement that is acceptable to the LPSC Staff and the Companies in their sole discretion and shall be used only for the purposes of the audit provided, however that nothing in the confidentiality agreement will prevent the auditor from testifying strictly as a fact witness regarding the terms of the audit. Further, nothing in this audit procedure or in the confidentiality agreement is intended to broaden or restrict those categories of information that would be ordinarily discoverable in a Commission proceeding. ELI and EGS will provide a copy of the confidentiality agreement between the auditor and ELI/EGS to any QF requesting a copy.

In order to facilitate the process of conducting the annual audit, the Companies will furnish the information set forth in subparagraphs a. through i., above, to the LPSC Staff and the auditor on an annual basis. The LPSC Staff and the Companies will agree on a mutually acceptable method of providing such data in order to assure that (1) the LPSC Staff and auditor receive the data necessary to conduct the audit on an annual basis in a timely fashion, and (2) the information is provided in a manner that does not unduly burden the Companies. All information provided to the LPSC Staff and auditor shall be maintained as confidential and/or highly sensitive under the terms of a confidentiality agreement that is acceptable to the LPSC Staff and the Companies, in their sole discretion. The provision of the information set forth in subparagraphs a. through i., above,

- 3 -

to the LPSC Staff and the auditor shall not constitute grounds for the discovery or receipt of such information by the QFs, nor shall it preclude the QFs from seeking such information in any judicial or regulatory proceeding.

4. The audit report shall identify any errors, including any variances from Commission regulations or orders or other applicable legal authorities, in the calculation of the Companies' avoided cost and will set forth the LPSC Staff's and auditor's estimates of the amounts involved in such variances. The audit is intended to be symmetrical, that is, the report will document instances of over-payment as well as under-payment to the QFs. The public version of the audit report will not attach or include any of the confidential or highly sensitive data provided by the Company to the auditor, but will set forth the auditor's conclusions based on such data. Before the public version of the audit report is provided to the QFs, the LPSC Staff and auditor shall submit the audit report to ELI and EGS for the sole purpose of redacting confidential or highly sensitive information. The Staff will then provide the audit report, including any redaction, to the QFs provided, however, that the Companies will provide one copy of the complete, unredacted audit report, to a person agreed upon by the QFs and the Companies ("mutually selected person"). The copy of the complete, unredacted audit report provided to such mutually selected person shall not attach the data provided by the Companies to the Staff and auditor. The copy of the complete unredacted audit report provided to such person shall be kept confidential in

- 4 -

accordance with any confidentiality agreement entered into pursuant to Paragraph
3 above.

5.   In the case of minor errors or variances, the Companies, the Commission Staff,
     and the affected QF(s) may agree to appropriate adjustments to avoided cost
     payments for the audit year.  If the parties do not agree, any party is free to file a
     petition with the Commission to correct the Companies' avoided cost payments
     for the applicable audit period.  No changes to such payments may be made
     without a Commission order unless the Companies, Staff, and the affected QFs
     are in agreement that such a change is appropriate, in which case such
     adjustments, when in the form of additional payments to the QF, may be
     recovered by the Companies in their respective Fuel Adjustment Clauses.  The
     parties intend that errors found in the audit, whether in favor of the QFs or the
     Companies, may be the subject of a proceeding before the Commission to correct
     the Companies' avoided cost payments for the applicable audit period.  Absent
     agreement by all parties (i.e., the Companies, Staff and directly affected QFs), the
     Companies would not be required to make any additional payments identified in
     the audit to QFs until the Commission issues an order approving such payments
     for recovery by the Companies through their Fuel Adjustment Clauses, with
     appropriate interest if such recovery is deferred or amortized.

6.   The findings of the LPSC Staff and auditor shall not be binding upon either the
     Companies or the QFs and may be disputed in any such proceeding.

- 5 -

7.  All costs incurred by the auditor of the calculation of avoided cost will be shared
    50/50 between the Companies and those QF's putting QF energy to the Companies
    under the applicable ELI and EGSI LPSC tariffs governing Puts by QFs. When
    the auditor submits his report he shall identify the percentage responsibility for
    audit costs for each QF. The allocation among the QFs of the 50% of such costs
    assigned to QFs will be based on the ratio that each QF's Put kWh provided to
    ELI or EGSI during the audit period compares to the total QF Put provided to ELI
    and EGSI during the audit period as identified by the auditor. The Companies
    shall reflect the amount of the audit costs allocated to each QF as an offset to the
    payments that otherwise would be made by the Company to that QF. If a QF
    disputes its allocated percentage responsibility for the audit costs, the QF
    nevertheless remains responsible for its allocated percentage amount while the
    dispute is pending, and the Company shall reflect the allocated amount as an
    offset to the payments that it otherwise would make to the QFs. The QFs are
    solely and entirely responsible for their 50% share of the audit costs and the
    Companies are solely and entirely responsible for their 50% share of the audit
    costs. Under no circumstances shall the QFs be responsible for the Companies'
    share of the audit costs. Under no circumstances shall the Companies be
    responsible for the QFs' share of the audit costs. ELI and EGSI may recover
    through their respective Fuel Adjustment Clauses of the 50% of audit costs
    allocated to them.

-6-

# LOUISIANA PUBLIC SERVICE COMMISSION

## ADMINISTRATIVE HEARINGS DIVISION

### DOCKET NO. U-27469

### LOUISIANA PUBLIC SERVICE COMMISSION
### EX PARTE

---

*In re: Examination into whether Entergy Gulf States, Inc. and Entergy Louisiana, Inc.'s proposed new "avoided cost" calculation methodology is proper and allowable under Commission General Order dated February 27, 1998.*

---

### RECOMMENDATION ON
### CONTESTED PROPOSED STIPULATED SETTLEMENT

### BACKGROUND AND PROCEDURAL HISTORY

*Background*

Entergy Louisiana, LLC ("ELL") and Entergy Gulf States, Inc. ("EGSI") (collectively, "Entergy") sent a letter to the Commission on July 25, 2003, proposing to use a new methodology to calculate avoided costs and requesting that it be allowed to implement that methodology on September 1, 2003. Entergy asserted that its avoided cost methodology no longer accurately reflected its avoided cost during off-peak periods, and stated that certain modifications were necessary to reflect market conditions during off-peak hours. Entergy proposed changing its existing avoided cost methodology to include energy prices reflected in offers that are "rejected" as a result of Entergy's purchases of Qualified Facility ("QF") power and costs associated with "emergency sales" of energy that Entergy makes as a result of excess QF supplies.

*Order No. U-27469 Exhibit 2*

*Procedural History*

The matter was docketed and published in the Commission's Official Bulletin dated August 13, 2003. On August 26, 2003, the Commission Secretary informed Entergy that its request was not a routine filing that could be implemented without further investigation. This docket was initiated and Air Liquide America, Chevron USA, Inc., PPG Industries, Inc., Formosa Plastics Corp., Louisiana, Exxon Mobil Corp., Dow Chemical Co., ConocoPhillips, CII Carbon LLC, Lemle & Kelleher, Louisiana Mid-Continent Oil and Gas Association, LEUG, Agrilectric Power Partners, Mike Thibodeaux, LEAN, Marathon Oil Company, Alliance for Affordable Energy, Calpine Corp., and Occidental Chemical Corp. intervened.

The Commission issued Order No. U-27469-A on October 8, 2003. In this Interim Order, the Commission authorized Entergy to modify its avoided cost calculation on an interim basis to reflect the "cost of purchases from other sources." It was also ordered:

> That a full investigation be undertaken to analyze whether it is in the public interest, and consistent with our 1998 General Order and PURPA to permit Entergy to implement its proposed changes on a permanent basis.[1]

The Order also provides for refunds, plus interest, if the final approved methodology would have resulted in higher QF avoided cost payments[2] than was paid under the interim method. A true-up procedure was attached to and made a part of the Commission's Order.

Ultimately, on October 31, 2005, a Contested Stipulated Settlement ("the Settlement") was filed along with supporting pleadings and testimony. The Settlement was entered into between Entergy and Commission Staff and is supported, or not opposed, by all Intervenors in this docket except Calpine Central, LP ("Calpine") and Occidental Chemical Corp., ("Occidental") (collectively known as "Calpine/OCC"). Calpine/OCC filed oppositions to the

---

[1] LPSC Order No. U-27469-A at 3.
[2] *Id.*, Exhibit "A".

settlement. The Contested Stipulated Settlement resolved several issues that were raised during the proceeding. It also reiterated those issues that remained opposed by Calpine/OCC and that required a recommendation from the Administrative Law Judge and, ultimately, a ruling from the Commission. A hearing was held on the Contested Stipulated Settlement from January 30 through February 2, 2006. Mr. Matthew I. Kahal testified on behalf of Staff in support of the Settlement. Entergy presented John Hurstell, Bruce Louiselle and Sallie T. Rainer as its witnesses in support of the Settlement. Calpine/OCC presented the testimony of Robert Nordhaus and Scott Norwood in opposition to the Settlement.

The litigants submitted final post hearing briefs in this matter on March 20, 2006.

*Applicable Law*

Section 210 of the Public Utility Regulatory Policies Act of 1978 ("PURPA") was designed to encourage the development of cogeneration facilities and small power production facilities or QFs, and to reduce the demand for fossil fuels. The Federal Energy Regulatory Commission ("FERC") promulgated rules with respect to utilities' purchases of electricity from these facilities. The Commission issued a General Order on February 27, 1998 implementing PURPA ("General Order").

Both FERC and the General Order require utilities to purchase electric energy from a QF at a rate equal to the utility's "full avoided cost," *i.e.*, the cost to the utility which, but for the purchase from the qualifying facility, would be incurred by the utility in generating the electricity itself or purchasing the electricity from another source.

Rule 6(D) of the Commission Rules of Practice and Procedure provides that when two or more non-aligned parties reach agreement with regard to all issues in the form of a Proposed Stipulated Settlement signed by the agreeing parties, they may file a Contested Stipulated

Settlement and request a hearing ("Request"). Commission Staff and Entergy reached such an agreement in this proceeding. Their Request included a Joint Motion requesting a Contested Stipulation Hearing; the Stipulated Settlement, signed by all Agreeing Parties, the documents, testimony and exhibits in support of the Contested Stipulated Settlement; and a statement of how the proposed settlement is in the public interest. A Settlement Term Sheet was also filed into the record in this proceeding. Those parts of the Stipulated Settlement that are not contested by any of the parties are also being forwarded to the Commissioners, without a recommendation on the merits by the Administrative Law Judge, as provided for in Rule (6)(B)(2).

Pursuant to Rule 6(H) of the Commission Rules of Practice and Procedure, the parties proposing a stipulated settlement shall have the burden of proving that the Stipulated Settlement is reasonable in light of the record, consistent with the law, and not contrary to the public interest.

### PROPOSED SETTLEMENT TERM SHEET

In the proposed Settlement Term Sheet submitted by Commission Staff and Entergy, Commission Staff and Entergy agreed on a method of resolving the following issues:

1. Hourly QF Puts,

2. Avoided Cost Audit,

3. Emergency Sales,

4. Review of the Hourly Avoided Cost Methodology, and

5. Miscellaneous Issues, including that Entergy shall be subject to the true up provided in the LPSC's October 16, 2003 Interim Order, a limited audit from January 1, 2003 through October 18, 2003, information that Entergy will preserve during the first year of the settlement and the fact that Entergy shall terminate its practice of providing each QF with the best estimate of avoided cost prices to that QF for the first fifteen days of the current month.

## SUMMARY OF THE SETTLEMENT TERMS

For over 20 years, Entergy has been calculating avoided cost on an after-the-fact basis. Commission Staff and Entergy aver that the settlement reached is designed to make that calculation more accurate by implementing a methodology that will allow Entergy to take into account economy purchases that it cannot make because of the presence of QF put on the Entergy System and to reflect emergency sales. The Settlement is attached as Joint Staff/Companies Exhibit 1.

The main features of the settlement are:

1. Entergy will continue to calculate after-the-fact avoided costs using the Intra System Billing ("ISB") model;

2. Entergy must notify Staff and QFs in advance of any future changes in calculation methodology;

3. Rejected purchases will be included in the avoided cost calculation as approved under the interim method, except in any given hour the percentage of avoided costs that would be set by rejected purchases is capped at 75 percent of the total QF put supply; *i.e.*, at least 25 percent would be based on the running costs of Entergy's owned or controlled dispatchable resources;

4. A true-up mechanism will be applied to the payments for the period October 11, 2003 until Commission approval of the Settlement and will be paid to all QFs;

5. Mid-month reporting of avoided costs by Entergy will cease;

6. An audit of the interim period and annual audits of QF prices and payments are required. The audit costs are to be split 50/50 between putting QFs and Entergy;

7. A review of the rejected purchase methodology would be allowed beginning one year after the Settlement; and

8. Emergency sales can be included in the avoided cost prices, if Entergy provides QFs with specified advance notification.

## SUMMARY OF OPPOSITION OF CALPINE AND OCC

Calpine/OCC oppose the Settlement on several grounds. They allege that the following elements of the avoided cost methodology endorsed by LPSC Staff and Entergy are inconsistent with PURPA and the federal and state implementing rules:

1. The inclusion of a rejected purchases methodology that allows offers which could not have been consummated to participate in the avoided cost calculation;

2. The inclusion of emergency sales in the avoided cost calculation;

3. The processing of off-system sales prior to the calculation of avoided cost;

4. The after-the-fact determination of avoided cost; and

5. The inability to verify the accuracy and reliability of the avoided cost calculation.

## SUMMARY OF THE ARGUMENTS AND RECOMMENDATIONS OF THE ADMINISTRATIVE LAW JUDGE

### Rejected Purchases

*Entergy and Commission Staff's Position*

The Settlement states that QF puts shall be priced at avoided cost using the Entergy ISB program. Rejected next day purchases are included up to the total amount of purchases that are identified as "rejected next day purchases" for purposes of this process by application of the following criteria: the rejections are processed in date-time order, and the total amount of

rejected next day purchases included is limited to the lesser of a) the forecasted QF energy for the hour, or b) 75% of the actual QF energy in any hour.

The remaining 25% of supply will be based on the actual owned or contracted for generation resources of the Entergy System. If rejected purchases account for less than 75% of the actual QF put to Entergy, then that amount of rejected purchases applies. Other details are outlined in the Term Sheet.

*Calpine/OCC's Position*

Calpine/OCC argues that the rejected purchases methodology included within the settlement is a "black box method" that is unverifiable. It also argues that reducing the price paid to QFs will discourage cogeneration. It claims that the proposed stipulated settlement seeks to limit the sources to be considered in determining the avoided cost by arbitrarily restricting the costs of Entergy's generation to establishing the price for no more than 25% of the QF put.

It also urges that the LPSC staff would have the Commission focus on whether the Settlement Method provides "savings" to ratepayers, rather than calculating full avoided cost rates which maximize the incentives for cogeneration and truly and accurately represent the cost Entergy would have incurred were the hourly QF put not delivered.

## RECOMMENDATION OF THE ADMINISTRATIVE LAW JUDGE

All parties agree that Entergy is required to purchase all energy and capacity made available by QFs, as defined in PURPA, at prices equal to Entergy's full "avoided cost." FERC regulations and the General Order define "avoided cost" as the incremental costs to an electric utility of electric energy or capacity or both which, but for the purchase from the qualifying facility or facilities, such utility would generate itself or purchase from another source.

These funds are passed through the Fuel Adjustment Clause of Entergy. All payments by Entergy in excess of actual avoided cost are made at the expense of Louisiana retail ratepayers, who pay the cost. The parties in this docket also agree that the "cost of purchases from other sources"[3] is validly considered in setting the avoided cost. However, the manner in which the "cost of purchases from other sources" is taken into account must result in an avoided cost that is just and reasonable and nondiscriminatory against QFs.[4]

Calpine/OCC's argument that it is the utility's highest cost avoidable generation or purchases that must be used is inaccurate. It is unreasonable to assume that Entergy would automatically use its own resources if it can purchase energy at a lesser rate than its own cost to operate its highest-cost units.

Staff's witness, Matthew I. Kahal, testified that the proposed method will dramatically lower the avoided cost payments to QFs. He also stated that the new method would result in a more accurate calculation of the full avoided cost rate than existed under the prior method.

### Emergency Sales

*ELI and Commission Staff's Position*

Emergency sales during low load conditions are backed down from their actual level to zero starting with the lowest priced emergency sale and working up to the highest priced emergency sale. The total amount of emergency sales backed down is limited to the amount of actual QF energy. If the amount of actual QF energy is greater than the total amount of emergency sales, the process proceeds to the next step. If notice of an emergency sale is given at least 30 minutes before the sale, then the price of the emergency sale shall be included in the avoided cost calculation.

---

[3] General Order Sec. 204 (f)(5).
[4] General Order Sec. 204 (a)(1) and (2).

*Calpine/OCC's Position*

It is the position of Calpine/OCC that it opposes the inclusion of emergency sales in the avoided cost methodology because neither LPSC staff nor Entergy has provided any proof that the presence of QF energy has ever been, or will ever be, the sole reason Entergy is forced to make emergency sales. It argues that the General Order, PURPA or FERC regulations expressly authorize setting avoided cost on the price received (usually a loss) for such emergency sales. Calpine/OCC's witness, Mr. Nordhaus, testified that the emergency sales provision of the settlement fails to meet the system emergency provisions because Entergy could make off-system sales or take other actions to avoid a system emergency. It argues that the inclusion of emergency sales in the avoided cost calculation only serves to unlawfully reduce the avoided cost rate.

## RECOMMENDATION OF THE ADMINISTRATIVE LAW JUDGE

The Settlement Term Sheet states, in part, the following concerning emergency sales:

> At times, the Entergy System dispatchers may be required to make sales at less than the Entergy System incremental costs. These sales are made in order to maintain minimum stable operating levels without curtailing QF production or in order to minimize the level of such curtailments. These sales are referred to as emergency sales. The cost for emergency sales used in the avoided cost calculation is the price received for the sale, as the energy sold would have been available to serve the Entergy System's customers but for the emergency sale.[5]

The term sheet also provides that it will attempt to provide QFs with two hours notice if it reasonably believes that it will be required to make emergency sales. If notice of an emergency sale is given at least 30 minutes in advance of the sale, then the price of the emergency sale shall be included in the avoided cost calculation. If Entergy does not provide notice at least 30

---

[5] Settlement Term Sheet at III.A.

minutes prior to the sale, the price of the sale will not be included in the avoided cost calculation but will be recovered through the applicable Fuel Adjustment Clause. The term sheet also requires Entergy to keep a log of the emergency sales and provide the log to the auditor. It will provide QFs a monthly report of all emergency sales made in the previous month. If the sale is in excess of 500 MWhs in any single hour, Entergy shall make an appropriate representative available if so requested by a QF within 30 days of such request. Entergy will also meet with the QFs to determine if it is possible to provide notice in the future before emergency sales in excess of 500 MWhs will be made.[6]

Neither party denies that the General Order allows the Entergy system to order QFs to cease deliveries when committed generation exceeds load. There is also no evidence that this is an event that occurs often. It is reasonable that the increased magnitude of QF put requires Entergy to trim some of its capacity. The development of the wholesale energy market has also allowed Entergy to purchase power and run less of its own capacity. This results in fewer resources that can be turned down in order to maintain system reliability.

The inclusion of emergency sales in the calculation of avoided costs is reasonable. It is a rare event and will only be included if QFs do not receive 30 minutes notice. It allows for a more efficient way to handle excess load than ordering all QFs to cease making deliveries during system emergencies. It also provides certainty because it does not rely on voluntary compliance by QFs. Inclusion of the emergency sales is appropriate because it is a reflection of the costs to continue accepting QF put.

---

[6] Settlement Term Sheet III.B. and C.

## Processing of Off-system Sales

*ELI and Commission Staff's Position*

Entergy argues that Entergy makes a certain amount of off-system sales on any given day. Entergy considers these sales an economic opportunity from which it can generate a profit. It is argued that these sales have nothing to do with the native load obligation, cannot be displaced by QF put and are irrelevant to the issue of avoided cost.

*Calpine/OCC's Position*

Calpine/OCC states that the processing of off-system sales prior to the calculation of avoided costs deliberately lowers the avoided cost rate and discriminates against QFs. Mr. Nordhaus and Mr. Norwood discuss that Entergy removes the costs incurred by the system but allocated to off-system sales by backing down the most expensive sources before calculating the avoided cost. They argue that it is the utility's highest cost avoidable generation or purchases that establish the avoided cost rate. To do otherwise is fundamentally inconsistent both with this principle and the definition of avoided cost. It argues that a cost that is attributable to an off-system sale can be avoided by a QF purchase as a cost attributable to an on-system load and thus cannot be excluded from the avoided cost calculation. It further notes that Entergy admits to changing the order of processing off-system sales from after the calculation of avoided costs to before without Commission approval to the detriment of QFs. It also reasons that Entergy, as a supplier on non-firm off-system sales can cut the off-system sale to replace lost power.

## RECOMMENDATION OF THE ADMINISTRATIVE LAW JUDGE

Calpine/OCC requested and Entergy agreed to the statement that:

> The Companies [Entergy] will not argue that the approval of the settlement itself by the Commission approves prior practices with respect to the avoided cost calculation in terms of the off-system-sales issues that have been raised by Calpine and Occidental in this case.

Since there is not a change in the use of off-system sales in the avoided cost calculation due to the Settlement Term Sheet, it will not be further discussed in this recommendation. If a party feels this matter needs to be addressed, it should do so in a separate proceeding.

### After-the-fact Methodology

*ELI and Commission Staff's Position*

The Settlement provides that no transmission limitation will be assumed for external or internal Avoided Cost Rejected Purchases. All avoided cost calculations for hourly QF puts will continue to be based on after-the-fact hourly calculations. They will not be based on a projection of the avoided cost.

*Calpine/OCC's Position*

Calpine/OCC consider that the after-the-fact method of determining avoided cost contradicts the General Order, PURPA and FERC regulations. It is their argument that to properly implement PURPA and the FERC regulations, the General Order's provision regarding the calculation of avoided cost at the time of the delivery must be interpreted to mean estimated at the time of delivery, and not calculated after-the-fact.

## RECOMMENDATION OF THE ADMINISTRATIVE LAW JUDGE

It is undisputed that the after-the-fact methodology has been in place and in use since the Commission adopted its 1998 General Order. This method of calculating actual avoided cost was never challenged until after the interim avoided cost methodology was implemented in October 2003.

There was extensive testimony in this matter concerning whether or not the method used should be calculated after-the-fact or whether it should be based upon an estimate of the costs. Each side provided expert testimony in support of its own position. The testimony in favor of continuing this method is reasonable and meets the burden of proof required. The record does not reflect any meaningful reason or benefit to justify changing this method of calculation. Nor does the record reflect anything that implies this methodology violates PURPA or the General Order. For the reasons stated above, this tribunal recommends that the use of the after-the-fact methodology, that was originally implemented by the Commission and that has been in place and in use since 1998, be continued.

### Audit Provisions

*ELI and Commission Staff's Position*

An audit will be conducted annually. Entergy shall submit its avoided cost calculation and payments to QFs to an audit as allowed by the General Order. Costs of the audit will be split "50/50" between Entergy and those QFs that put QF energy to Entergy. The 50% of costs assigned to QFs will be assigned based on each QF's PURPA put kWhs to ELL or EGSI during the audit period. The auditor will be selected and retained by the Commission. The auditor shall report to the Commission and shall be supervised by Commission Staff. Other aspects of the audit are set forth in the Term Sheet and its accompanying Appendix A.

*Calpine/OCC's Position*

It is the position of Calpine/OCC that the audit procedures set forth in the proposed settlement are inadequate to ensure that Entergy is correctly calculating avoided cost. It is argued that there are unreasonable restrictions placed on the scope of the audit. Calpine/OCC also disapprove of the fact that the auditor will not be testifying as an expert witness and thus able to give an opinion on the methodology or suggestions for changes to the methodology. It also urges that the fact that the unredacted report provided to the QF representative will not have any of the supporting data attached prevents QFs from verifying the avoided cost.

## RECOMMENDATION OF THE ADMINISTRATIVE LAW JUDGE

One of the main complaints of Calpine/OCC is that it will not be privy to all information used to calculate the avoided cost. This complaint overlooks the fact that Commission staff, including its consultants and special counsel, shall conduct a review of certain aspects of the avoided cost methodology one year after approval of the settlement by the Commission. It also overlooks the fact that the Commission's agreement to this settlement does not waive its right, ability and obligation to re-examine Entergy's avoided cost methodology and any other related issues in a separate proceeding if the Commission feels it is warranted.

Every other party to this proceeding has agreed to the methodology as laid out in the Settlement Term Sheet. To imply that the Commission is not capable of overseeing the implementation of the avoided cost methodology and the resulting audit at the one-year point indicates a distrust of the authority and work product of the Commission that is totally unwarranted. Accuracy and reliability of the avoided cost procedure will certainly be under

scrutiny at the one-year point and it appears that there are enough safeguards and reviews of the data and methodology used to warrant its imposition for one year.

### RECOMMENDATION OF THE ADMINISTRATIVE LAW JUDGE ON THE CONTESTED STIPULATED SETTLEMENT

Calculating a utility's avoided cost under PURPA is a complex and tricky matter. The fact that FERC regulations do not prescribe a particular method of calculation but rather leave it to individual jurisdictions is indicative of that fact. The interim avoided cost methodology currently in use has saved ratepayers millions of dollars, particularly where the cost of non-peak energy is concerned. Calpine/OCC argues that Entergy's motive in adjusting the avoided cost methodology is not purely altruistic. It declares that Entergy is trying to stifle competition from QFs. Entergy argues that Calpine/OCC is only interested in getting paid far greater amounts of money for its energy that it puts to Entergy than it could get for the same energy on the open market. As is often the case, the truth probably lies somewhere between these allegations. The main concerns of the Commission are to ensure that regulated utilities have a reasonable opportunity to make an adequate return on their investments, that the requirements of PURPA are met concerning promoting energy production from qualified QFs and that the ratepayers of Louisiana do not pay more for energy due to QF puts than they would if the puts were not made.

The fact that there has been a large increase in the amount of energy that QFs put onto Entergy's system over the last several years is not disputed. The fact that there does not appear to be a decline in the amount of energy put to the system by QFs since imposition of the interim method seems to indicate that they are still receiving adequate compensation for their energy. It is also necessary to realize that the goals of PURPA, which resulted in the requirement that regulated utilities be required to buy all of the energy QFs put on their systems, may have been

or may soon be met. There is currently a Proposed Rulemaking before the FERC addressing the possibility that regulated utilities may no longer be required to accept QF puts if certain criteria are met.

Although Calpine/OCC argued strenuously that the proposed avoided cost methodology does not conform to PURPA or the Commission's General Order, there does not appear to be any convincing evidence that this is the case. It also states that FERC has explained that the avoided cost rate must provide a reasonably verifiable and objective standard. It argues that this is not possible under this settlement. This tribunal disagrees with this statement. There is no one correct way to calculate avoided costs.

The calculations are complex and of necessity, require many "best guesses" and "judgment calls." This is a situation where there are many ways of getting from Point A to Point B, none of which involve a straight line. The calculation proposed in this Settlement Term Sheet appears to be the best method currently available to reach Point B, or determine Entergy's avoided cost. It provides the opportunity to audit the matter in one year and provides many safeguards to QFs. Some aspects, including the use of a 75% cap on rejected purchases, seem to be rather generous to QFs. No testimony was provided that indicated that transmission constraints or possible double counting of rejected purchases would make more than a small percentage of rejected costs unreliable.

## CONCLUSION

Rule (6)(E)(2)(b) of the Rules of Practice and Procedure of the Louisiana Public Service Commission states that the Administrative Law Judge shall issue a recommendation to the Commissioners with regard to the Contested Stipulated Settlement. In this proceeding,

comments were received that contested certain portions of the settlement. The opportunity to file rebuttal comments concerning the contested portions of the settlement was provided along with a hearing on the contested issues.

Having reviewed the challenges to the Contested Stipulated Settlement filed by Calpine/OCC, it is the recommendation of the Administrative Law Judge that the Settlement is in compliance with PURPA and the General Order and that it be adopted. The settlement methodology results in an avoided cost that is just and reasonable and nondiscriminatory against QF, while also being in the best interests of Louisiana ratepayers.

Baton Rouge, Louisiana this 27th day of June, 2006.

_____
Michelle Finnegan
Administrative Law Judge

cc: Official Service List
    By E-Mail and U. S. Mail

*Louisiana Public Service Commission*
*Administrative Hearings Division*
*11th Floor, Galvez Building*
*602 North Fifth Street*
*Post Office Box 91154*
*Baton Rouge, Louisiana 70821-9154*
*Telephone (225) 219-9417*
*Fax (225) 342-5611*

Docket No. U-27469
Recommendation on Contested
Proposed Stipulated Settlement
Page 17

# AGREEMENT FOR PURCHASED POWER
## FROM
## QUALIFIED COGENERATION FACILITY

## BETWEEN


## OCCIDENTAL CHEMICAL CORPORATION

## AND

## ENTERGY LOUISIANA, INC.


**DATED AS OF** _July 12_ , **2002**

EXHIBIT

tabbies®

"2"

# TABLE OF CONTENTS

ARTICLE I - DEFINITIONS.................................................................................1

ARTICLE II - SALE AND PURCHASE OF POWER.............................................3

ARTICLE III - TERM OF AGREEMENT ............................................................4

ARTICLE IV – MONTHLY PAYMENTS BETWEEN THE PARTIES ....................4

  A. CUSTOMER CHARGE PAYMENT FROM PRODUCER .............................4
  B. ENERGY PAYMENT TO PRODUCER......................................................5
  C. INVOICE AND PAYMENT DATES...........................................................5

ARTICLE V - POWER PURCHASE GENERAL TERMS AND CONDITIONS .........5

  A. AGREEMENT FOR ELECTRIC SERVICE – STANDBY SUPPLIED BY THE
     COMPANY..........................................................................................6
  C. LAND RIGHTS .....................................................................................6
  D. METERING ..........................................................................................6
  E. FORCE MAJEURE ...............................................................................8
  G. INDEMNITY .........................................................................................9
  H. WAIVER..............................................................................................9
  I.  ASSIGNMENT ...................................................................................10
  J.  APPLICABLE LAW .............................................................................10
  K. GOVERNMENTAL JURISDICTION AND AUTHORIZATION....................12
  M. NOTICES..........................................................................................12

ARTICLE VI - INSURANCE.............................................................................14

ARTICLE VII - GENERAL PROVISIONS ..........................................................14

i

# AGREEMENT FOR PURCHASED POWER
# FROM
# QUALIFIED COGENERATION FACILITY

THIS AGREEMENT ("Agreement") is made this _12th_ day of _July_, 2002, between Occidental Chemical Corporation, hereinafter called the "Producer" and/or "Customer", and Entergy Louisiana, Inc., an Louisiana corporation, hereinafter called the "Company," Producer and Company sometimes herein referred to individually as "Party" and collectively as "Parties").

## WITNESSETH:

WHEREAS, the Producer leases, or will lease, and operate a qualified cogeneration facility ("Facility"), qualifying under Section 201 of the Public Utility Regulatory Policies Act of 1978, as amended ("PURPA"), the regulations thereunder of the Federal Energy Regulatory Commission ("FERC Regulations"), and the Cogeneration Rules of the Louisiana Public Service Commission ("LPSC Rules"), and to be operated in accordance therewith; and,

WHEREAS, the Producer wishes to sell, and the Company agrees to purchase, electric energy from such Facility in accordance with rules and regulations of the appropriate regulatory authorities;

WHEREAS, the Producer and the Company have entered into an Interconnection and Operating Agreement ("IOA"), and the Producer and Entergy Services, Inc. as agent for the Company, have entered into a Generator Imbalance Agreement ("GIA"), both filed together on March 7, 2001 in Docket No. ER00-2621-000 with FERC;

NOW, THEREFORE, in consideration of and subject to the mutual covenants contained herein, it is agreed:

## ARTICLE I - DEFINITIONS

Whenever used in this Agreement and Attachments hereto, the following terms shall have the following meanings:

Avoided Costs - Avoided Costs shall have the definition of Avoided Costs as set forth in the LPSC General Order of February 27, 1998, and the Regulations adopted thereby or attached thereto – i.e., the incremental cost to Company of electric energy which, but for the purchase from Producer's Facility, Company would generate itself or purchase from another source.

Business Day – is defined as Monday through Friday, excluding Federal Banking Holidays.

1

<u>Company Transmission System</u> shall mean all the facilities owned or controlled by the Company on the Company's side of the Points of Interconnection for the purpose of providing service pursuant to this Agreement.

<u>Emergency</u> – shall mean any abnormal system condition that requires automatic or immediate manual action to prevent or limit loss of transmission facilities or generation supply that could adversely affect the reliability of the Company Transmission System or the systems to which the Company Transmission System is directly or indirectly connected..

<u>FERC</u> – shall mean Federal Energy Regulatory Commission or any successor thereto.

<u>Good Utility Practice</u> – shall mean any of the practices, methods and acts engaged in or approved by a significant proportion of the electric utility industry during the relevant time period, or any of the practices, methods and acts which, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at the lowest reasonable cost consistent with reliability, safety and expedition. Good Utility Practice is not intended to be limited to the optimum practice, method or act to the exclusion of all others, but rather to be a spectrum of acceptable practices, methods or acts..

<u>Governmental Authority</u> – shall mean any nation, state, sovereign or other government, any federal, regional, state, local or political subdivision thereof, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including the LPSC and FERC.

<u>Interconnection Facilities</u> – shall mean all facilities presently in place or presently proposed to be installed, or facilities which are later installed, in order to interconnect and deliver energy from the Facility to the Company Transmission System including, but not limited to, connection, distribution, engineering, administrative, transformation, switching, metering and safety equipment.

<u>Law(s)</u> shall mean:  (i) any law, legislation, statute, act, rule, ordinance, decree, treaty, regulation, order, judgment, tariff requirement or other similar legal requirement; or (ii) any legally binding announcement, directive or published practice or interpretation thereof, enacted, issued or promulgated by any Governmental Authority.

<u>LPSC</u> – shall mean the Louisiana Public Service Commission or any successor thereto.

2

<u>Net Energy Delivered</u> — shall mean the energy delivered to the Company available at the Point of Interconnection, as defined in the IOA, in excess of Scheduled Energy, if any, less step-up transformation or interconnection losses, if any.

<u>Operation Date</u> — shall mean the day commencing at 00:01 hours on the day following the day during which Interconnection Facilities and equipment of the Facility have been completed to Company's and Producer's mutual satisfaction and energized in parallel operation of Company's and Producer's systems as confirmed in a writing.

<u>Point of Interconnection</u> — shall mean the point or points where the facilities of Producer interconnect with the facilities of Company.

<u>Producer's Facility</u> — shall mean the qualifying cogeneration facility described in Article II of this Agreement.

<u>PURPA</u> — shall mean the Public Utility Regulatory Policies Act of 1978, as amended.

<u>Scheduled Energy</u> — shall mean the amount of energy generated by Producer scheduled to be delivered to third party(ies) pursuant to Entergy's Open Access Transmission Tariff ("OATT").

## ARTICLE II - SALE AND PURCHASE OF POWER

A.   The Producer agrees to sell and deliver, and the Company agrees to purchase and accept such Net Energy Delivered as the Producer makes available to the Company, at any given time.

B.   The Producer's Facility rated at 778 MW, located at Taft, Louisiana shall be the source of the Net Energy Delivered. Producer has self-certified the Producer's Facility as a qualifying facility pursuant to FERC regulations in Docket No. QF00-64-000. Producer represents and warrants that the Producer's Facility meets all requirements for qualification as a qualifying facility pursuant to the provisions of PURPA, the FERC Regulations and the LPSC Rules.

C.   Company shall not be required to take or pay for Net Energy Delivered it is permitted to refuse under the terms of this Agreement and any applicable provisions of PURPA or its implementing FERC regulations, or pursuant to the LPSC General Order of February 27, 1998.

For example, Company will not be required to purchase electric energy during any period during which, due to operational circumstances, purchases from Producer will result in costs greater than those which Company would incur if it did not make such

purchases, but instead generated an equivalent amount of energy itself. Operational circumstances shall include light loading problems. Company shall provide Producer reasonable advance notice and coordinate such reductions with Producer in time for the Facility to cease delivery of such energy. A claim by Company that such a period has occurred or will occur is subject to such verification by the LPSC either before or after the occurrence.

## ARTICLE III - TERM OF AGREEMENT

This Agreement shall be binding upon execution and shall remain in effect until a mutually agreed termination date not to exceed the date on which the Facility ceases commercial operations, provided this Agreement is in effect pursuant to the then applicable Law; provided, that either the Producer or Company may terminate this Agreement by giving written notice of its intent to do so to the other Party not less than ___60_____ days prior to the effective date of such termination. Neither Party's agreement to the foregoing termination rights, nor any termination hereunder, shall constitute, or be construed as, a waiver by either Party of any of its rights under the LPSC Rules, or any other applicable Law. If, for any reason, delivery, purchase, and/or payment hereunder are suspended, delivery, purchase, and/or payment shall promptly resume upon correction or elimination of the condition that gave rise to the suspension.

The Parties acknowledge that certain provisions of the IOA are incorporated herein by reference, and the Parties hereby agree to be bound by the terms and conditions of the following provisions of the IOA, as modified from time to time by the Parties, or pursuant to any successor agreement thereto between the Parties:

1.   Article 4, Operations;

2.   Article 5, Maintenance;

3.   Article 6, Emergencies; and

4.   Article 7, Safety.

## ARTICLE IV – MONTHLY PAYMENTS BETWEEN THE PARTIES

**A.   CUSTOMER CHARGE PAYMENT FROM PRODUCER**

Producer shall pay Company a monthly Customer charge of $169.00

**B.   ENERGY PAYMENT TO PRODUCER**

The monthly payment to Producer for the Net Energy Delivered shall be based on Entergy Louisiana, Inc.'s Purchased Power Service Rate Schedule PPS-1 (or any

4

superseding Rate Schedule approved by the LPSC). The rate applicable to Net Energy Delivered will be the calculated hourly Avoided Costs at the time of delivery to Company.

## C.   INVOICE AND PAYMENT DATES

The Company will prepare an invoice monthly reflecting the total energy (kWh), if any, purchased in each hour at the Avoided Costs for that hour and submit it to Producer no later than the fifteenth (15th) Business Day of the month after the month of deliveries ("Invoice Month"). The Company shall pay the Producer no later than ten (10) calendar days following the date of the invoice. Producer will be provided a monthly report of energy purchased in each hour, if any, and the Avoided Cost for each hour in which Net Energy Delivered was purchased by the Company.

## ARTICLE V - POWER PURCHASE GENERAL TERMS AND CONDITIONS

## A.   AGREEMENT FOR ELECTRIC SERVICE – STANDBY SUPPLIED BY THE COMPANY

This Agreement does not provide for supply of any electric service by the Company to the Producer. The Producer may enter into separate contract arrangements with the Company in accordance with the Company's applicable electric service tariff on file with and authorized by the appropriate Governmental Authority.

## B.   DEFAULT

Each of the following shall constitute an "Event of Default":

a.   The failure by a Party to pay any amount owed hereunder which is not being disputed in good faith, which failure continues for three (3) Business Days after receipt of written notice thereof from the other Party.

b.   The failure by a Party to perform any other material covenant set forth in this Agreement, which failure continues for thirty (30) days after receipt of written notice thereof from the other Party.

If an Event of Default occurs, the non-defaulting Party shall be entitled to exercise its remedies at Law and in equity, including any right to terminate this Agreement immediately by written notice to the defaulting Party and suspension of receipt and delivery of power.

## C.  LAND RIGHTS

Each Party shall furnish at no cost to the other Party any necessary access, easements, licenses, and/or rights of way upon, over, under, and across lands owned or controlled by either Party and/or its affiliated interests for the construction and operation of necessary lines, substations, and other equipment to accomplish interconnection of the Facility with the Company Transmission System under this Agreement and shall, at all reasonable times, give the other Party, or its agents, free access to such lines, substations, and equipment for purposes under this Agreement. An accessible, protected and satisfactory site selected upon mutual agreement by the Parties and located                                   on                                   the Customer's premises shall be provided by and at the Customer's expense for installation of metering devices for purposes of this Agreement, unless Company elects to install meters on poles or other locations controlled by it.  Customer grants to Company at all reasonable times and with reasonable supervision, the right of free ingress and egress to Customer's premises for the purpose of installing, testing, reading, inspecting, repairing, operating, altering or removing any of Company's property located on Customer's premises or for other purposes necessary to enable Company to receive under this Agreement Net Energy Delivered or suspend the receipt thereof, or determine Customer's compliance with this Agreement.

## D.  METERING

Company shall provide, install, own and maintain metering equipment necessary to meet its obligations under this Agreement ("Metering Equipment").  If necessary, Metering Equipment shall be either located or adjusted, at Company's option in coordination with Customer, in such manner to account for any transformation or interconnection losses between the location of the meter and the Points of Interconnection. Metering quantities, in analog and/or digital form, shall be provided to Customer upon request. All reasonable costs associated with the administration of Metering Equipment and the provision of metering data to Customer under this Agreement shall be borne by Customer. The costs of administration and of providing metering data shall be separately itemized on Company's invoice to Customer.  All reasonable costs associated with either the initial installation of metering under this Agreement or any changes to Metering Equipment requested by Customer, shall be borne by Customer.

## E.  FORCE MAJEURE

### 1.  Definition

"Force Majeure" shall mean an event or circumstance beyond the reasonable control of and without the fault or negligence of the Party claiming Force Majeure. It shall include an act of God; war (declared or undeclared); sabotage; riot; insurrection; civil unrest or disturbance; military or guerilla action; banditry; terrorist activity or a threat of terrorist activity which, under the circumstances, would be considered a precursor to actual

6

terrorist activity; economic sanction or embargo; civil strike, strike, work stoppage, slow-down, or lock-out; explosion; fire; earthquake or seaquake; abnormal weather condition; action of the elements; hurricane; flood; lightning; wind; drought; peril of the sea; the binding order of any governmental authority (provided that such order has been resisted in good faith by all reasonable legal means); the failure to act on the part of any governmental authority (provided that such action has been timely requested and diligently pursued); unavailability of fuel (but only to the extent that such unavailability or interruption of fuel is caused by a breakdown or failure of pipelines, facilities and/or equipment not owned, maintained, or controlled by Producer), equipment, supplies or products, and failure of equipment. Neither the lack of money nor changes in market conditions shall constitute an event of Force Majeure.

2.    Effect of Force Majeure

If either Party is rendered wholly or partly unable to perform its obligations under this Agreement because of Force Majeure, that Party shall be excused from whatever performance is affected by the Force Majeure to the extent so affected, provided that the Party affected by such Force Majeure, as soon as reasonably practical after the occurrence of the claimed Force Majeure event, gives the other Party prompt oral notice, followed by a written notice within 48 hours after such oral notice, fully describing the particulars of the occurrence. Notwithstanding anything in this Section to the contrary, no payment obligation arising under this Agreement prior to the date of an event of Force Majeure shall be excused by such event of Force Majeure.

**F. CONTINUITY OF SERVICE**

Notwithstanding any other provision of this Agreement, Company shall not be obligated to accept, and Company may require Producer to curtail, interrupt or reduce, deliveries of, Net Delivered Energy if such delivery of energy impairs Company's ability to construct, install, repair, replace or remove any of its equipment or any part of its system or if Company determines that curtailment, interruption or reduction is necessary because of Emergencies, forced outages, operating conditions on its system, or any reason otherwise permitted by applicable rules or regulations promulgated by a regulatory agency having jurisdiction over such matters. The Parties shall coordinate, and if necessary negotiate in good faith, the timing of such curtailments, interruptions, reductions or deliveries with respect to maintenance, investigation or inspection of Company's equipment or system. Nothing in this Section constitutes a waiver of Producer's or Company's rights under the IOA.

Except in case of Emergency, in order not to interfere unreasonably with the other Party's operations, the curtailing, interrupting or reducing Party shall give the other Party reasonable prior notice of any curtailment, interruption or reduction, the reason for its occurrence, and its probable duration.

## G.  INDEMNITY

Producer agrees to fully indemnify and hold Company, its shareholders, directors, partners, stakeholders, officers, managers, employees, agents, representatives, servants, its affiliated and associated companies, their respective shareholders, directors, partners, stakeholders, officers, managers, employees, agents, representatives, servants, and/or their assigns, harmless from and against any and all claims, demands, liability, losses, damage, costs or expenses (including attorneys' fees and other costs of defense), of any nature or kind whatsoever, including, but not limited to, claims, demands and/or liability for personal injury to (including death of) any person whomever (including payments and awards made to Producer's employees or other under any workers' compensation law or under any plan for employees' disability and death benefits) and for damage to any property whatsoever (including Producer's Facility and the Company Transmission System) arising out of or otherwise resulting from the use, ownership, maintenance, or operation of the Producer's Facility, regardless of whether such claims, demands or liability are alleged to have been caused by negligence or to have arisen out of Company's status as the owner or operator of facilities involved; provided, however, that the provisions of this Section shall not apply if any such personal injury or property damage is held to have been caused by the negligence or the intentional wrongdoing of Company, its agents or employees.

Company agrees to fully indemnify and hold Producer, its shareholders, directors, partners, stakeholders, officers, managers, employees, agents, representatives, servants, its affiliated and associated companies, their respective shareholders, directors, partners, stakeholders, officers, managers, employees, agents, representatives, servants, and/or their assigns, harmless from and against any and all claims, demands, liability, losses, damage, costs or expenses (including attorneys' fees and other costs of defense), of any nature or kind whatsoever, including, but not limited to, claims, demands and/or liability for personal injury to (including death of) any person whomever (including payments and awards made to Company's employees or other under any workers' compensation law or under any plan for employees' disability and death benefits) and for damage to any property whatsoever (including the Company Transmission System) arising out of or otherwise resulting from the use, ownership, maintenance, or operation of Company's Transmission System, regardless of whether such claims, demands or liability are alleged to have been caused by negligence or to have arisen out of Producer's status as the owner or operator of facilities involved; provided, however, that the provisions of this Section shall not apply if any such personal injury or property damage is held to have been caused by the negligence or the intentional wrongdoing of Producer, its agents or employees.

Neither Party shall be liable in statute, contract, in tort (including negligence), strict liability, or otherwise to the other Party, its agents, representatives, its affiliated and associated companies, and/or its assigns, for any incidental or consequential loss or damage whatsoever, including, but not limited to, loss of profits or revenue on work

8

not performed, for loss of use of or under-utilization of the other Party's facilities, or loss of use of revenues or loss of anticipated profits, resulting from either Party's performance or non-performance of an obligation imposed on it by this Agreement.

Each Party acknowledges and agrees that in no event shall any partner, shareholder, owner, officer, director, employee or affiliate of either Party be personally liable to the other Party for any payments, obligations, or performance due under this Agreement, and any breach or failure of performance of the obligations hereunder shall be against the Producer or Company and not against any other person, except for such liability as expressly assumed by an assignee pursuant to an assignment of this Agreement in accordance with the terms hereof.

## H.   WAIVER

Any waiver at any time by either Party of its rights with respect to a default under this Agreement, or with respect to any other matters arising in connection with this Agreement, shall not be deemed a waiver with respect to any subsequent default or other matter.

## I.   ASSIGNMENT

Neither Party shall voluntarily assign its rights nor delegate its duties under this Agreement, or any part of such rights or duties, without the written consent of the other Party, which consent shall not be unreasonably withheld, except in connection with the sale, merger, or transfer of a substantial portion of its properties (or in the case of Company, its transmission facilities) including the Interconnection Facilities which it owns so long as the assignee in such a sale, merger, or transfer assumes directly all rights, duties and obligations arising under this Agreement and such assignor shall be, without further action, released from its obligation hereunder. Any such assignment or delegation made without such written consent shall be null and void. In addition, Company shall be entitled to assign the Agreement to any wholly-owned direct or indirect subsidiary of Entergy Corporation.

Notwithstanding the foregoing, Producer may assign this Agreement (and shall be, without further action, released from obligation hereunder) without Company's prior consent to the owner of the Facility. In addition and notwithstanding the foregoing, Producer or its assignee may assign this Agreement to the persons, entities or institutions providing financing or refinancing to an owner or lessor of the Facility for the development, design, construction or operation of the Facility, and if Producer provides notice thereof to Company, Company shall provide notice and reasonable opportunity for such parties to cure any default under this Agreement. Company shall, if requested by such parties, execute a consent to assignment in a form acceptable to Company and execute its standard documents and certificates, and shall provide an opinion of counsel, as may be requested with respect to the assignment and status of this Agreement, provided such documents do not change the rights of Company under this

Agreement except with respect to providing notice and reasonable opportunity to cure. In the event of (i) any foreclosure by such lenders or sale by such owner or lessor, or (ii) the termination of any lease regarding the Facility, the purchasers or any subsequent purchaser at such foreclosure or termination of Facility's lease, shall if it requests, be entitled to the rights and benefits of (and be bound by) this Agreement so long as it is an entity entitled to interconnect with the Company Transmission System.

## J.  APPLICABLE LAW

This Agreement is executed in accordance with and is intended to be construed under the Laws of the State of Louisiana, excluding any Law related to conflict or choice of Law which would result in the application of any Law to this Agreement other than the Laws of the State of Louisiana.

## K.  GOVERNMENTAL JURISDICTION AND AUTHORIZATION

This Agreement is subject to all present and future Laws and ruling of Governmental Authority and shall not become effective until filed with and approved by the LPSC, to the extent such approval is required, and/or accepted by any other Governmental Authority. Each Party expressly reserves the right to terminate this Agreement should a Governmental Authority materially and adversely modify or rescind the rights and obligations of the Parties, or the terms, conditions, or enforceability of this Agreement, and the Parties are unable to amend this Agreement to confer to each Party materially similar benefits to the ones hereunder.

## L.  STATUTORY OR REGULATORY CHANGES

1. The Parties recognize and hereby agree that Company is entering into this Agreement to implement the statutory and regulatory requirements relating to qualifying facilities under PURPA, the FERC Regulations , and the LPSC Rules ("Qualifying Facilities") or other applicable laws or regulations presently in force under federal and state Law. If, during the term hereof, such statutory or regulatory requirements change (including, without limitation, legislative, administrative or judicial changes, interpretations or reinterpretations, whether involving Company's participation or not) in such a way as to reduce, limit, modify or remove the requirement that Company accept and pay for electric energy tendered from Producer's Facility, then Company shall have the right, upon ninety (90) days written notice, to reduce, limit or modify its purchases and takes of Net Energy Delivered, to the same extent permitted or required by such change in statutory or regulatory requirements. Producer may at its option supply or sell all or any part of such Net Energy Delivered to any lawful purchaser to the full extent permitted by applicable Law.

2.     This Agreement has been entered into in accordance with relevant rules of the LPSC currently in force; however, if any federal, state or regulatory authority, including without limitation the LPSC, should for any reason enter an order, modify its rules or Company's tariff, or take any action whatever, having the effect of disallowing Company's recovery in its rates, fuel cost recovery factor, purchase power recovery factor, or otherwise, of all or any portion of the cost of purchases hereunder from the Producer's Facility (except where such disallowance is due to a finding by the LPSC of imprudence on the part of the Company, or a failure to seek recovery or comply with procedural requirements governing recovery of such costs), Company may, at its option, suspend any affected portion(s) of payment obligations hereunder pending approval of a superseding order, modified rules or tariff for Company, or other action that would permit timely recovery of such costs. During such suspension, Producer may make any lawful disposition it elects of the energy for which payment has been suspended to the full extent permitted by applicable law. Company and Producer obligate themselves to all good faith efforts necessary to expedite the establishment, if possible, of such superseding order, approval of modified rules or tariffs, or other action so as to allow the earliest possible resumption of full, or failing that, adjusted payments hereunder. Should any such government or regulatory action hereunder become final and unappealable:

a.     Producer shall indemnify Company (including interest at a rate equal to the "Prime Rate" for domestic banks, as published in The Wall Street Journal (Northeast edition) in the "Money Rates" section, in effect on the date payment is due, plus one percent (1%) per annum, not to exceed the maximum rate allowed by applicable law.) to the extent of any prior payments for energy made to Producer, the recovery of which is prevented by such government or regulatory action; and

b.     Company may, at its option, upon at least fourteen (14) days prior written notice to Producer, and within thirty (30) days following the date on which such government or regulatory action hereunder becomes final and unappealable, reduce Producer's payments hereunder to a level that will allow Company complete recovery thereof; and

c.     Producer may, at its option, upon at least fourteen (14) days prior written notice to Company, and within thirty (30) days following the date on which such government or regulatory action hereunder becomes final and unappealable:  (i) terminate this Agreement in whole or in part, or (ii) reduce its deliveries of energy hereunder.

This Section L shall survive termination of this Agreement for a period of two (2) years after the effective date of termination.

3.     Nothing in this Agreement is intended to preclude Producer from transmitting on Company's system, subject to terms and conditions to be agreed upon by the Parties in accordance with any applicable rules and regulations, any

Net Energy Delivered for which payment has been suspended, under Section L above.

## M.  NOTICES

Any notice, demand or request required or permitted to be given by either Party to the other and any instrument required or permitted to be tendered or delivered by either Party to the other may be so given, tendered or delivered, as the case may be, by (i) commercial overnight courier such as Federal Express; (ii) by facsimile so long as delivery is confirmed in writing; (iii) deposit in any United States Post Office with postage prepaid, for transmission by certified or registered mail, addressed to the Party, or (iv) personally delivered to the Party, at the address set out below:

To Company:     President
                Entergy Louisiana, Inc.
                4809 Jefferson Highway
                Jefferson, Louisiana 70121

                Facsimile:

To Producer:    Occidental Chemical Corporation
                5 Greenway Plaza, Suite 1500
                Houston, TX 77046
                Attention: Director, Energy

                Facsimile:

## ARTICLE VI - INSURANCE

Without limiting any obligations or liabilities under this Agreement, Producer shall, at its expense, provide and maintain in effect for the life of this Agreement, minimum insurance coverage (in any combination of primary and excess layers), as follows:

Workers' Compensation Insurance in accordance with all applicable state, federal, and maritime laws, including Employer's Liability Insurance in the amount of $1,000,000 per accident. Policy shall be endorsed to include a Waiver of Subrogation in favor of Company and its affiliated and associated companies.

Commercial General Liability Insurance/Excess Liability Insurance, including Contractual Liability Coverage for liabilities assumed under this Agreement, and Personal Injury Coverage in the amount of $25,000,000 per occurrence for Bodily Injury and Property Damage. The Company and its affiliated and associated companies shall be included as Additional Insureds.

Producer, at its option, may self-insure all or part of the insurances required in this Article; provided, however, Producer agrees that all other provisions of this Article, including, but not limited to, waiver of subrogation, waiver of rights of recourse, and additional insured status, which provide or are intended to provide protection for Company and its affiliated and associated companies under this Agreement, shall remain enforceable. Producer's election to self-insure shall not impair, limit, or in any manner result in a reduction of rights and/or benefits otherwise available to Company and its affiliated and associated companies through formal insurance policies and endorsements as specified in the above paragraphs of this Article. Producer further agrees that all amounts of self-insurance, retentions and/or deductibles are the responsibility of and shall be borne by the Producer.

Without limiting any obligations or liabilities under this Agreement, Company shall, at its expense, provide and maintain in effect for the life of this Agreement, minimum insurance coverage (in any combination of primary and excess layers), as follows:

Workers' Compensation Insurance in accordance with all applicable state, federal, and maritime laws, including Employer's Liability Insurance in the amount of $1,000,000 per accident. Policy shall be endorsed to include a Waiver of Subrogation in favor of Producer and its affiliated and associated companies.

Commercial General Liability Insurance/Excess liability Insurance, including Contractual Liability Coverage for liabilities assumed under this Agreement, and Personal Injury Coverage in the amount of $25,000,000 per occurrence for Bodily Injury and Property Damage. The Producer and its affiliated and associated companies shall be included as Additional Insureds.

Company, at its option, may self-insure all or part of the insurances required in this Article; provided, however, Company agrees that all other provisions of this Article, including, but not limited to, waiver of subrogation, waiver of rights of recourse, and additional insured status, which provide or are intended to provide protection for Producer and its affiliated and associated companies under this Agreement, shall remain enforceable. Company's election to self-insure shall not impair, limit, or in any manner result in a reduction of rights and/or benefits otherwise available to Producer and its affiliated and associated companies through formal insurance policies and endorsements as specified in the above paragraphs of this Article. Company further agrees that all amounts of self-insurance, retentions and/or deductibles are the responsibility of and shall be borne by the Company.

All policies of insurance shall provide for 30 days prior written notice of cancellation, or material adverse change. Prior to the date the Facility is first operated in parallel with Company Transmission System and annually thereafter during the term

of this Agreement, Certificates of Insurance shall be furnished by each Party to the other.

## ARTICLE VII - GENERAL PROVISIONS

The Company shall not be liable for any costs or damages due to the inability of the Producer or its designated representatives to obtain any licenses or permits required by any Governmental Authority.

This Agreement along with any appendices constitutes the entire agreement between the Parties with reference to the subject matter hereof, and no change or modification as to any of the provisions hereof shall be binding on either Party unless reduced to writing and approved by the authorized officer or agent of the Producer and the President or a Vice President of the Company.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by their duly authorized officers on the day and year first above written.

**OCCIDENTAL CHEMICAL CORPORATION**

By: _Steph R. Sitzwell_

Title: _V. P. Manufacturing_

**ENTERGY LOUSIANA, INC.**

for By: _JT Fludm_

Title: _V.P. Commercial & Industrial Markt_

**WITNESSES**

_(signature)_

_(signature)_

DATE _7/9/02_

_(signature)_

_(signature)_

DATE _7/11/02_

RES\020411c

14

## BEFORE THE

## LOUISIANA PUBLIC SERVICE COMMISSION

### GENERAL ORDER
*(Amends and Supersedes Order No. U-14964)*

Docket No. U-22739. In re: Generic Rulemaking Proceeding Concerning Avoided Costs Estimates.

(Decided at the February 18, 1998 Open Session)

This proceeding was initiated in July of 1997 in order to revise and update the regulations and guidelines of the Louisiana Public Service Commission (the "LPSC" or "Commission") concerning the administrative determination of avoided costs. The impetus for this docket was the Commission's review and investigation of issues raised in the administrative hearings for Docket No. U-21384.

The Commission believed that action in this docket would have industry-wide implications and, therefore, it was treated as a rule-making proceeding. All Louisiana electric utilities and qualifying facilities were invited to participate in the docket. Parties taking active roles in this docket included: the Commission through its Legal, Economic, Audit and Utilities Division; representatives of CII, L.L.C. (Calciner), Louisiana Energy Users Group (LEUG), Cajun Electric Power Cooperative, Inc., Southwestern Electric Power Company (SWEPCO) and Entergy Louisiana, Inc. (ELI).

On November 3, 1997, the Commission Staff issued a Notice of Proposed Rulemaking (NOPR) to members of the service list for this proceeding. The NOPR set forth criteria that Staff thought essential in developing an administrative method for determining avoided costs. Additionally, the NOPR contained a discussion of the various methods to be considered by the Staff in its investigation. After receiving comments from the parties regarding the NOPR, Staff further researched the methods under consideration and circulated to the electric utilities and qualifying facilities a proposed set of rules to which additional comments were submitted to the Staff. Thus, this General Order is the product of a collaborative process involving the Commission Staff and all interested industry representatives who chose to participate.

In this docket, the Commission is proposing to amend its regulations governing purchases and sales of electricity between electric utilities and qualifying cogeneration facilities and qualifying small power production facilities (QFs) and the purchase of electricity form such facilities as prescribed by Section 210 of the Public Utility Regulatory Policies Act of 1978 (PURPA). Section 210 and 201 of PURPA seeks to encourage the development of cogeneration and small power production facilities. It had as its main objectives the conservation of energy in the generation of electric power and the encouragement of alternative sources of power generators, known as qualifying facilities (QFs), and it required all utilities to buy all electricity that these qualifying facilities wished to sell.

In order to protect consumers from having to subsidize QFs, Congress provided that the maximum price for electricity from these facilities was the cost that the utility would have incurred if it had generated the electricity itself or had purchased it from a source other than the QF. It was assumed that the cost that a utility would have to pay for power from a QF would never be above that utility's "avoided costs" for new supplies of power that it needed.

PURPA established a partnership between the Federal Energy Regulatory Commission (FERC) and the states to implement its terms. The FERC established general guidelines and, subject to those guidelines, the states determined "avoided costs" and other key elements of utilities' power purchase obligations. In accordance with PURPA, the Louisiana Public Service Commission in Docket Number U-14964 adopted rules for the sale of energy by electric utility companies to qualifying cogeneration facilities and qualifying small power production facilities and the purchase of electric energy from such facilities. The attached order would amend sections of Commission Order No. U-14964, by more sharply defining guidelines and criteria for the administrative determination of avoided costs and the regulations of purchases from QFs.

*Page 1*                    *General Order dated February 27, 1998*



EXHIBIT

"3"

After careful review of the issues presented in this docket, the Commission Staff recommended use of the Economic Dispatch Model (EDM) as a reasonable approach to calculating the costs that are actually avoided by a utility as a result of a purchase from a qualifying cogeneration facility or small power production facility. It was the Commission Staff's belief that using the utility system's actual cost during an hour to calculate the payment to a QF for energy delivered by the QF to the utility during that same hour should ensure that electric utility ratepayers are not adversely affected by the purchase of energy from the QF, while at the same time ensuring that the rate does not discriminate against the QF. The approach set forth in the General Order will produce a result that is consistent with the stated intent of the Public Utility Regulatory Policy Act of 1978, which requires at a minimum, that it be accurate, fair and in the public interest.

Accordingly, at the Commission's February 18, 1998 Open Session, on motion of Commissioner Owen, seconded by Commissioner Field, the Commission voted unanimously to adopt the attached General Order, as amended in Section 201(c) by motion of Commissioner Blossman.

**IT IS THEREFORE ORDERED THAT:**

1.  The Regulations for the determination of avoided costs as attached hereto are hereby adopted.

2.  All provisions of these Regulations are hereby ordered by the Commission.

3.  All entities subject to the provisions of this Order shall forthwith take all actions required by the regulations found therein.

4.  This Order shall be effective immediately.

**BY ORDER OF THE COMMISSION**
**BATON ROUGE, LOUISIANA**
**FEBRUARY 27, 1998**

/S/ DON OWEN
DON OWEN, CHAIRMAN
DISTRICT V

/S/ IRMA MUSE DIXON
IRMA MUSE DIXON, VICE-CHAIRMAN
DISTRICT III

/S/ C. DALE SITTIG
C. DALE SITTIG, COMMISSIONER
DISTRICT IV

/S/ JAMES M. FIELD
JAMES M. FIELD, COMMISSIONER
DISTRICT II

SECRETARY

/S/ JACK "JAY" A. BLOSSMAN, JR.
JACK "JAY" A. BLOSSMAN, JR., COMMISSIONER
DISTRICT I

*General Order dated February 27, 1998*

# *REGULATIONS*

**Section 101 Definitions.**

  (a)   General rule. Terms defined in the Public Utility Regulatory Policies Act of 1978 (PURPA) shall have the same meaning for purposes of this rule as they have under PURPA, unless further defined in this rule.

  (b)   Definitions. The following definitions apply for purposes of this rule.

     (1)   "Qualifying facility" means a cogeneration facility or a small power production facility which is a qualifying facility under Subpart B of the Federal Energy Regulatory Commission's Regulations under Section-201 of the Public Utility Regulatory Policies Act of 1978 as in effect on the date of the adoption of these rules except that:

        (I)   A cogeneration facility which utilizes reject heat from a useful thermal energy process for the production of electrical energy and otherwise qualifies under these Rules shall be considered to be a qualifying facility regardless of the source of the energy input to the thermal process and the efficiency standard of Section 201 shall only apply to any such facility utilizing oil or natural gas for supplemental firing.

     (2)   "Purchase" means the purchase of electric energy or capacity or both from a qualifying facility by an electric utility.

     (3)   "Sale" means the sale of electric energy or capacity or both by an electric utility to a qualifying facility.

     (4)   "System emergency" means a condition on a utility's system which is likely to result in imminent significant disruption of service to customers or is imminently likely to endanger life or property.

     (5)   "Rate" means any price, rate, charge, or classification made, demanded, observed or received with respect to the sale or purchase of electric energy or capacity, or any rule, regulation, or practice respecting any such rate, charge, or classification, and any contract pertaining to the sale or purchase of electric energy or capacity.

     (6)   "Avoided costs" means the incremental costs to an electric utility of electric energy or capacity or both which, but for the purchase from the qualifying facility or qualifying facilities, such utility would generate itself or purchase from another source.

     (7)   Interconnection costs" means the reasonable costs of connection, switching, metering, transmission, distribution, safety provisions and administrative costs incurred by the electric utility directly related to the installation and maintenance of the physical facilities necessary to permit interconnected operations with a qualifying facility.

     (8)   "Supplementary power" means electric energy or capacity supplied by an electric utility, regularly used by a qualifying facility in addition to that which the facility generates itself.

     (9)   "Long term contract" means a contract which is for a term of at least one year and can be for a term of up to twenty years.

(10) "Back-up power" means electric energy or capacity supplied by an electric utility to replace energy ordinarily generated by a facility's own generation equipment during an unscheduled outage of the facility.

(11) "Interruptible power" means electric energy or capacity supplied by an electric utility subject to interruption by the electric utility under specified conditions.

(12) "Maintenance power" means electric energy or capacity supplied by an electric utility during scheduled outages of the qualifying facility.

(13) "Firm power" from a qualifying facility is power or power producing capacity that is available to the electric utility pursuant to a legally enforceable obligation for scheduled availability over a specified term.

(14) "Non-firm power" from a qualifying facility is power provided under an arrangement that does not guarantee scheduled availability, but instead provides for delivery as available.

(15) "Commission" means the Louisiana Public Service Commission.

**Section 201  Scope.**

(a) Applicability.  This subpart applies to the regulation of sales and purchases between qualifying facilities and electric utilities.

(b) Negotiated rates or terms.

(1) Any electric utility and qualifying facility may agree to a rate for any purchases, or terms or conditions relating to any purchase, which differ from the rate or terms or condition which would otherwise be required by this subpart; and

(2) Any contract entered into between a qualifying facility and an electric utility for any purchase shall comply with applicable rules, regulations, practices and procedures of the Commission in effect at the date of execution of the contract.

(3) No utility may unreasonably refuse to negotiate and enter into a long-term contract for the purchase of energy and/or capacity.

(c) Review and Approval of Contracts.  Except as provided in 203 (d), no utility may enter into a contract with a qualifying facility without first obtaining the approval of the Commission.  Upon receipt of a filing, the Commission shall review the contract and, if found to be just and reasonable, issue an Order approving the contract.

(d) Confidentiality of Qualifying Facility Data.  Any data or information furnished by a qualifying facility to a utility during negotiations which is specified as confidential and privileged shall be regarded by the utility as confidential and privileged.

**Section 202  Availability of electric utility system cost data.**

(a) Applicability.  This section applies to all electric utilities regulated by the Commission.

(b) Each electric utility shall make available data reporting the actual cost of time of delivery on an hourly basis for each day of the reporting period.  The data shall be made available not later than 30 days from the date these rules become effective and quarterly thereafter.  The data shall be submitted in an electronic format acceptable to the Commission, both in hard copy and on a 3.5" diskette.  The data shall contain the following:

(1) The actual avoided costs on the electric utility's system, solely with respect to the energy component, for various levels of purchases from qualifying facilities. Such levels of purchases shall be stated in blocks of not more than 100 megawatts for systems with peak demand of 1000 megawatts or more, and in blocks equivalent to not more than 10 percent of the system peak demand for systems of less than 1000 megawatts.

(2) The actual avoided costs shall be stated on a cents per kilowatt-hour basis.

(c) Review.

(1) Any data submitted by an electric utility under this section shall be subject to an annual review for accuracy, adequacy, content and timeliness, by the Commission.

(2) In any such review, the electric utility has the burden of coming forward with justification for its data.

## Section 203  Electric utility obligations under this subpart.

(a) Obligation to purchase from qualifying facilities. Each electric utility shall purchase, in accordance with Section 204, any energy and capacity which is made available from a qualifying facility:

(1) Directly to the electric utility; or

(2) Indirectly to the electric utility in accordance with paragraph (d) of this section.

(b) Obligation to sell to qualifying facilities. Each electric utility shall sell to any qualifying facility, in accordance with Section 205, any energy and capacity requested by the qualifying facility.

(c) Obligation to interconnect.

(1) Subject to paragraph (c)(2) of this section, any electric utility shall make such interconnections with any qualifying facility that normally would or could be served, under the Commission's Rules, by that utility as may be necessary to accomplish purchases or sales under this subpart. The obligation to pay for any interconnection costs shall be determined in accordance with Section 206.

(2) No electric utility is required to interconnect with any qualifying facility if, solely by reason of purchases or sales over the interconnection, the electric utility would become subject to regulation as public utility under Part II of the Federal Power Act.

(3) The Commission shall be informed of any request for an interconnection made by a qualifying facility to an electric utility company solely to permit the sale of energy by such qualifying facility to an electric utility other than the one requested to provide the interconnection before an agreement in consummated.

(d) Transmission to other electric utilities. If a qualifying facility agrees, an electric utility which would otherwise be obligated to purchase energy or capacity from such qualifying facility may transmit the energy or capacity to any other electric utility. Any electric utility to which such energy or capacity is transmitted shall purchase such energy or capacity under this subpart as if the qualifying facility were supplying energy or capacity directly to such electric utility. The rate for purchase by the electric utility to which such energy is transmitted shall be adjusted up or down to reflect line losses pursuant to Section 204(e)(4). The rate paid by a purchasing utility shall not include any charges for transmission; however, the wheeling utility shall be paid a reasonable

transmission charge, including consideration of line losses, by the selling qualifying facility. Rates for wheeling within the meaning of this rule shall apply only to transmission from the qualifying facility to the purchasing utility. The Commission shall be informed of any proposed agreement between a qualifying facility and an electric utility company other than the electric utility company whose service area includes the location of the qualifying facility before such agreement is consummated. Nothing in this section shall interfere with the right of any qualifying facility to apply to the FERC for an order pursuant to Section 211 of the Federal Power Act (16 U.S.C. § 824(j)) requiring a transmitting utility to provide transmission services to the applicant.

(e)     Parallel operation.  Each electric utility shall offer to operate in parallel with a qualifying facility, provided that the qualifying facility complies with any applicable standards established in accordance with Section 208.

**Section 204    Rates for purchases.**

(a)     Rates for purchases.  The Commission hereby sets the following minimum requirements for avoided costs rates. With respect to the rates for purchases, they shall be:

    (1)     Reasonable and just to the electric consumer of the utility and in the public interest.

        (I)     In general, a rate shall be just and reasonable if the rate equals the avoided costs of the utility.

        (ii)    A rate for purchase (other than from "new capacity") may be less than avoided costs if, in the opinion of the Commission, the lower rate is consistent with the minimum requirements and is at a level sufficient to encourage cogeneration     and small power production in the market. This section does not apply to purchases of capacity from a Qualifying Facility ("QF"), construction of which was commenced on or after November 9, 1978.

        (iii)   Rates for purchases may be negotiated and, if the parties cannot agree, the parties shall submit the issue to the Commission which will resolve the matter on a case by case basis.

    (2)     Non-discriminatory against qualifying cogeneration and small power prodution:

    (3)     At a level not to exceed the actual avoided costs of the utility; and

    (4)     Negotiated by the parties, and, in the case such negotiation fails, either party may submit the issue to the Commission which will resolve the matter on a case by case basis.

(b)     Relationship to avoided costs.

    (1)     For purposes of this paragraph, "new capacity" means any purchase from capacity of qualifying facility, construction of which was commenced on or after November 9, 1978.

    (2)     Subject to paragraph (b)(3) of this section, a rate for purchases satisfies the requirements of paragraph (a) of this section if the rate equals the avoided costs determined after consideration of the factors set forth in paragraph (e) of this section.

(3)    A rate for purchases (other than from new capacity) may be less than the avoided cost if the Commission finds that with respect to a particular qualifying facility, avoided costs rates would be unjust or unreasonable to the electric consumers of the electric utility.

(4)    Rates for purchases shall be in accordance with paragraph (b)(2) and (b) (3) of this section, regardless of whether the electric utility making such purchases is simultaneously making sales to the qualifying facility.

(c)    Standard rates for purchases.

    (1)    There shall be put into effect, not later than six months from the date the rules become effective, standard rates for purchases from qualifying facilities with a design capacity of 100 kilowatts or less.

    (2)    The standard rates for purchases under this paragraph:

        (I)    Shall be consistent with paragraphs (a) and (e) of this section; and

        (ii)    May differentiate among qualifying facilities using various technologies on the basis of the supply characteristics of the different technologies; and

        (iii)    Shall specify terms and conditions of service such as metering, safety, liability and access to equipment, etc.

(d)    Purchases "as available" or pursuant to a legally enforceable obligation. Each qualifying facility shall have the option either:

    (1)    To provide non-firm energy as the qualifying facility determines such energy to be available for such purchases, in which case the rates shall be based on the purchasing utility's avoided costs calculated at the time of delivery; or

    (2)    To provide firm energy or capacity pursuant to a legally enforceable obligation for the delivery of energy or capacity over a specified term, in which case the rates shall as agreed upon prior to the beginning of the specified term, be based on either

        (I)    The avoided costs calculated at the time of delivery; or

        (ii)    The avoided costs calculated at the time the obligation is incurred.

    (3)    Nothing in these rules shall restrict the right of a qualifying facility to provide some portions of its energy or capacity upon terms and conditions for purchase by a utility which may differ from the terms and conditions upon which it provides other portions of its energy or capacity for purchase by the utility.

(e)    Elements affecting rates for purchases. In determining rates for purchases from qualifying facilities, the following elements shall, to the extent practicable, be taken into account:

    (1)    The data provided pursuant to Section 202(b);

    (2)    The availability of capacity and energy from a qualifying facility during the system daily and seasonal peak periods, including:

(i)    The ability of the utility to dispatch the qualifying facility;

(ii)    The expected or demonstrated reliability of the qualifying facility;

(iii)    The terms of any contract or other legally enforceable obligation, including the duration of the obligation, termination notice requirement and sanctions for non-compliance;

(iv)    The extent to which scheduled outages of the qualifying facility can be usefully coordinated with scheduled outages of the utility's facilities.

(v)    The usefulness of energy and capacity supplied from a qualifying facility during system emergencies, including its ability to separate its load from its generation;

(vi)    The individual and aggregate value of energy and capacity from qualifying facilities on the electric utility's system;

(vii)    The smaller capacity increments and the shorter lead times available with additions of capacity from qualifying facilities.

(3)    The relationship of the availability of energy and capacity from the qualifying facility as derived in paragraph (e) (2) of this section, to the ability of the electric utility to avoid costs, including the avoidance or deferral of capacity additions or portions thereof, the avoidance or deferral of demand charges associated with power purchases from other utilities or pools, and the reduction of fossil fuel use; and

(4)    The costs or savings resulting from variations in line losses from those that would have existed in the absence of purchases from a qualifying facility, if the purchasing electric utility generated an equivalent amount of energy itself or purchased an equivalent amount of electric energy or capacity.

(f)    Factors for consideration. The following factors should be considered in the calculation of avoided costs:

(1)    fuel costs;
(2)    variable operating and maintenance costs;
(3)    line losses;
(4)    heat rates;
(5)    cost of purchases from other sources;
(6)    other energy-related costs;
(7)    capacity costs, if the utility requires additional capacity and if, as a class, qualifying facilities providing nonfirm energy offer some predictable capacity; and
(8)    for energy purchases, the time and quantity of energy furnished.

(g)    The avoided cost shall be determined for each time period (usually for each hour) by using the utility system's economic dispatch model (or comparable methodology) to calculate the difference between the cost of the total amount of energy actually furnished by the utility system (calculated using the actual costs of the utility system's generation and off-system purchases and assuming zero costs for energy supplied by the qualifying facilities) and the cost the utility system would have been required to incur had energy not been supplied by the qualifying facility(ies).

(h) The economic dispatch model shall take into consideration the following factors:

    (1) fuel costs;
    (2) variable operating and maintenance costs
    (3) line losses;
    (4) heat rates;
    (5) purchased power opportunity;
    (6) system stability; and
    (7) operating characteristics.

(i) Time periods shall be hourly.

(j) Administrative, billing, and metering costs shall be recovered through a monthly customer charge to the qualifying facility.

(k) For information purposes only, the projections of avoided cost rates by utilities shall be filed on an annual basis with the Commission. The following are a set of minimum standards and data that shall be used for these projections:

    (1) A "state-of-the-art" production costing model should be utilized for projecting fuel expenses.

    (2) Key input data should reflect historic data with any deviation from historical data clearly explained for the reasonableness of the deviation.

    (3) Key factors such as generating characteristics and fuel data should be for the same time frame and reflect consistent assumptions. In other words, there should be no double standard for input items.

    (4) Demand forecasts should utilize weather normalization.

    (5) Demand forecasts should be current and reflect the economic growth and population changes in the utility's service area.

    (6) Demand forecasts should take into consideration the elasticity assumptions of electricity in the utility's market. In other words, the sensitivity in the quantity demanded of electricity given income changes and price changes of electricity should be incorporated into the forecast models.

    (7) Fuel prices should consider such factors as historic fuel costs, world markets, spot markets, current fuel contracts, inventory levels and availability, and purchasing volumes.

    (8) Major changes from the last fuel projection filed with the Commission should be adequately explained.

    (9) The projected avoided costs shall be stated on a cents per kilowatt-hour basis, during daily and seasonal peak and off-peak periods, by year, for the current calendar year and each of the next 5 years.

    (10) The electric utility's system plan for the addition of capacity by amount and type, for purchases of firm energy and capacity, and for capacity retirements for each year during the succeeding 10 years.

    (11) The estimated capacity costs at completion of the planned capacity additions and planned capacity firm purchases, on the basis of dollars per kilowatt, and the associated energy costs of each unit, expressed in cents per kilowatt-hour. These costs shall be expressed in terms of individual generating units and of individual planned firm purchases.

          *General Order dated February 27, 1998*

    ●          ●

(12)    Additional data may be made available as mutually agreed upon by the electric utility and qualifying facility. In the event of a dispute, the Commission will determine the reasonableness of the request, and issue an appropriate Order, pursuant to the provision of Section 301 of these Rules.

(l)    Periods during which purchase not required.

    (1)    Any electric utility which gives notice pursuant to paragraph (l)(2) of this section will not be required to purchase electric energy during any period during which, due to operational circumstances such as light loading problems, purchases from qualifying facilities will result in costs greater than those which the utility would incur if it did not make such purchases, but instead generated an equivalent amount of energy itself.

    (2)    Any electric utility seeking to invoke paragraph (l)(1) of this section must notify each affected qualifying facility in time for the qualifying facility to cease the delivery of energy to the electric utility.

    (3)    Any electric utility which fails to comply with the provisions of paragraph (l)(2) of this section will be required to pay the same rate for such purchase of energy as would be required had the period described in paragraph (l)(1) of this section not occurred.

    (4)    A claim by an electric utility that such a period has occurred or will occur is subject to such verification by the Commission as it determines necessary or appropriate either before or after the occurrence.

## Section 205  Rates for sales.

(a)    General rules.

    (1)    Rates for sales:

        (i)    Shall be just and reasonable and in the public interest; and

        (ii)    Shall not discriminate against any qualifying facility in comparison to rates for sales to other customers served by the electric utility.

    (2)    Rates for sales to any qualifying facility shall be determined in the same manner as any other sales and shall not be considered to discriminate against any qualifying facility to the extent that such rates apply to the utility's other customers with similar load, cost or other characteristics as deemed appropriate by the Commission.

        (I)    Rates for sales of power as described in paragraphs (b) and (c) of this section shall be negotiated by the parties and shall be filed with the Commission to become effective not later than 12 months after the date these rules become effective.

(b)    Additional Services to be Provided to Qualifying Facilities.

    (1)    Upon request of a qualifying facility, each electric utility shall provide:

        (i)    Supplementary power;
        (ii)    Back-up power;
        (iii)    Maintenance power; and
        (iv)    Interruptible power.

On peak loads and off peak rates for Back-Up and Maintenance Power shall be required. The peak period is defined as the summer season from June 1 through September 15 during the hours of 6 a.m. and 12 midnight on weekdays and off-peak period is defined as all other hours of the year unless otherwise defined by the Commission.

(2) The Commission may waive any requirement of paragraph (b)(1) of this section if, after notice in the area served by the electric utility and after opportunity for public comment, the electric utility demonstrates and the Commission finds that compliance with such requirement will:

(I) Impair the electric utility's ability to render adequate service to its customers; or

(ii) Place an undue burden on the electric utility; or

(iii) Unreasonably interfere with the operation of existing contracts under which the utility is providing power to its customers.

(c) Rates for sales of back-up and maintenance power. The rate for sales of back-up power or maintenance power:

(1) Shall not be based upon an assumption (unless supported by factual data) that forced outages or other reductions in electric output by all qualifying facilities on an electric utility's system will occur simultaneously, or during the system peak, or both; and

(2) Shall take into account the extent to which scheduled outages of the qualifying facilities can be usefully coordinated with outages of the utility's facilities.

### Section 206  Interconnection costs.

(a) Obligation to pay. Each qualifying facility shall be obligated to pay any reasonable interconnection costs which electric utility may assess against the qualifying facility on a nondiscriminatory basis with respect to other customers with similar load characteristics.

(b) Reimbursement for interconnection costs. The Commission shall determine the options available to the qualifying facility for payments of interconnection costs.

### Section 207  System emergencies.

(a) Qualifying facility obligation to provide power during system emergencies. A qualifying facility shall be required to provide energy or capacity to an electric utility during a system emergency only to the extent:

(1) Provided by agreement between such qualifying facility and electric utility; or

(2) Ordered under section 202(c) of the Federal Power Act.

(b) Discontinuance of purchases and sales during system emergencies. During any system emergency, an electric utility may discontinue:

(1) Purchases from a qualifying facility if such purchases would contribute to such emergency. For billing purposes, purchases shall continue to the extent that a qualifying facility itself is able to use the power it produces; and

(2) Sales to a qualifying facility, provided that such discontinuance is on a nondiscriminatory basis.

**Section 208  Standards for operating reliability.**

The Commission may establish reasonable standards to ensure system safety and reliability of interconnected operations.

**Section 301  Resolution of disputes.**

(a)  A proceeding to resolve a dispute between an electric utility and a qualifying facility arising under this rule may be instituted by the filing of a petition with the Commission in accordance with the Rules of Practice and Procedure of the Commission.

(b)  Commission Resolution of Disputes Related to Contracts.  If a contract has not been successfully negotiated within 90 days after submission of a written proposal by the qualifying facility, or of a written request to the utility for a proposal; or, if there is an alleged breach of an existing contract or a dispute between the parties as to interpretation of an existing contract, the Commission may, in its discretion on a case-by-case basis, provide a resolution of the specific matters at issue according to the following procedures:

(1)  The qualifying facility or the electric utility may petition the Commission for informal arbitration of the specific matters in dispute, naming the other party as respondent.

(2)  Upon receipt of a petition from either party, and of a certificate of service of the petition upon the other party, the Commission shall assign the case to one or more members of its staff, who will conduct informal arbitration on an expedited basis and issue a written decision within 30 days, except that:

(3)  Within 30 days of the issuance of the staff decision either party may bring a formal appeal to the Commission from any part of the decision.  If no appeal has been filed within 30 days, the staff decision will become final and binding upon the parties as an order of the Commission.

(4)  An appeal and Commission proceedings upon the appeal will be conducted according to the Commission's existing rules for the formal adjudications of cases, except that to the extent possible, an expedited schedule will be maintained which will permit issuance of the Commission's final decision within 90 days of the staff decision appealed from.  The Commission's decision will be in the form of an Order and will be final and binding upon the parties subject to appeal.

**Section 401  Exemptions from regulation.**

(a)  Exemption.  All qualifying facilities are exempted from Louisiana State laws and regulations, other than those promulgated herein, respecting:

(1)  The rates of electric utilities; and
(2)  The financial and organizational regulation of electric utilities.

**Section 501  Provisions for Annual Review and Audit**

(a)  Any data submitted by an electric utility in accordance with this Order shall be subject to an annual review for accuracy, adequacy, content and timeliness by the Commission.

(b)  In any such review, the electric utility  has the burden of proving by clear and convincing evidence that the avoided costs rates for purchases and sales are just, reasonable and in the public interest.

(c)  The Commission Staff, when deemed appropriate by the Commission, shall review the method of calculating avoided cost set forth in this document.

**Section 601  Confidentiality Statement.**

Pursuant to a standing Commission order, any data or information furnished by a party with respect to avoided costs shall be treated as confidential and subject to review only under the Commission's standard confidentiality agreement.

**117 FERC ¶61,206**

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Occidental Chemical Corporation & Carville Energy LLC

Docket No. EL06-106-000

v.

The Louisiana Public Service Commission

NOTICE OF INTENT NOT TO ACT

(November 17, 2006)

1.      On September 18, 2006, in Docket No. EL06-106-000, Occidental Chemical Corporation and Carville Energy LLC, a subsidiary of Calpine Corporation, (collectively, Petitioners), filed a petition for enforcement action pursuant to section 210(h)(2) of the Public Utility Regulatory Policies Act of 1978 (PURPA).[1]

2.      Petitioners state that on July 12, 2006, the Louisiana Public Utilities Commission (the Louisiana Commission) issued an order approving an avoided cost methodology that understates Entergy's avoided energy costs. This order approved a settlement agreement that requires Entergy to calculate its avoided costs for unscheduled QF energy payments by taking into account not only its own generating resources, but also energy that it would have purchased from other sources, but for the QF puts. Petitioners claim that the methodology adopted by the Louisiana Commission systematically understates Entergy's avoided energy costs. Petitioners ask the Commission to institute an enforcement proceeding against the Louisiana Commission to prevent implementation of the Louisiana Commission's order.

---

[1] 16 U.S.C. § 824a-3(h) (2000).



EXHIBIT
" 4 "

3.    Notice is hereby given that the Commission declines to institute an enforcement action under section 210(h)(2) of PURPA.

By direction of the Commission.

( S E A L )

Magalie R. Salas,
Secretary.

# LOUISIANA PUBLIC SERVICE COMMISSION

## ORDER NO. U-27469-A

### LOUISIANA PUBLIC SERVICE COMMISSION,
### EX PARTE.

---

**DOCKET NO. U-27469 - IN RE: EXAMINATION INTO WHETHER ENTERGY GULF STATES, INC. AND ENTERGY LOUISIANA, INC.'S PROPOSED NEW "AVOIDED COST" CALCULATION METHODOLOGY IS PROPER AND ALLOWABLE UNDER COMMISSION GENERAL ORDER DATED FEBRUARY 27, 1998.**

---

(Decided at the October 8, 2003 Business and Executive Session)

This matter is before the Commission for consideration of a Staff Report and Recommendation ("Staff Recommendation") in this Docket. At the September 10, 2003 Business & Executive Session we considered, for the first time, a proposal submitted by Entergy Louisiana, Inc. ("ELI") and Entergy Gulf States, Inc. ("EGS") (collectively referred to as the "Companies" or "Entergy") to modify certain portions of the methodology they use to calculate the avoided cost payments made to Qualifying Facilities ("QFs" or "co-generators"). ELI and EGS sought immediate implementation of the changes. When we first considered this matter there was very little detail concerning how the changed methodology would operate and its potential impacts. Numerous QFs objected to the proposed changes, at least until such time as further information was provided. At the September 10, 2003 B&E, we directed the Companies to delay implementation of the proposed avoided cost calculation methodology pending further investigation. We retained outside counsel and expert consultants to provide assistance to the in-house Commission Staff in its investigation of the proposed changes. Finally, we directed the Staff to report back to us with any preliminary recommendations. Prior to the October 8, 2003 B&E, we received from the Staff the results of its initial analysis of the Companies' filing. The Staff Recommendation proposes that we adopt, on an interim basis, a portion of the ELI/EGS proposal.

The Entergy Operating Companies are required by the Public Utility Regulatory Policies Act of 1978 ("PURPA") to purchase energy generated by QFs that is delivered or "put" to the Entergy System. Purchasing utilities are required to make payments to QFs for non-firm, as available energy in an amount equal to the Entergy System actual hourly avoided cost. The System's avoided cost is calculated using an economic dispatch model. In February 1998, we revised our guidelines concerning the determination of avoided costs for purposes of payments to QFs. LPSC General Order No. U-22739 (February 18, 1998) ("1998 General Order").

Entergy has indicated to the Staff that, according to its calculations and its observations of the operation of the market, during off-peak hours, the Companies are paying co-generators prices that reflect on-peak conditions. Entergy contends that it would be accessing the wholesale economy market and paying far lower prices but for the energy being "put" to it by the co-generators. The Companies claim that the existing formula is not capturing these lower "avoided costs" during the off-peak hours. All "avoided cost" payments made pursuant to the Commission's 1998 General Order are passed through the Companies' fuel adjustment clauses and collected from ELI and EGS ratepayers. Entergy calculated that for July 2003, for its LPSC-jurisdictional operations, it paid over $5 million dollars more to the co-generators under the existing formula than it would have under the proposed methodology. For the month of August 2003, for its LPSC-jurisdictional operations, it paid over $6 million dollars more to the co-generators under the existing formula than it would have under the proposed methodology.

The Staff recommends, based on its preliminary analysis, that the Companies be permitted to implement the portion of their proposal to utilize in their avoided cost calculation,

*Order No. U-27469-A*

**EXHIBIT**

" 5 "

offers that are rejected because of the co-generator "puts". Staff proposes that a full investigation be undertaken with an opportunity for discovery for all interested intervenors and hearings if necessary. Staff further recommends that Entergy be required to keep a separate set of books reflecting what the payments would have been as currently calculated. In the event that the Commission ultimately approves a methodology different than that approved on an interim basis, the Companies would credit or pay to the co-generators any excess amounts they would have been due under the formula as finally approved. Entergy would be permitted to collect those additional jurisdictional amounts from ratepayers via the fuel adjustment clause of each company. Staff believes that in this manner, ratepayers are held harmless, and the co-generators would be protected by the proposed true-up mechanism.

## DISCUSSION

Based on the Staff's analysis, we are convinced that interim action is necessary to ensure that ratepayers are not harmed during the pendency of this case through Entergy's use of an avoided cost mechanism that may overpay QFs, and, therefore, overcharge ratepayers. We have reviewed the Staff's recommendation and believe that it contains the safeguards necessary during the pendency of this proceeding to hold ratepayers harmless from potential overpayments while providing protection to co-generators in the event that we determine that Entergy's proposal should not be implemented, or should be adopted with changes. In addition, Entergy's proposal to utilize rejected purchases is consistent with our 1998 General Order on avoided costs and the provisions of PURPA. Both the federal statute and our 1998 General Order define avoided costs as "the incremental costs to an electric utility of electric energy or capacity or both which, but for the purchase from the qualifying facility or qualifying facilities, such utility would generate itself or purchase from another source." (1998 General Order, Sec. 101(b)(6)). The 1998 General Order further provides:

> The avoided costs shall be determined for each time period (usually for each hour) by using the utility system's economic dispatch model (or comparable methodology) to calculate the difference between the cost of the total amount of energy actually furnished by the utility system (calculated using the actual costs of the utility system's generation and off-system purchases and assuming zero costs for energy supplied by the qualifying facilities) and <u>the cost the utility system would have been required to incur had energy not been supplied by the qualifying facility(ies)</u>.

1998 General Order Sec. 204(g)
(emphasis supplied).

The cost that the Companies would have incurred but for energy or capacity supplied by the QFs includes the potential benefits from any economy and other purchases, as well as the avoided cost of Entergy's owned units. PURPA prohibits utilities from discriminating against co-generators, but it also requires that the rates paid for QF purchases "be just and reasonable to the electric consumers of the electric utility and in the public interest." 16 U.S.C. § 824a-3(b)(1). Entergy's proposed methodology to include consideration of rejected purchases is consistent with these provisions.

We decline, at this time, to implement Entergy's proposal to change its avoided cost calculation methodology to accommodate "emergency sales." During periods of low load on the Entergy System, if a QF delivers energy in excess of Entergy's needs, in order to keep the System in balance, Entergy might have to take a generator off-line, even if it is needed to serve load several hours later or the next day. Higher energy costs to Entergy's customers could result from purchases at market price to replace the energy from the unit taken off-line. To prevent the generator from being taken off-line, Entergy has the option of selling energy into the market at less than Entergy's incremental cost. Entergy seeks to include the cost of these emergency sales in its avoided cost calculation. Based on the limited time we have had to review this matter, it is unclear how, precisely, inclusion of these emergency sales would affect the avoided cost calculation and whether an amendment to our 1998 General Order would be required to include them in the calculation. In addition, the Companies have informed the Staff that these low load events are rare occurrences on the Entergy System and, at least in the short term, the cost

*Order No. U-27469-A*
