# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**OCCIDENTAL CHEMICAL CORPORATION**

**VERSUS**

**LOUISIANA PUBLIC SERVICE COMMISSION, ET AL**

**CIVIL ACTION**

**NUMBER  06-894-JJB-DLD**

**consolidated with**

**CARVILLE ENERGY, LLC**

**VERSUS**

**LOUISIANA PUBLIC SERVICE COMMISSION, ET AL**

**CIVIL ACTION**

**NUMBER  06-903-JJB-DLD**

## <u>ORDER</u>

This matter comes before the Court on cross motions for an order governing the protection and exchange of discovery material (rec. docs. 56 and 59).  After renegotiating their original proposals, upon instruction from the Court, the parties agree to a majority of the terms of a proposed protective order, but they disagree as to the terms governing the disclosure of "Highly Confidential Information" (HCI) to expert witnesses and to two of Occidental's employees.  The Court held oral argument on the cross motions on December 7, 2007.

## Background

In these consolidated actions, plaintiffs, Occidental Chemical Corporation (Occidental) and Carville Energy, L.L.C. (Carville), claim that the August 15, 2006, Final Order (Final Order) of the defendants, the Louisiana Public Service Commission, through its commissioners Jack Blossman, Jr., James Field, Lambert Boissiere, III, C. Dale Sitting,

and Foster Campbell (collectively "LPSC"), violates their rights under the United States Constitution and federal law (actions 06-894 and 06-903 rec. docs. 1).  Plaintiffs claim that the Final Order fails to implement the regulations promulgated by the Federal Energy Regulatory Commission (FERC) issued pursuant to the Public Utility Regulatory Policies Act of 1978 (PURPA) and violates federal law because it approves a new rate methodology that permits Louisiana's utilities, such as defendant Entergy[1], to purchase energy from qualifying facilities (QFs), such as plaintiffs, at a rate that is less than Entergy's "avoided costs." Id.  Plaintiffs also claim that because the LPSC Final Order fails to comply with PURPA or FERC's rules and regulations promulgated thereunder, it is preempted by federal law. Id.

These consolidated actions also contain claims arising out of the July 12, 2002, QF Contract between Occidental and Entergy Louisiana, Inc., and the August 31, 2002, QF Contract between Carville and Entergy Gulf States, Inc., which require defendant Entergy to purchase power from the plaintiffs at the "avoided cost" rate as defined in the 1998 LPSC Order.[2] Id.  Occidental claims that pursuant to the terms of the QF Contract, defendant Entergy Louisiana is obligated to pay it for energy at a rate equal to its avoided costs; therefore, it is liable on an open account basis for underpayments made since

---

[1] Entergy Louisiana LLC (06-894) and Entergy Gulf States, Inc. (06-903), the defendants in each of the consolidated actions, are referred to herein collectively as "Entergy."

[2] The LPSC initially implemented PURPA and FERC regulations in 1982.  On February 27, 2998, the LPSC issued a "General Order" amending and superceding its 1982 order.  The General Order required utilities subject to the jurisdiction of the LPSC to purchase all energy and capacity made available to QF's at prices equal to the purchasing utilities' "avoided costs."  The 1998 General Order defined "avoided costs" by using the FERC definition, and required a purchasing utility to determine its avoided costs on an hourly basis using an economic dispatch model that calculated the difference between the cost of energy actually furnished by the utility and the costs the utility would have been required to incur absent the presence of QF supply. See rec. doc. 51.

implementing the LPSC Interim Order in October 2003, which permitted Entergy to modify its avoided costs methodology pending a full investigation (action 06-894, rec. doc. 1). Both plaintiffs claim that Entergy Louisiana and Entergy Gulf States breached their QF Contracts with the plaintiffs and breached their implied covenants of good faith and fair dealing (actions 06-894 and 06-903 rec. docs. 1).  Both plaintiffs also seek attorney's fees. Id.

Both plaintiffs and defendants seek the entry of a protective order in this case, but disagree as to the specific terms necessary to protect the confidential/competitive information of the respective parties.  Plaintiffs and defendants originally filed separate motions for the entry of a protective order, with their proposed orders attached (rec. docs. 56 and 59).  The parties disagreed on several terms in the proposed protective orders, most specifically on the terms governing the disclosure of HCI to experts, employees and supervisors, and in-house counsel, directors, and officers engaged in competitive duties. Id.  The Court held oral argument on December 7, 2007, to discuss the outstanding issues between the parties (rec. doc. 75).  After oral argument, the parties agreed to renegotiate the terms of their competing protective orders and submit a joint proposed protective order with each party's objections noted on the document and a short supporting memorandum to explain the objections (rec. doc. 74).

The proposed joint protective order incorporates several of the terms agreed to by the parties (rec. doc. 77-2, Exhibit 1). Specifically, the parties were able to resolve the issues regarding the "Confidential" designation that related to pre-existing documents; the definition of HCI; and the burden of proof for a Producing Party to defend a Confidential or Highly Confidential designation.  The parties also were able to agree to the identity of the employees who are eligible to review HCI, with the exception of two Occidental employees.

Id.

Thus two unresolved issues are before the Court regarding the disclosure of HCI: whether experts engaged in competitive duties in a specific geographic area should be allowed to review HCI, 5(a)(iii) and Exhibit D, and whether two of Occidental's employees, Joe Matranga and Irv Kowenski, should be allowed to review  HCI in light of their job duties with Occidental, 5(a)(iv) and Exhibit E.  Id.

### Governing Law

Rule 26(c)(G) of the Federal Rules of Civil Procedure allows a district court to "make an order which justice requires to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense, including ... that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a designate way for good cause shown."   The requirement of a showing of good cause to support the issuance of a protective order indicates that "[t]he burden is upon the movant to show the necessity of its issuance, which contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements."  *In re Terra Intern., Inc.*, 134 F.3d 302 (5th Cir. 1998).

There is no absolute privilege for trade secrets and similar confidential information. *Centurion Industries, Inc. v. Warren Steurer and Associates*, 665 F.2d 323, 325 (10th Cir. 1981).  To resist discovery under Rule 26(c)(G), a party must first establish that the information sought is a trade secret or other confidential information and then demonstrate that its disclosure would cause an identifiable, significant harm. *Id, citing* 8 C Wright & A. Miller, Federal Practice and Procedure § 2043 at 301 (1970); see also *Deford v. Schmid*

-4-

*Products Co., a Div. of Schmid Laboratories, Inc*, 120 F.R.D. 648, 653 (D.Md. 1987)(and cases cited therein).  Where a business is the party seeking protection, it will have to show that disclosure would cause significant harm to its competitive and financial position. *Deford*, 120 F.R.D. at 653.   That showing requires specific demonstrations of fact, supported where possible by affidavits and concrete examples, rather than broad, conclusory allegations or potential harm.  Id.  If these requirements are met, the burden shifts to the party seeking discovery to establish that the disclosure of trade secrets is relevant and necessary to the action.  Id.  When competitively sensitive information is involved, "[t]he court must balance the risk of inadvertent disclosure against  the risk that the protective order will impair the prosecution or defense of the other party's claims." *In re Papst Licensing*, 2000 WL 136184 (E.D. 2000), *citing Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992).

The parties agree that a protective order under Fed. R. Civ. P. 26(c)(G) is necessary in this matter to protect the disclosure and exchange of highly sensitive competitive information (rec. docs. 57 and 60).

## Discussion

Although both parties agree that some of the information that will be produced through discovery in this case constitutes highly sensitive competitive information and, therefore, will be treated as HCI under the joint protective order, the parties disagree as to who can have access to this type of information.  Specifically, defendants seek to impose restrictive terms governing plaintiffs' selection of expert witnesses and the ability of expert witnesses to work in a competitive field after conclusion of the litigation.  Defendants propose that because retained experts are in a position to misuse HCI, they must be willing

to execute an affidavit confirming that they are not currently engaged in certain competitive duties and they are not currently assisting or advising an entity within the "Into Entergy Market Area" in six specific categories of competitively sensitive commercial advice (rec. doc. 77-2, Exhibit D).  Defendants' proposal defines the "Into Entergy Market Area" as including the Entergy, CLECO, Louisiana Generating, Louisiana Energy and Power Authority, and Union Power Project balancing authority areas, which is a broader geographic definition than that outlined in their original proposal (rec. doc. 77).  The broader definition includes market participants that regularly sell to the Entergy System.   Id. Defendants' proposal also requires the retained expert to agree not to engage in any of the six specific categories of activities during the course of the litigation or for one-year after the date the litigation is terminated. Id.

Plaintiffs argue that, given the facts of this case, they will be greatly disadvantaged by having to chose an expert who has not had any involvement with the Entergy balancing authority and is unfamiliar with the flow gates, transmission constraints, structural limitations, methodologies, and other highly detailed attributes of the Entergy system (rec. doc. 76).[3]  Plaintiffs claim that an expert with no prior knowledge of the specifics of Entergy's system will spend a significant amount of time and money educating himself on the basics needed to challenge whether the avoided cost methodology approved by the LPSC and utilized by Entergy violates federal law.  Id.

Plaintiffs also argue that defendants cannot prove that they would suffer significant

---

[3]   Neither defendants' proposed retained expert affidavit nor their arguments seem to impose a restriction that would require the plaintiffs to choose an expert who has not previously had involvement with the Entergy balancing authority (rec. docs. 77, pp. 7-8 and 77-2, Exhibit D).

harm by allowing experts to access HCI.  Plaintiffs support their argument with testimony of Entergy's counsel in a similar proceeding that proves that the actual threat is that market competitors will intervene in the litigation, request the produced documents, and collude with market participants to raise prices (rec. doc. 76, Exhibit 4).  Plaintiffs also offer FERC orders adopting protective orders where the threat of collusion was found not to be a deterrent to the production of highly sensitive protected material. Id., Exhibit 3.  Plaintiffs argue that there is no risk of significant harm in this case because only a few employees and two experts of the 74 market participants will have access to the HCI (rec. doc. 76).

Although plaintiffs believe they should have unfettered access to experts, they nevertheless have proposed an expert declaration that would preclude the parties from disclosing HCI to experts who currently engage in *certain* competitive activities, within a more limited geographic area (rec. doc. 76, Exhibit 6).  Their proposal further defines what competitive duties are of concern in this particular litigation.

The Court has reviewed all of the exhibits offered by the defendants in support of their position that disclosure of HCI to experts, without adopting their retained expert affidavit, would cause significant harm to competition and ultimately to Louisiana ratepayers.  As explained by plaintiffs, there is no risk in this case that any of the other market participants could intervene and seek discovery of the HCI because the plaintiffs are the only parties who objected to the proposed LPSC settlement, which allowed Entergy to modify its avoided cost methodology (rec. docs. 1 and 76, p. 5)**.**  However, there is a possibility that Entergy could suffer significant harm if an expert violated the terms of the protective order, shared HCI with other market participants, and the market participants colluded to raise prices.  Although argued more in conjunction with the limitations placed

on Occidental's employees, defendants have also raised concerns regarding an expert's ability to give advice to other market participants regarding when to "put" energy on the wholesale market, which could be informed by HCI disclosed in this case (rec. doc. 77). Plaintiffs have not offered evidence to rebut defendants' argument that it could suffer significant harm if experts are allowed to access HCI, without some restriction, considering their ability to advise other market participants on when to "put" energy.  The question, then, is what kind of restriction would meet the competing needs of the parties.

The expert affidavit proposed by the defendants is substantially more restrictive than the provisions in the FERC model protective order, and it is in addition to the agreed restrictions contained in the proposed order (rec. doc. 60-2, pg. 27).   The FERC model protective order provides, with respect to the disclosure of protected material, that if certain "reviewing representatives" are engaged in competitive duties, they may not use the disclosed information to give any participant in the proceeding or any competitor of any participant a commercial advantage (rec. doc. 60-2).  The proposed joint protective order contains a provision similar to the one in the FERC model order that offers substantial protection to HCI by providing that both "confidential information" and "HCI" shall not be used for any other purpose other than conducting this litigation, and "in no event shall such information be used for any business, competitive, personal, private, public, or other purpose" (rec. doc. 77-2, Exhibit 1, ¶3).  This limiting provision, combined with the Court's ability to enforce the order and sanction violations of the order, imposes substantial restrictions on the experts' use of HCI.

The FERC model protective order does not contain a provision restricting the disclosure of highly confidential information to certain individuals, and the sample FERC

protective orders attached by the parties handle the disclosure of highly confidential or highly sensitive material on a case-by-case basis.  See *Entergy Services, Inc.,* FERC Docket No. EL05-22-000, slip op., 23  (Mar. 2, 2005)(rec. doc. 76, Exhibit 3) and *Ameren Energy Generating Co.,* FERC Docket No. EC03-53-000 (May 29, 2003)(rec. doc. 77, Exhibit 4).

The language governing the disclosure of highly sensitive materials to "reviewing representatives" or experts in the FERC protective orders attached by the defendants is not as restrictive as the defendants' proposed retained expert affidavit. See  *Ameren Energy Generating Co.,* FERC Docket No. EC03-53-000 (May 29, 2003); *Entergy Services,* FERC Docket No. ER03-583-000 (July 23, 2003)(rec. doc. 77, Exhibit 4). Rather, the language governing the disclosure of highly sensitive materials to "reviewing representatives" or experts in the above cases is more similar to the plaintiffs' proposed expert affidavit.

In choosing any provision, the Court must balance the plaintiffs' need for discovery and their obligation to carry the burden of proof in this matter with the defendants' need to protect their HCI from disclosure.  The more restrictive the conditions for selecting an expert, the more difficult it becomes for the plaintiffs to have a fair opportunity to develop their case.  Many experts that could meet defendants' restrictions may also have problems surviving a *Daubert* motion. The expert affidavit proposed by the plaintiffs best accomplishes the balance between the defendants' need to protect their HCI from disclosure and the plaintiffs' right to fully prosecute their case. Thus, the Court adopts the plaintiffs' expert affidavit (rec. doc. 77-2, p. 26, Exhibit D).

With respect to party employees, the Court did not and does not reject the "competitive duty" rationale advanced by the defendants in earlier briefing and arguments

and recognizes that party employees who will have access to HCI should not engage in competitive duties.   Rather, the Court advised the parties at oral argument that the "competitive duty" terminology in defendants' original proposed protective order left the specifics of who could and could not access HCI ambiguous, and that future disputes between the parties could be eliminated by identifying specific employees who are not engaged in competitive duties, and, therefore, who will have access to HCI.   The very nature of truly HCI mandates that it not be distributed widely if it is to remain HCI.

To that end, Occidental has listed five (5) potential employees who would be allowed access to HCI under the joint protective order, and defendants object to two of the employees - Irv Kowenski and Joe Matranga.[4]   Occidental argues that defendants cannot prove that they will be significantly harmed by disclosing their HCI to these employees. Occidental claims that defendants will only suffer significant harm if the Court assumes that the two employees will breach the terms of the protective order, share the HCI with market participants, and collude with market participants to raise energy prices. (rec. doc. 76, pp. 7- 8).   Occidental argues that Entergy's hypothetical risk of harm is outweighed by Occidental's need for its President, Mr. Kowenski, to assist it in preparing this case for trial or settlement. Id.  With respect to Mr. Matranga, Occidental argues that his responsibilities do not include day-to-day trading activities or the direct supervision of any traders, and that absent collusion among all market participants, Mr. Matranga's access to HCI would not cause significant harm to Entergy. Id.

Defendants have offered significant evidence in the form of affidavits and deposition

---

[4] Two of Occidental's employees, Melissa Hunt and Andy Wu, that defendants do not object are in-house counsel (rec. doc. 77-2, p. 28).  Defendants also do not object to Occidental employee, Joe Marone.

testimony, which shows that both Mrrs. Kowenski and Matranga are regularly involved in Occidental's request for proposal process and bilateral negotiations of long-term contracts with Entergy, including the negotiation of contract pricing (rec. docs. 63-3 and 77-6, Exhibits 9-11).  It appears, however, that the bilateral negotiation and request for proposal process would not suffer significant harm absent a breach of the protective order and collusion among market participants.

However, defendants also have argued that Mr. Matranga is involved in the decision whether to "put" energy to Entergy or to sell it on the wholesale market, which decision could be impacted by HCI disclosed in this case (rec. doc. 77).  As a result, Energy claims that it could suffer significant harm by having to pay the higher of the two prices (the "put" price or the wholesale price) and never get the better deal for ratepayers. Id.   Occidental has failed to offer any evidence to rebut Entergy's argument that it could suffer significant harm  by allowing Mr. Matranga to access HCI based on Mr. Matranga's authority to decide whether to decide to "put" energy to Entergy or sell on the wholesale market. In light of the evidence of competitive job duties, Mr. Matranga should not be allowed to have access to HCI.

Additionally, Mr. Kowenski is the signatory to contracts between Occidental and Entergy.  Id.  Although plaintiffs argue that Mr. Kowenski should have access to HCI because, as President of Occidental Energy Ventures Corp., he has ultimate responsibility for the lawsuit and management decisions regarding litigation strategy, they do not explain why he needs to review the details of HCI in order to make litigation decisions.  As President of Occidental Energy Ventures Corp., Mr. Kowenski  employs attorneys and experts who will be able to review HCI and provide him with compilations of data or other

-11-

forms of information that would allow him to make informed decisions about litigation strategy.  Thus, Irv Kowenski is not allowed to have access to HCI, and and Section 5(a)(iv) should be amended to delete both Irv Kowenski and Joe Matranga from the listing.

Accordingly;

**IT IS ORDERED that**,

(1)     Defendants' motion for protective order (rec. doc. 56) is **DENIED**;

(2)     Plaintiffs' motion for protective order (rec. doc. 59) is **DENIED**;

(3)     Plaintiffs' version of the expert affidavit is incorporated into the joint protective order;

(4)     Irv Kowenski and Joe Matranga are stricken from the list of Occidental employees allowed to access HCI; and

(5)     The parties shall file a joint motion and revised  protective order incorporating the terms outlined by the Court on or before March 10, 2008.

Signed in Baton Rouge, Louisiana, on February 29, 2008.

**MAGISTRATE JUDGE DOCIA L. DALBY**