## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

OCCIDENTAL CHEMICAL                )
CORPORATION                        )
                                   )      CIVIL ACTION NO. 06-894-JJB-DLD
v.                                 )
                                   )
LOUISIANA PUBLIC SERVICE           )
COMMISSION, ET AL.                 )

consolidated with

CARVILLE ENERGY, LLC               )
                                   )
v.                                 )      CIVIL ACTION NO. 06-903-JJB-DLD
                                   )
LOUISIANA PUBLIC SERVICE           )
                                   )
COMMISSION, ET AL.                 )


### DEFENDANTS, ENTERGY LOUISIANA, LLC AND ENTERGY GULF STATES, INC.'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL DISCOVERY RESPONSES FROM ENTERGY

For the second time in three months, Plaintiffs, Occidental Chemical Corp. ("Occidental") and Carville Energy LLC ("Carville") (collectively "Plaintiffs") have filed a motion to compel that is both premature and meritless. For the reasons set forth in more detail below, Plaintiffs' Motion to Compel Discovery Responses from Entergy ("Plaintiffs' Motion" or "Pls. Mot.") should be denied.

1

## I.    SUMMARY OF ARGUMENT

For the past several months, the Defendants, Entergy Louisiana, LLC ("ELL") and Entergy Gulf States, Inc. ("EGS") (collectively "the Companies" or "Defendants")[1] have worked diligently to resolve any disagreements about both sides' productions in this case voluntarily.  Once the Court resolved the parties' disagreements concerning the protective order, the Companies agreed to produce the vast majority of documents requested by Plaintiffs and asserted legitimate objections related to a few remaining requests.  Production is ongoing, in accordance with a schedule agreed upon by the parties.  To date, the Companies have produced 102 gigabytes of information, which includes 8,542 documents,[2] as well as the data considered in the avoided cost calculation for a period of two years.[3]

With one exception, Plaintiffs' Motion presents a manufactured dispute that does not require the Court's intervention, at least not at this time.  The Motion focuses on four issues: (1) Plaintiffs' access to the Intra-System Bill ("ISB") Model; (2) Plaintiffs'

---

[1] The six Entergy Operating Companies ("Operating Companies") are Entergy Arkansas, Inc. ("EAI"), Entergy Gulf States Louisiana, L.L.C. ("EGSL"), Entergy Louisiana, LLC ("ELL"), Entergy Mississippi, Inc. ("EMI"), Entergy New Orleans, Inc. ("ENO"), and Entergy Texas, Inc.  Each Operating Company is a wholly-owned subsidiary of Entergy Corporation.  The electric generation and bulk transmission assets of these five Operating Companies are operated on a coordinated, integrated basis as a single electric system, referred to as the "Entergy System" or the "System."

[2] Notably, Plaintiffs have also produced far less information than the Companies.  Plaintiff Occidental has only produced 3 gigabytes of responsive information and Plaintiff Carville has only produced 4.5 gigabytes of information.

[3] Plaintiffs misrepresent Judge Brady's ruling on a motion to dismiss Plaintiffs' contract-related claims as a ruling that Plaintiffs are entitled to various categories of information sought in this motion to compel.  Judge Brady cited "data input used by Entergy in calculating the avoided cost" and "the structural limitations that the avoided cost model contains" as examples of what he concluded was a " 'common nucleus of operative facts' " to support the exercise of supplemental jurisdiction.  *Occidental Chem. Corp. v. Louisiana Public Serv. Comm'n,* 494 F. Supp. 2d 401, 415 (M.D. La. 2007).  The Companies have already produced the data inputs used in calculating avoided cost that are responsive to Plaintiffs' Request for Production ("RFP") 9 of  Plaintiffs' First Set of Requests for Production to Entergy ("Plaintiffs' RFPs") and have agreed to produce the inputs for the year 2004 in response to RFP 7 .  To the extent that Plaintiffs' Motion involves what Plaintiffs characterize as "structural limitations" in the avoided cost method approved by the LPSC, Judge Brady's opinion should not properly be viewed as prejudging any of the issues raised by Plaintiffs' Motion.  Judge Brady did not rule on the discoverability of this information in the context of specific requests and objections.

requests for transmission "studies;" (3) Plaintiffs' requests for information in the TRADES database; and (4) Plaintiffs' requests to access computer models used to commit and dispatch the Companies' generation fleet.

Despite the Companies having agreed to produce, or having already produced, voluminous information falling within the first three of these categories, Plaintiffs quibble with the manner in which the Companies have offered to make the ISB available for inspection, as well as the Companies' legitimate efforts to narrow the scope of requests for transmission studies and information from TRADES to include only what is properly discoverable in this case.  As described in more detail below, Plaintiffs' meritless complaints reflect their own failure, including through their own lack of diligence, to focus, narrow and even resolve the issues before involving the Court.

With respect to the ISB Model, Plaintiffs' Motion evidences a failure to engage in a good faith effort to resolve discovery disputes voluntarily.  Plaintiffs' Motion represents the first time Plaintiffs have objected to the Companies' offer to make the ISB Model available for reasonable inspection, a perfectly legitimate form of production under the circumstances when, as here, the Companies have asserted numerous, detailed objections, most notably including the impossibility of isolating the avoided cost calculation from the ISB Model and producing it to the Plaintiffs in a "reasonably useable form."  Fed. R. Civ. P. 34(b)(2)(d), (E)(ii); Defendants Entergy Louisiana, LLC and Entergy Gulf States, Inc.'s First Supplemental Responses to Plaintiffs' First Set of Requests for Production ("Defs.' Suppl. Resps.") at 11-12, attached to Plaintiffs' Memorandum in Support of Plaintiff's Motion to Compel ("Plaintiffs' Memorandum" or "Pls. Memo"), at Exhibit 1.

As for transmission "studies," Plaintiffs have moved to compel despite: (a) the overbreadth of their discovery requests, which call for production of studies that Plaintiffs admit "do not provide information necessary to assess Entergy's avoided cost calculation;"[4] and (b) Plaintiffs' failure to review the many hundreds of studies that fall within the categories of studies that the Companies have agreed to produce under the parties' agreed-upon production schedule.[5]

Concerning the TRADES database, Plaintiffs' Motion clearly demonstrates their failure to examine the data already produced by the Companies prior to filing.  As even a cursory examination would reveal, the Companies have already produced to Plaintiffs data about all purchases rejected for any reason, not only those "Avoided Cost Rejected Purchases" that are included in the avoided cost calculation.  In addition, the Companies have also agreed to produce data from TRADES related to off-system sales.  Finally, the Companies have produced information regarding purchases, to the extent they have been included in the avoided cost calculation.  The Companies are not obligated to produce this information from TRADES in multiple forms.  To the extent TRADES contains information that has not already been produced, that information is not relevant.

Plaintiffs have presented a ripe, legitimate dispute only related to the last category, the Companies' generation and dispatch model.  The Court should conclude that this information requested by Plaintiffs is irrelevant and falls outside the proper

---

[4] Occidental Chemical Corporation's Objections and Responses to Defendants Entergy Louisiana, LLC and Entergy Gulf States, Inc.'s First Set of Requests for Admission ("Occidental's RFA Responses") (attached hereto as Exhibit A), Responses to Request Nos. 1-2; Plaintiff Carville Energy LLC's Responses and Objections to Defendants Entergy Louisiana, LLC and Entergy Gulf States, Inc.'s First Set of Requests for Admission to Plaintiff ("Carville's RFA Responses") (attached hereto as Exhibit B), Responses to Request Nos. 1-2 (collectively "RFA Responses").

[5] By the end of June, the Companies anticipate producing more than 500 studies or links to such studies posted on the OASIS web site maintained by the Companies.

scope of discovery in this case. As a result, the Court should affirm the Companies'

legitimate objection to production of this irrelevant information.

      For all of these reasons, Plaintiffs' Motion should be denied.

## II.     PLAINTIFFS' MOTION SHOULD BE DENIED.

### A.     The Companies have fulfilled their discovery obligations by agreeing to make the ISB Model available for Plaintiffs' reasonable inspection.

      Plaintiffs manufacture a dispute by raising for the first time in their Motion an

objection to the Companies' offer to "make available for Plaintiffs' reasonable inspection

the ISB Model at a mutually convenient time at the Companies' offices" pursuant to Rule

34(b)(2)(d). Defs.' Suppl. Resps. at 12-13. Plaintiffs' Motion relies upon a letter that

they claim suggests that the Companies intend to limit Plaintiffs to a single reviewing

representative, a limitation that is neither included nor implied in the Companies' formal

written response. *Id.* If Plaintiffs had any questions about the scope of reasonable access

to the ISB Model, they could have sought clarification. Instead, Plaintiffs have never

contacted the Companies concerning the offered inspection.

      The Companies are willing to permit Plaintiffs a reasonable opportunity to review

the ISB Model and are not intent on limiting Plaintiffs to a single reviewing

representative. What is reasonable, in terms of the number of reviewing representatives

and number of opportunities for review, taking into consideration the Companies'

legitimate space, security and operating constraints, is surely something that the parties

should attempt to resolve in the first instance without Court intervention. At this

juncture, any disagreement is purely speculative and the Court should not act on

Plaintiffs' Motion.

As for Plaintiffs' objection that the Companies have agreed to allow Plaintiffs to inspect the ISB Model, rather than produce it,[6] Plaintiffs have completely ignored the Companies' extremely detailed explanation of why the avoided cost calculation contained in the Model cannot be extracted and produced.  *Id.* at 11-13.  The Companies have submitted a declaration from David Reed, (attached as Exhibit C hereto), verifying the substance of this objection.  Reed Decl. at ¶¶ 4-5.

Thus, the Companies have amply demonstrated that production (as opposed to inspection) of the ISB Model would be unduly burdensome, oppressive, and could not be used to accomplish the objectives Plaintiffs claim justify requiring physical production of the ISB Model.  The avoided cost calculation cannot be isolated from the ISB Model and produced to Plaintiffs in "reasonably useable form."  Fed. R. of Civ. P. 34(b)(2)(E)(ii); Reed Decl. at ¶ 6.  Even if it could, Plaintiffs do not claim to have the technical capability to run the ISB Model.  Furthermore, the ISB Model cannot be used to "test hypotheses and change assumptions" as Plaintiffs propose because it does not include any user interface to perform these functions.  Reed Decl. ¶ 4.  If Plaintiffs attempt these tasks that the ISB Model is not designed to perform, they will not generate valid results, and thus, extraction of the Model, even if it were possible, is not reasonably calculated to lead to the discovery of admissible evidence.  *Id.*; s*ee also Rates Technology, Inc. v. Elcotel, Inc.,* 118 F.R.D. 133, 135 (M.D. Fla. 2006) (stating that review of a computer program was valid because such a review could show "that production of the entire program is unnecessary and inappropriate"); Fed. R. Civ. P. 26(b)(1).  For all of these reasons, Plaintiffs' Motion should be denied as it relates to the ISB Model.

---

[6] In this Motion, Plaintiffs apparently are not challenging the Companies' objections to produce prior iterations of the ISB Model.  As a result, the legitimacy of the Companies' objections to that aspect of Plaintiffs' Motion need not be addressed here.

**B.    The Companies have made a reasonable, good-faith effort to respond to Plaintiffs' overly broad, unduly burdensome and ambiguous requests for transmission "studies."**

Plaintiffs' Memorandum creates the misleading impression that Entergy has in its possession "studies that show whether these transactions [Avoided Cost Rejected Purchases] are deliverable." Pls. Memo. at 3. In fact, the Companies do not "study" the deliverability of each Avoided Cost Rejected Purchase;[7] the Final Order does not require the Companies to do so.[8] Therefore, this dispute is about Plaintiffs' requests for documents that do not directly address whether a particular Avoided Cost Rejected Purchase was deliverable. When the documents requested by Plaintiffs are at best, indirectly related to disputed issues, the burden of such discovery "outweighs the likely benefits of the information sought" and should be foreclosed. *Muhammed v. Ness,* 47 F.3d 427, 1995 WL 71394, *2 (5th Cir. 1995) (unpublished); Fed. R. Civ. P. 26(b)(2).

As it relates to transmission, Plaintiffs' Motion essentially boils down to the following: (1) the Companies' efforts to narrow Plaintiffs' RFPs 20 and 23 related to studies of transmission constraints and relieving transmission constraints that Plaintiffs have effectively admitted are overbroad; and (2) the Plaintiffs' displeasure that despite their repeated efforts to rephrase RFP 21, there are no responsive documents to that

---

[7] For the purposes of this Memorandum, Rejected Purchases include all unconsummated offers to sell energy to the Companies that were rejected for any reason. Another category of unconsummated offers, Avoided Cost Rejected Purchases, are purchases that the Companies would have made if they had not been required to accept the energy put to them by QFs like the Plaintiffs in accordance with PURPA. Avoided Cost Rejected Purchases thus are a subset of all Rejected Purchases. Only Avoided Cost Rejected Purchases are included in the avoided cost calculation.

[8] Plaintiffs' contention that "the LPSC Order presumes that constraints on Entergy's transmission system do not exist" is flatly incorrect. Pls. Memo. at 10. Under the LPSC Order the Companies only consider Avoided Cost Rejected Purchases up to 75% of the total amount of QF put received. This 75% cap is designed to account for several of the alleged deficiencies in the Avoided Cost Method cited by Plaintiffs, including "double counting" and any alleged inability to deliver energy due to transmission constraints. LPSC Order No. U-27469-B at 4 (July 12, 2006) (describing the 75% cap as a safeguard). While Plaintiffs may disagree with the use of a cap to account for any transmission constraints limiting deliverability, it is inaccurate to suggest that the LPSC Order ignores this issue entirely.

request, as the Companies understand it.   Despite the Companies' good faith efforts to

provide responsive documents, the only clarity that has emerged is that Plaintiffs' RFPs

20, 21 and 23 are so vague, overbroad, and burdensome that the Companies should not be

required to produce any studies other than those they have already agreed to produce.

Regarding RFP 21, Plaintiffs have neither overcome the Companies' legitimate

vagueness objections nor legitimately called into question the validity of the Companies'

response that no responsive documents exist.   As a result, Plaintiffs' Motion should be

denied.

**1.      Plaintiffs either cannot or will not identify the types of "studies" related to transmission constraints with sufficient specificity to permit the Companies to respond.**

Contrary to Plaintiffs' suggestion, the Companies' narrowed response to RFPs 20

and 23 is not a result of feigned ignorance or intransigence.   See Pls. Memo. at 3.

Plaintiffs have insisted that the Companies produce all:

> "Studies" – *by way of example, include but are not limited to* any final version of any study, report, summary, presentation, memorandum, paper, analysis, investigation, summary or *any other document containing any findings, conclusions, opinions, evaluations or recommendations* as they relate to transmission constraints, release of transmission capacity, and the impact of transmission constraints since February 27, 1998.

Plaintiffs' First Set of Requests for Production to Entergy ("Pls. RFP") attached as

Exhibit 2. to Pls. Memo. (emphasis added).

Plaintiffs' contention that "studies" under their proposed definition "comprise a

reasonably narrow subset of documents" defies credibility.  Pls. Memo. at 11.  It is

difficult to imagine any document that would not possess any "findings, conclusions,

opinions, evaluations or recommendations;" most pieces of writing necessarily have such things, unless they are incoherent ramblings. Under Plaintiffs' overly broad, vague and ambiguous definition, any "document" or "paper" that is "final" and refers to a transmission constraint would be responsive.

In fact, Plaintiffs' inability – or unwillingness – to specify what they mean by "studies" has left the Companies unsure of what Plaintiffs are seeking. Documents requested in discovery must be described with "reasonable particularity." Fed. R. Civ. P. 34(b)(1)(A). This reasonable particularity requirement necessarily means that it is "essential" for document requests to have "[s]ome degree of specificity" and to "indicate within a reasonable degree of certainty" what is expected to be produced. *Hunter Outdoor Products, Inc. v. Bank of New York,* 21 B.R. 188, 192 (Bankr. D. Mass. 1982) (citing *Int'l Commodities Corp. v. Int'l Ore & Fertilizer Corp.,* 30 F.R.D. 58, 61 (S.D.N.Y. 1961)).

Numerous courts have denied motions to compel where, as here, the production requests at issue did not adequately specify the types of documents requested. *E.g., Hunter,* 21 B.R. at 192. In denying a motion to compel production of "all writings" based on the over breadth of the request at issue, one court reasoned as follows:

> Conceivably, the request would require Detrex to produce all writings relating to . . . any clean-ups, removal actions . . . remedial action . . remedial investigation or feasibility study involving Detrex. . . . . Moreover, the request is unlimited as to time frame, *as well as the types of "writings" which are sought*, and it falls far short of fulfilling the requirement of Rule 34(b) . . . . While there can be no doubt . . . [that the request] may net some relevant information, the same could perhaps be said of a request for each and every document in Detrex's possession. *The request in this instance represents not merely a fishing expedition, but as one court described it,*

> *an effort to drain the pond and collect the fish from the*
> *bottom. . . . No party seeking information is entitled to*
> *roam an adversary's files . . . .*

*Amcast Industrial Corp. v. Detrex Corp.,* 138 F.R.D. 115, 121 (N.D. Ind. 1991) (internal

citations and quotations omitted) (emphases added). *See also Apsley v. Boeing Co.,* 2007

WL 3120712, *5 (D. Kan. 2007) (vague requests for "financial presentations" were not

sufficient because Boeing provided numerous "presentations" concerning financial

matters every year); *Bitler Investment Venture II, LLC v. Marathon Ashland Petroleum*

*LLC,* 2007 WL 1164970, *6 (N.D. Ind. 2007).

Plaintiffs' requests for "studies" fall far short of the particularity required to

"indicate within a reasonable degree of certainty what the defendants would be expected

to produce." *Hunter,* 21 B.R. 188 at 192 (citations omitted). Thus, Plaintiffs' offer to

limit these requests to "final" studies presents a false compromise[9] that does not cure the

Companies' legitimate objections. The court should deny Plaintiffs' Motion to Compel

production of this indeterminate set of documents. *Bruggeman v. Blagojevich,* 219

F.R.D. 430, 436 (N.D. Ill. 2004) (denying motion to compel because the document

request did not place Defendants upon "reasonable notice of what is called for and what

is not," rendering Defendants incapable of identifying responsive documents); *William A.*

*Merier Glass Co., Inc. v. Anchor Hocking Glass Corp.,* 11 F.R.D. 487 (W.D. Pa. 1951).

### 2.    Plaintiffs have asked this Court to compel production of information they admit is irrelevant.

Plaintiffs' Motion calls for production of documents that the Plaintiffs themselves

recognize are not "necessary." Occidental's RFA Responses 1-2; Carville's RFA

---

[9] Plaintiffs' original RFPs asked for *"[a]ll documents that relate to any analyses or studies* since February 27, 1998" on the following: (1) "transmission constraints or relieving transmission constraints on Entergy's system;" and (2) "the impact of transmission constraints on energy imported into the Entergy system from external resources." Plaintiffs' RFPs, RFPs 20 and 23 (emphasis added).

Responses. 1-2.  Plaintiffs have admitted that certain system transmission "studies,"

specifically System Impact Studies and Facilities Studies, that fall within the scope of

their proposed definition "do not provide information necessary to assess Entergy's

avoided cost calculation including, without limitation, information as to whether

transmission existed for 'rejected purchases' included in this calculation."  Occidental's

RFA Responses 1-2; Carville's RFA Responses. 1-2.[10]  Plaintiffs' admissions

demonstrate that the subject matter "limitation," as Plaintiffs seek to characterize it, of

"transmission constraints,"[11] is not sufficiently focused to cure the over breadth of their

requests.  Consequently, the Companies over breadth objection is legitimate and should

be upheld.

> **3.    The Companies have already agreed to produce voluminous transmission "studies" sufficient to satisfy their discovery obligations under any reasonable interpretation of that term.**

If Plaintiffs' requests for "studies" are properly considered in the context of the

Companies' operations as a transmission service provider and the voluminous

information that the Companies have already agreed to produce, the Court should

conclude that Plaintiffs' requests are vague, ambiguous, overly broad and unduly

burdensome.

The transmission component of the Entergy System is a complicated network of

wires, substations, transformers, and other equipment spread over a large geographic area

and involving different voltage levels.  What is forecasted to happen in the future and

what is happening in real-time on this power grid depends upon, among other things,

---

[10] These admissions are binding and conclusive.  Fed. R. Civ. P. 36(b).
[11] Pls. Memo. at 11.  Plaintiffs' reference to "transmission upgrades" as a subject matter limitation is inaccurate.  Neither Plaintiffs' RFP 20 nor 23 mentions transmission upgrades.  Transmission upgrades are referenced in RFP 22, which is not at issue in this Motion to Compel.

what power generating units (including third party units) are running at what levels, as well as any purchases and sales by the System and third parties that are being made at the same time. The Companies engage in System planning so that the transactions that are expected to take place can be consummated in a reliable fashion. Bartlett Decl. at ¶ 6 (attached as Exhibit D hereto). Day-to-day events also arise that affect what happens on the power grid.

Faced with Plaintiffs' extraordinarily broad and ambiguous requests, the Companies made a good faith effort to narrow their scope.[12] The Companies have identified and agreed to produce ten categories[13] of what George Bartlett, Director of Transmission Operations at Entergy Services, Inc., considers to be "studies" related to transmission constraints, meaning formal reports that the Companies use to plan the System that analyze and/or offer recommendations related to transmission constraints (collectively "Formal Studies"). *Id.* at ¶ 8-9. The Companies' interpretation of "studies" does not include routine, real-time, or short-term analyses of transmission operations in the day-to-day operation of the system or provision of customer service that do not generate a formal report (collectively referred to as "Real Time Analyses," described in more detail in Section II(B)(4) <u>infra</u>). Bartlett Decl. at ¶ 12.

As Mr. Bartlett's Declaration confirms, the Companies have satisfied their discovery obligations by agreeing to produce all of the Formal Studies within the Companies' possession, custody or control. Bartlett Decl. at ¶ 10; Fed. R. Civ. P. 34(a)(1). To date, several hundreds of Formal Studies (more than 500) have been

---

[12] As the Companies understand, RFP 23 seeks a subset of the information sought in RFP 20.

[13] As detailed in Exhibit 5 of Plaintiffs' Memorandum, the Companies originally identified 8 types of transmission studies. Mr. Bartlett also describes System Impact Studies (which are available to the public) and SERC Studies (which are not performed by Entergy) in his declaration. Bartlett Decl. at ¶¶ 8-9.

identified for production.[14]  Production of the Formal Studies is imminent in accordance

with the parties' agreed-upon production schedule. Thus, Plaintiffs have not reviewed

these materials prior to filing this Motion to Compel.

4.    **The Court should uphold the Companies' interpretation of "studies" as not including Real Time Analyses.**

The Court should not require the Companies to produce Real Time Analyses in

response to Plaintiffs' requests for "studies" because doing so would not only compound

the vagueness and over breadth associated with Plaintiffs' requests, but would also

dramatically increase the burden for providing a response.  Any effort to send power

across the grid requires an "analysis" of whether there is sufficient transmission capacity.

Many of these analyses are final, in the sense that they are not subject to revision.

Bartlett Decl. at ¶ 12.  Real Time Analyses that address transmission constraints are

neither segregated nor readily distinguishable from those that do not, and are potentially

located in the files of dozens of custodians.  *Id.*at ¶¶ 12-13.  Thus, the burden of searching

for responsive Real Time Analyses would be extraordinary.

Most importantly, the burden associated with any search of Real Time Analyses is

not justified in light of the peripheral relevance, if any, of such documents.  *See, e.g.,*

*Muhammed,* 1995 WL 71394 at *2**.**  Again, Real Time Analyses would not directly show

whether an Avoided Cost Rejected Purchase was deliverable. [15]

---

[14] Some System Impact Studies posted on the OASIS web site maintained by the Companies will be
identified by a link to the relevant web site.

[15] The only routine, real-time, or short-term analysis that is used for deliverability purposes is the
Companies' Available Flowgate Capability ("AFC") process.  The AFC process does not produce a formal
report regarding transmission constraints.  Instead, it calculates numerical values that measure the
remaining amount of electric power that can flow across a Flowgate (a point on the transmission system
through which power flows are calculated) after existing transmission commitments are taken into account.

**5.    The burden associated with Plaintiffs' interpretation of "studies" is particularly unjustified in light of the voluminous transmission-related information that the Companies have agreed to produce in response to other requests.**

Furthermore, the burden associated with responding to Plaintiffs' requests for "studies," as Plaintiffs interpret them, is not justified in light of the voluminous transmission-related information more directly related to deliverability and transmission constraints that the Companies have agreed to produce in response to other requests.  In addition to the 10 categories of Formal Studies discussed above, the Companies have already produced or agreed to produce the following information:

- Short-term Transmission Service Requests that were refused or counter-offered due to lack of AFC, including the reasons why such requests were refused or counter-offered (RFP 37).

- Short-term Transmission Service Requests submitted by Entergy that were refused or counter-offered due to lack of AFC (RFP 38).

- For each Rejected Purchase, information on Available Transfer Capability ("ATC"), meaning the amount of transmission capacity available across all interfaces within and into the Entergy System.  The Plaintiffs can use this information to determine whether the total volume of Avoided Cost Rejected Purchases in a given hour exceeded ATC.

- Audit data recently provided to the LPSC that includes: (a) Last Posted AFC values for 2007.  Provides all of the hourly available flowgate capacity for all hours of every day in 2007.  The spreadsheet contains information on Seller, Offer Start Time, Offer End Time, Start Time, End Time, Capacity, Service Increment (hourly), Transmission Service Class (firm or non-firm), Transmission Service period, Transmission Service window (fixed); and (b) Response Factor Matrices for 2007.  The Response Factor Matrices quantify the incremental increase of power flows across specific transmission lines for specific transfers of energy from generation to load.

- The success rate for deliveries of bulk power purchased by the Companies on a next day basis (RFP 24).

---

As noted below, the Companies have agreed to produce these values and other data related to the AFC process to Plaintiffs according to the production schedule agreed upon by the parties.

- The actual transmission upgrades for the Entergy system since 2003 (RFP 22).

This information that the Companies have agreed to produce will provide data related to transmission capacity and constraints for multiple tens of thousands of transactions or proposed transactions. Production of the remaining documents is imminent under the production schedule agreed upon by the parties. Plaintiffs filing this Motion before reviewing any of the Formal Studies or this other, voluminous information related to transmission about to be produced renders this dispute grossly premature.

Compiling all of the information related to transmission constraints that the Companies have agreed to produce in response to RFPs 20, 23 and others has required the assistance of over a dozen non-legal personnel who have already expended several hundred hours to date. Bartlett Decl. at ¶ 15. Under these circumstances, where the burden of producing Real Time Analyses far outweighs any likely benefit, Plaintiffs' Motion should be denied. *See* Fed. R. Civ. P. 26(c); *Nguyen v. Excel Corp.,* 197 F.3d 200, 209 (5th Cir. 1999); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 28 F.3d 1388, 1394 (5th Cir. 1994)(citation omitted).

### 6.    The Companies are under no obligation to search public web sites maintained by third parties.

Completely ignoring the proper scope of Rule 34, Plaintiffs take the outrageous position that the Companies are obligated to search "non-Entergy controlled public websites . . . [including] NERC's website[][16] in order to produce or locate responsive documents." Pls. Memo. at 19. Plaintiffs admit that they are aware of documents on

---

[16] North American Electric Reliability Corporation ("NERC"), is a third party that develops and enforces reliability standards; monitors the bulk power system; assesses future adequacy; audits owners, operators, and users for preparedness; and educates and trains industry personnel.

public websites "that appear on their face to be relevant, [but] *plaintiffs are not in a position to determine whether those documents are truly responsive to their document requests." Id.*. In other words, Plaintiffs admit that they do not know what they are looking for.

A Motion to Compel simply is not an appropriate vehicle for the Plaintiffs to enlist a defendant or a court's assistance to determine whether third-party documents are responsive. The unpublished *Raytheon* case cited by Plaintiffs provides no support for expanding the Companies' search obligations beyond what is required by Rule 34. In *Raytheon*, the court required the US government to provide an index to its electronic databases, or to provide a knowledgeable member of its staff to assist in the review of its databases. *Raytheon Aircraft Corp. v. U.S.,* 2006 WL 2570545, *9 (D. Kan 2006). *Raytheon* provides no support whatsoever for imposing an obligation on a defendant to search for and produce documents that are not in its "possession, custody or control," a result that would conflict with the express language of Rule 34. Fed. R.. Civ. P. 34(a)(1). As Plaintiffs' Memorandum demonstrates, the Companies' objection to producing publicly available documents that are equally accessible to Plaintiffs is legitimate and should not be overruled.[17] As a result, Plaintiffs' suggestion that the Companies are obligated to search third party web sites for documents responsive to their indeterminate requests should be rejected.

**7.    Plaintiffs' speculation about the existence of certain studies cannot support a Motion to Compel.**

---

[17] Moreover, the Plaintiffs have provided no basis for overruling this objection, asserted in response to numerous requests, on a global basis. As this objection specifically relates to transmission studies, the Companies have not withheld any Formal Studies available on their OASIS web site from production on the grounds that such information is equally accessible to Plaintiffs.

In addition to the objections related to "studies" described in Section I.B.1, supra, the Companies have an additional defense to RFP 21, which is that no responsive documents exist for this vague and ambiguous request, as the Companies understand it. Bartlett Decl. at ¶ 11. RFP 21 asks for transmission studies "regarding Entergy's release of transmission capacity that had been reserved for native load." The Companies do not reserve transmission service under FERC's Open Access Transmission Tariff for native load.[18] (Native load is the power usage of the customers that the Companies are legally obligated to serve).[19] However, the Companies do designate network resources in the same manner as other customers and it is through this mechanism that transmission capacity is reserved for native load.[20]

Given this regulatory framework, the Companies attempted to interpret the request in a way that made sense by interpreting the phrase "release of transmission capacity" to mean "the procedures whereby a network resource is delisted or expires by its own terms." Defs.' Suppl. Resps. at 18. The Companies also noted that they had not performed any such studies or analyses of those procedures. Plaintiffs claimed that the Companies did not properly interpret RFP 21 and provided a "clarification" that was in fact a wholly different request, and still failed to generate any responsive documents. Email from Jennifer Quinn-Barabanov to Michael Stenglein (Apr. 9. 2008) (attached as

---

[18] *See Preventing Undue Discrimination and Preference in Transmission Service*, Order No. 888-A, 62 Fed. Reg. 12,274 (1997), *FERC Statutes and Regulations, Regulations Preambles* July 1996-December 2000 ¶31,048, at 30,127 (1997), order on reh'g, *Order No. 888-B*, 62 Fed. Reg. 64,688, 81 FERC ¶ 61,248,  (1997), order on reh'g, Order No. 888-C , 82 FERC ¶61,046  (1998), aff'd in part sub nom. *Transmission Access Study Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), cert. granted, 69 U.S.L.W. 3574 (Nos. 00-568 (in part) and 00-809) and cert. denied, id. (No. 00-800) (U.S. February 26, 2001).

[19] *See* Order No. 888-A, at 30,217 fn. 129.

[20] *See* Order No. 888-A, at 30,217.

Exhibit E hereto).  Plaintiffs' attempt to modify this request yet a third time by way of this Motion only further underscores the ambiguity of RFP 21 as drafted and the point that Plaintiffs do not know what they are asking for.

A party cannot compel the production of documents when it is not even clear that those documents exist.  *See, e.g., Hunter,* 21 B.R. at 192; *Mullen v. Mullen,* 14 F.R.D. 142 (D. Alaska 1953); *William A. Merier Glass Co., Inc. v. Anchor Hocking Glass Corp.,* 11 F.R.D. 487 (W.D. Pa. 1951) ("where the documents and things sought to be produced have not even been shown to exist, or are not subject to a reasonable inference that they exist, the Court cannot compel their production.").  Moreover, a motion to compel is not an appropriate vehicle for modifying a request for production that has failed to yield any responsive documents.

The public comments that Entergy made to the Federal Energy Regulatory Commission ("FERC") do not demonstrate that the Companies have studied "the release of transmission capacity that had been reserved to serve native load."  Plaintiffs' RFP 21.  Plaintiffs cite the Companies' comments that discuss "redirecting" network service and the "undesignation of network resources."  Pls. Memo. at 12-13.  Plaintiffs apparently misunderstand the nature of the comments they reference, which do not involve a different method for releasing transmission capacity used to serve native load.  The term "delist" is often used interchangeably with "undesignation" and, thus, Entergy's interpretation of the phrase "release of transmission capacity" to mean "the procedures whereby a network resource is delisted or expires by its own terms" includes instances where a network resource is "undesignated."  Moreover, Entergy's comments regarding "redirecting" network service simply refer to a methodology for delisting (or

undesignating) one network resource for another network resource. Comments of Entergy Services, Inc., FERC Docket No. RM05-25-000 (August 7, 2006). Thus, those comments do not cast any doubt on the Companies' representations that no responsive documents exist for RFP 21 as drafted. The Court should deny this Motion to Compel production of documents responsive to RFP 21 because it is based solely upon Plaintiffs' misunderstanding of a different issue.

To the extent that Plaintiffs are now reinterpreting RFP 21 to request analyses related to the delisting or undesignation of network resources, such analyses are included in System Impact Studies which the Companies have agreed to provide in response to RFPs 20 and 23. Thus, if this is the nature of Plaintiffs' vague and ambiguous request, there should be no dispute. If the Plaintiffs are seeking something other that System Impact Studies, they need to issue a new request identifying clearly the documents sought. The Companies have made a good faith effort to understand this request, and it is incumbent on Plaintiffs to explain the scope of the request or issue a new request because, to the best of the Companies' knowledge, they do not possess responsive documents.

**C.    The Companies have already produced all properly discoverable information stored in TRADES; Plaintiffs are not entitled to more.**

In RFP 43, Plaintiffs request production of the TRADES database, which stores information related to all unconsummated Rejected Purchases, as well as off-system sales and consummated purchases of energy by the Companies. Plaintiffs' RFP 43 overlaps substantially with Plaintiffs' other document requests, including those related to unconsummated offers (RFPs 15 and 16), off-system sales (RFP 32) and the inputs into the avoided cost calculation (RFPs 7 and 9). The Companies have already produced or

agreed to produce responsive data related to those requests. Under these circumstances, Plaintiffs are not entitled to any additional information from the TRADES database. *Muhammed*, 47 F.3d 427, 1995 WL 71394, *2 (a "district court may limit discovery if the information sought is duplicative, unreasonably cumulative"); Fed. R. Civ. P. 26(b)(2), 34(b)(2)(E)(iii).

> **1.    The Companies have already produced all of the information related to Rejected Purchases and have agreed to produce off-system sales sought by Plaintiffs from TRADES, rendering this aspect of the Motion to Compel moot.**

In moving to Compel production of information related to Rejected Purchases contained in the Companies' TRADES database, Plaintiffs reveal their own lack of diligence; the Companies have already produced all of the information about Rejected Purchases Plaintiffs seek.

The Companies have already produced to Plaintiffs the TRADES data relating to Rejected Purchases, including, as a subset, the Avoided Cost Rejected Purchases. Reed Decl. at ¶¶ 15-17. In other words, the Companies have produced responsive information related to all unconsummated offers, whether they were considered in the avoided cost calculation or not. *Id.* For each Rejected Purchase, the Companies produced information including the counterparty name, whether it was internal or external to the Companies' System (where known), time, date, reason for rejection, start time, end time, megawatts, price, alternate price, forecasted put and available transfer capability. *Id.* at ¶ 18. When offers to purchase energy were rejected, the Companies also included the criteria for determining whether a Rejected Purchase should properly be characterized as an Avoided Cost Rejected Purchase. *Id.*

Even a cursory examination of this information, which has been in Plaintiffs'
possession since May 15, 2008, should have revealed that the Plaintiffs already have the
Rejected Purchases data that they claim to need in order to determine whether any
Avoided Cost Rejected Purchases did not meet the applicable criteria and whether the
Companies "double counted" any "two offers to sell the same energy at the same time as
two separate Rejected Purchases."  See Pls. Memo. at 16.  In addition, the Companies
have produced all inputs into the avoided cost calculation for the each of the 17,520 hours
from January 1, 2006 through December 31, 2007 and have agreed to produce the inputs
for each of the 8,760 hours of 2004.  With all of that input data, as well as all of the
Rejected Purchase data, the Plaintiffs can make comparisons to determine whether, in
their view, any Avoided Cost Rejected Purchases were considered in the avoided cost
calculation that should not have been considered.

Plaintiffs' suggestion that the data concerning Rejected Purchases produced to
them is not the same data stored in TRADES is flatly incorrect.  As the Companies have
previously explained, the "rejected purchases database" is a short-handed way of
referring to an export of the Rejected Purchases data from TRADES into an Excel
spreadsheet.  Substantively, the data in TRADES and the "rejected purchases database" is
the same.  Reed Decl. at ¶ 15-17; *see also* Pls. Memo. at 15.  Therefore, there is no issue
as to "which transactions Entergy included in its 'Rejected Purchases database' as
opposed to those it did not;" the data are the same.  *Id.*

In addition to data about unconsummated Rejected Purchases, TRADES houses
data related to all of the Companies' consummated sales and purchases of power.  The
Companies are about to produce an Excel spreadsheet containing the sales data contained

in TRADES responsive to Plaintiffs' RFP 32, which seeks information about off-system sales. *Id.* at ¶ 10  Therefore, there is no basis for the Plaintiffs to move to compel production of this portion of TRADES.

Finally, Defendants have agreed to produce all purchase data relevant to the avoided cost calculation.  The majority of the purchase data sought by Plaintiffs are irrelevant.  The only actual power purchases included in the avoided cost calculation are single hour non-firm purchases.  Reed Decl. at ¶ 11.  The data relating to those purchases included in the avoided cost calculation have been produced as a part of the diagnostic reports of avoided cost inputs that the Companies have produced in response to RFP 9 or have agreed to produce in response to RFP 7.  *Id.* at ¶ 12.  The remaining purchase data contained in TRADES is not used in the avoided cost calculation.  *Id.* at ¶ 13.

### 2.    Defendants have produced the responsive data in TRADES in the format requested by Plaintiffs.

In Request 43, Plaintiffs request that Plaintiffs provide the data contained in TRADES in a "format in which Plaintiffs can manipulate and search the data" and in "native format, including but not limited to data that currently exists in Comma-Separated Variable or 'CSV' format."  Pl. Memo. at 16.  For the first time in their Motion to Compel, Plaintiffs assert they are "entitled to know not only the data, but also how and where the data is stored, and to review the data in its original format."  Pls. Memo. at 16. Plaintiffs are incorrect; the Companies have already fulfilled their obligation under Rule 34 by producing or agreeing to produce the only potentially relevant information contained in TRADES in CSV format.

Defendants have complied with Plaintiffs' request and have produced the relevant data from TRADES in CSV format which is manipulable and searchable.  TRADES is an

Oracle® database containing raw data that utilizes standard query tools to extract that data. Reed Decl. at ¶ 8. These programs produce data in response to a query in tabular form which is then converted to CSV format. *Id.* Defendants have run the proper queries to extract the responsive information requested by Plaintiffs in Requests 15, 16 and 32. Defendants have produced or will produce the results of these queries in the CSV format requested by Plaintiff that is manipulable and searchable.

Because Plaintiffs have or will receive the relevant data from TRADES, they are not now entitled to seek unfettered access to the database. First, Rule 34 expressly recognizes that Defendants are not required to produce information in more than one format. Fed. R. Civ. P. 34(b)(2)(E)(iii); *D'Onofrio v. SFX Sports Group, Inc.*, 247 F.R.D. 43, 47 (D.D.C. 2008). Defendants have produced or have agreed to produce the relevant information in TRADES in Plaintiffs' requested format. Moreover, Plaintiffs are not entitled to unfettered access to Defendants' databases absent some showing of some improper conduct on behalf of Defendants. *In re Ford Motor Co.,* 345 F.3d 1315, 1317 (11th Cir. 2003) (holding that Rule 34 "does not grant unrestricted, direct access to a respondent's database compilations. Instead, Rule 34(a) allows a requesting party to inspect and to copy the production – whether it be a document, disk or other device – resulting from the respondent's translation of the data into a reasonably usable form.").

### D.    Plaintiffs' requests for the Companies' generation models should be rejected because they seek irrelevant information.

Plaintiffs' requests for the Companies' generation models fall far outside the scope of legitimate discovery in this case disputing treatment of: (a) rejected purchases; (b) off-system sales; and (c) emergency sales, under the avoided cost methodology

approved by the LPSC.  As a result, Plaintiffs' illegitimate request for this highly confidential and irrelevant information should be denied.

The Companies utilize a computer model known as the Generation Management System ("GMS") to commit and dispatch their generation fleet in real time.[21]  GMS determines which generating units operate at what level at a given moment in time in order to meet customer demands as efficiently as possible within the parameters of the Entergy System and consistent with reliability requirements.  Reed Decl. at ¶ 20.  GMS is not used in calculating avoided cost.  *Id.* at ¶ 21.

According to Plaintiffs, they need access to GMS in order to test the validity of the Companies' treatment of certain costs associated with gas-fired generators as unavoidable and therefore, ineligible for consideration in calculating avoided cost.  Pls. Memo. at 13.  Plaintiffs claim that the Companies mischaracterize the costs associated with running these gas generators as "unavoidable," and thereby underestimate avoided cost.  *Id.*  For example, Plaintiffs argue that "Entergy claims that at certain times it is unable to decrease loads on its inefficient, high cost generators or that it must slowly decrease the loads over time."  *Id.* at 13.

GMS cannot be used in the manner Plaintiffs suggest.  GMS does not model the performance of particular generating units to determine how much or how quickly a particular unit can be ramped down.  Reed Decl. at ¶ 24.  Those kinds of engineering limits are set through performance testing.  *Id.*  GMS accepts these engineering limits as

---

[21] Since Plaintiffs' Motion does not address prior versions of GMS that have been in use since February 27, 1998, the Companies understand Plaintiffs as only seeking the current version of GMS.  To the extent that this is not the case, production of prior versions would be unduly burdensome.  *See* Reed Decl. ¶ 19.  As originally drafted, Plaintiffs' RFP 40 requested transmission models used to commit and dispatch the System in real time.  Since the Companies objected to the production of any responsive transmission models and  Plaintiffs' Motion to Compel does not address transmission models, the Companies understand Plaintiffs as having abandoned this aspect of RFP 40.

given inputs in performing its modeling; it does not generate or analyze those limits in any way.  *Id.*  Therefore, Plaintiffs' purported justification for discovery of GMS is fundamentally flawed.  Accordingly, Plaintiffs' Motion to Compel production of GMS should be denied.

Further, the example that Plaintiffs' cite as the reason for needing the GMS reflects a fundamental misunderstanding of the avoided cost calculation.  The avoided cost calculation does not consider how quickly a unit might be able to ramp down.  Instead, the avoided cost calculation merely determines what level the unit would have been loaded at had the QF Put not been present on the System.  Thus, even putting aside the fact that the GMS model has no use in the avoided cost calculation, Plaintiffs have not even articulated a coherent rationale for its production.

As a result, the Court need not address the question of whether the validity of the engineering limits of certain types of generators should properly be considered in the context of what Plaintiffs have characterized as lawsuit challenging whether avoided cost *methodology* adopted by the LPSC in the Final Order properly implements PURPA.  The avoided cost calculation is unrelated to whether the Entergy System properly conducts the security constrained economic dispatch of its generating units, which is the function supported in part by the GMS.  Not surprisingly, the Companies' position is that such an inquiry falls outside the scope of a proper implementation claim under Section 210(h) of PURPA. 16 U.S.C. 824a-3(h).

**E.**     **Plaintiffs' blanket objections to the Defendants' General Objections should be denied.**

Plaintiffs raise objections to certain of Defendants' General Objections set forth in Defendants' discovery responses.  The Court should reject Plaintiffs efforts to obtain a

ruling on the validity of these objections in the abstract, rather than in the context of specific requests.

Regarding the Companies' General Objection No. 3 concerning the post-February 27, 1998 time period covered by most of Plaintiffs' RFPs, Plaintiffs have conceded the legitimacy of this objection by agreeing to limit (subject to a reservation of rights) the time parameters for several of their requests. Since those agreements were made subject to a reservation of Plaintiffs' rights to seek the information for the full time period in the future, it is not appropriate for the court to rule on this objection globally and in the abstract.

Similarly, a decision regarding General Objection 5 is premature at this time. Defendants currently are not aware of any documents that have been withheld from production on the basis of any rule, agreement or duty of confidentiality that would preclude production in this case. Once document collection, review and production have concluded, Defendants will inform Plaintiffs if any otherwise responsive documents have been withheld under General Objection 5. If documents have been withheld under General Objection 5, that would be the appropriate time for Plaintiffs to contest this objection.

With respect to General Objection 11, the Companies have rightfully asserted that the term "Avoided Cost" should be defined according to the LPSC General Order and the LPSC Order. The LPSC General Order and its definition of Avoided Cost has not been called into question in this case. In fact, the LPSC's definition of Avoided Cost in the General Order and the LPSC Order are the central issue in this case. Accordingly, Avoided Cost should be defined according the LPSC General Order and the LPSC Order.

26

**III.    CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion to Compel should be denied.


June 11, 2008                    Respectfully submitted,


                    _____s/ Karen H. Freese_____
                    Karen H. Freese, Esq., Bar No. 19616
                    Timothy S. Cragin, Esq., Bar No. 22313
                    639 Loyola Avenue
                    Mail Unit L-ENT-26E
                    New Orleans, LA 70113
                    Telephone: (504) 576-4377
                    Facsimile: (504) 576-5579


                    _____s/ Jennifer Quinn-Barabanov_____
                    Douglas G. Green, Esq., admitted *pro hac vice*
                    Jennifer Quinn-Barabanov, Esq., admitted *pro hac vice*
                    STEPTOE & JOHNSON LLP
                    1330 Connecticut Ave., N.W.
                    Washington, D.C. 20036
                    Telephone: (202) 429-3000
                    Facsimile: (202) 429-3902

                    *Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 11, 2008, a copy of the foregoing Memorandum in Opposition to Plaintiffs' Motion to Compel Discovery Responses from Entergy was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent, by operation of the Court's electronic filing system to those parties listed on the Court's docket report for this proceedings.

_____/s/ Jennifer Quinn-Barabanov_____
Jennifer Quinn-Barabanov, admitted *pro hac vice*
Email: jquinnba@steptoe.com
STEPTOE & JOHNSON LLP
1330 Connecticut Ave., N.W.
Washington, D.C. 20036
Telephone: (202) 429-3000
Facsimile: (202) 429-3902

*Attorney for Defendants*